## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

In re:

    Hermitage Inn Real Estate Holding
Company LLC,

        Putative Debtor

Chapter  7

Involuntary Case No.  19-10214    (CAB)

## MOTION OF PETITIONING CREDITORS FOR ORDER TRANSFERRING VENUE OF PENDING CHAPTER 11 CASES FROM THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF CONNECTICUT TO THE DISTRICT OF VERMONT

The petitioning creditors[1] in the above-captioned involuntary case commenced against

Hermitage Inn Real Estate Holding Company, LLC (the "Petitioning Creditors"), by their

attorneys, Glinka & Schwidde, and pursuant to 28 U.S.C. §§ 1408 and 1412 and Rule 1014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") move for an order,

substantially in the form submitted with this motion, to transfer the chapter 11 cases of the

Hermitage Inn Real Estate Holding Company, LLC ("HIREHCO") and the Hermitage Club,

LLC (the "Hermitage Club" and together with HIREHCO the "Debtors"), that were filed on May

28, 2019, in the United States Bankruptcy Court for the District of Connecticut (the "Connecticut

Bankruptcy Court"), Case Nos. 19-20904 (JJT) and 19-20903 (JJT) (the "Connecticut Cases"),

to the United States Bankruptcy Court for the District of Vermont where the above-captioned

involuntary bankruptcy case was filed on May 22, 2019 ("the Vermont Chapter 7 Case" and

together with the Connecticut Cases the "Cases") in the interest of justice and the convenience of

the parties (the "Motion").  In support of the Motion, the Petitioning Creditors submit the

---

[1] The petitioning creditors are Bobbi Resek, Dan Solaz and Lakeland Bank, with aggregate liquidated and undisputed claims in the amount of $699,147.64, of which no less than $16,750.00 is deemed unsecured.

Declaration of Timothy Treanor ("Treanor Decl.") filed in this case and respectfully states as follows:

**PRELIMINARY STATEMENT**

The Petitioning Creditors hold secured and general unsecured claims against HIREHCO that are both liquidated and undisputed.  HIRECHO is believed to be a holding and/or operating company that owns the equity in a number of wholly owned subsidiaries, including Hermitage Club, LLC.  On May 23, 2019, the Petitioning Creditors commenced the Vermont Chapter 7 Case by filing an involuntary bankruptcy petition against HIREHCO under chapter 7 of the Bankruptcy Code.   On May 28, 2019, the Debtors commenced the Connecticut Cases under chapter 11 of the Bankruptcy Code.

The Debtors own and formerly operated an alpine private ski area with lifts and trails, together with a private club resort community that includes a large luxury base lodge, mid-mountain lodge, the Hermitage Golf Course and several inns, among other property, including properties in various stages of construction (collectively the "Facilities").  The Facilities span some 1,000 acres located in the Towns of Wilmington and Dover, Vermont, including an area of the alpine private ski area that is leased by the Debtors from the Town of Wilmington, Vermont.

As will be discussed below and in subsequent filings in the Vermont Chapter 7 case, critical to the success of the Cases is the appointment of a chapter 7 trustee and the preparation and sale of all of the Debtors' property through a sale process under section 363 of Title 11 of the United States Code (the "Bankruptcy Code") under the watchful eye of the this Court. Implicit in this process is the total displacement of James Barnes, the Debtors' founder and Chief Executive Officer, from active involvement in the administration of the Cases. Stated simply, the Facilities are deteriorating and time is running out for the Facilities to be sold in

2

time for opening for the 2019/2020 ski season, which is a critical step forward in the economic

revitalization of Wilmington, Dover, and the surrounding communities.  This Court is in the

best position to evaluation and approve an expedited process so that the Facilities can be put

back to use, jobs can return to Southern Vermont, and important tax revenues can be generated

for local governments and the State.

The Debtors face significant challenges with Barnes at the helm of the Connecticut

Cases.  Beyond loss of confidence of a majority of the Debtors' constituents, the significant

challenges include serious mismanagement of the Facilities leading to the appointment of a

state court foreclosure receiver (the "Receiver") in June 2018, and resulting in ongoing growth

of secured indebtedness believed to eclipse the value of the assets; a multi-million dollar fraud

judgment and claims against Barnes arising from his mismanagement of the Debtors; millions

of dollars in unpaid state and local taxes; a federal investigation into whether the Debtors,

under Barnes' leadership, were engaged in an unlawful scheme related to real estate referral

fees; and a complete halt to real estate development activities at the Facilities.  In fact, the

Receiver (and not Barnes) has been in control of the Facilities since June 2018, and in

February 2019, the Receiver actually served Barnes with a Notice Against Trespass, which

prevents him from entering the Facilities without the Receiver's permission and supervision.

Presently pending before this Court is the Emergency Motion of Berkshire Bank to

maintain the state court receiver in place, or appoint an interim ch. 7 trustee (Doc. #7).

In these circumstances, liquidation of the Debtors' assets is the most likely and realistic

outcome of the Cases.  In turn, the prospect of a liquidation is just one of the factors that

supports the transfer of the Connecticut Cases to the Vermont Bankruptcy Court in the interest

of justice and for the convenience of the parties.  Indeed, transfer of the Connecticut Cases to

the Vermont Bankruptcy Court is clearly warranted here because: (1) The Facilities are located

3

in Vermont; (2) the Debtors' principal place of business and center of operations are in Vermont; (3) the vast majority of the Debtors' creditors and other parties in interest are located in Vermont; (4) a number of the Debtors' books and records are in Vermont; (5) virtually all of the witnesses who may be called upon to participate in proceedings arising in the Cases are in Vermont, and the non-party witnesses would not be subject to subpoena in Connecticut; (6) Vermont public policy favors resolving matters involving Vermont residents, Vermont real estate, the Vermont economy and environment, and (7) the Vermont Bankruptcy Court is more familiar with Vermont state law.

In contrast, it is likely Barnes chose to file the Connecticut Cases in Connecticut solely for his own personal convenience and in order to avoid the active participation of the Debtors' many Vermont-based constituents. Connecticut has no significant connection to the Cases, other than the fact that Barnes may reside here and incorporated the Debtors here. Such limited connections to Connecticut cannot overcome the weight of evidence showing that it would be far more economical, efficient and convenient to adjudicate these cases in Vermont.

In short, and for the reasons explained below, the Connecticut Cases should be transferred to the Vermont Bankruptcy Court and consolidated with the Vermont Case in the interest of justice and for the convenience of all interested parties.

## <u>JURISDICTION AND VENUE</u>

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. For avoidance of doubt, venue would also be proper in the District of Connecticut inasmuch as the Debtors are organized in Connecticut.

2.      The statutory predicates for the relief sought in this Motion are 28 U.S.C. §§ 1408 and 1412 and Rule 1014 of the Bankruptcy Rules.

4

3.      Rule 1014(b) of the Bankruptcy Rules provides that the Vermont Bankruptcy

Court should decide the Motion because the Vermont Chapter 7 Case was filed prior to the

Connecticut Cases.

## **FACTUAL BACKGROUND**

**A.      Summary of Relevant Facts Leading up to the Debtors' Bankruptcy
         Petition**

4.      The Debtors own and formerly operated the Facilities in the Towns of

Wilmington and Dover, Vermont, including an area of the alpine private ski area that is leased

by the Debtors from the Town of Wilmington.   *See* Treanor Decl., ¶ 4.

5.       The Debtors sold club memberships to individuals (the "Members") granting

them rights to various levels of use of the Facilities, and were also involved in the

development of residential real estate, including single family homes and townhomes sold or

rented to the Members.  *Id.*, ¶ 5.

6.      Some of the Debtors' books and records are located in Vermont, and the

Debtors' primary business operations are and have historically been located in Vermont.  *Id*., ¶

9.

7.      Members were induced to purchase club memberships based on Barnes'

unfulfilled promises.  Unfortunately, however, jobs were lost, business were closed, and the

Members right to use the Facilities were extinguished when on March 20, 2018, the Vermont

Department of Taxes ordered the summary shutdown of the Facilities following the Debtors'

failure to pay more than $1.5 million in unpaid rooms, sales and meals taxes (the "Closure

Order").  *Id.,* ¶ 10.  These taxes remain unpaid and with interest and fees likely exceed $2

million.  *Id*.

8.      For more than a year now, Barnes has promised to the Members and beyond that he would lead a corporate restructuring of the Debtors.  To date, he has failed to make good on this promise.  *Id.,* ¶ 11.  Instead, he has filed the Connecticut Cases solely in response to the filing of the Petitioners' involuntary petition, without even filing in Connecticut any statements of financial affairs or schedules of assets and liabilities.

9.      The Debtors have had little or no business activity for more than a year, as the state court Receiver (not Barnes) managed a skeleton crew of Vermont-based personnel to prevent the wasting of the Debtors' assets.  Barnes' C-Suite has also been a revolving door.[2] Robert Rubin, who was listed as the interim president in court documents filed in May 2018, was reportedly relieved of duties in the Summer 2018, and Harper Sibley was reportedly named the new president in a media report from August 2018.  The Debtors' chief financial officer was also improperly terminated and, in fact, obtained multiple judgments against one or more of the Debtors and Barnes. *Id.,* ¶ 9.

10.     At around the same time as the State of Vermont's Closure Order, the Debtors' largest secured creditor, Berkshire Bank (the "Bank"), filed a foreclosure and replevin action in the State of Vermont Superior Court ("Vermont State Court") against the Debtors, an affiliate of the Debtors and Mr. Barnes  (the "Vermont Action").  *Id.,* ¶ 14.

---

[2] Apart from Barnes, court filings and news reports have identified two different presidents of the Debtors in the last 14 months.  The Debtors identified Robert M. Rubin as an interim president in documents filed in the Vermont Action (as hereinafter defined) in May 2018, and news reports from August 2018 identify Harper Sibley as the Debtors' President. *See* Receivership Objection (attached hereto as Exhibit C); *see also Sibley Named Hermitage Club President*, The Deerfield Valley News (August 2, 2018), https://www.dvalnews.com/news/sibley-named-hermitage-club-president) (attached hereto as Exhibit D). On December 5, 2017, the Debtors terminated Daniel Solaz, its Chief Financial Officer (the "CFO").  On our July 28, 2018, the CFO obtained an arbitration award against the Debtors and Barnes for more than $300,000 based on allegations that he was dismissed without cause and that the CFO was entitled to contractual damages.  *See* Application for Confirmation of Arbitration Award (attached hereto as Exhibit E).  Mr. Solaz is one of the petitioning creditors.

11.      The Bank also named approximately 35 unpaid junior lienholders as defendants in the Vermont Action.  Many of these junior lien holders are small, Vermont-based "mom and pop" contractors that performed critical work at the Facilities and are owed millions and millions of dollars by the Debtors and Mr. Barnes.  *Id.,* ¶ 15.

12.      The closure of the Facilities has had a large, negative economic impact on the small communities of Wilmington and Dover, Vermont, resulting in the loss of approximately 100 jobs, substantial tax revenue, and tourism business.[3]  *Id.,* ¶ 16.

13.      In May 2018, the Vermont State Court appointed Alan Tantleff of FTI Consulting as the Receiver  to oversee the Facilities over the Debtors' objections.  The Vermont Court made extensive findings of fact pertaining to the Facilities and the Debtors' wholesale inability to pay for basic expenses to protect the Facilities, such as insurance and property taxes.  *See* Vermont State Court's Receivership Order (attached hereto as Exhibit H).[4]

14.      Since the Receiver's appointment, the Debtors' have been unable to fund even the smallest of expenses. *See* Receivership Report, dated May 9, 2019 (the "Receiver Report") (attached hereto as Exhibit I) at p. 9 (noting that Debtors could no longer pay for their portion of the healthcare costs of a skeleton crew retained to protect Facilities from waste).

15.      The Receiver Report—the fifth quarterly report since the Receiver's appointment—notes that as a result of Barnes' unlawful removal of four (4) snowmobiles from the Facilities in February 2019, as well as the Receiver's ongoing concerns that Barnes would

---

[3] *See* Chris Mays, *Fate of Hermitage Club Will Reverberate Throughout Vermont,* (Aug. 13, 2018), https://www.usnews.com/news/best-states/vermont/articles/2018-08-13/fate-of-hermitage-club-will-reverberate-throughout-vermont (attached hereto as Exhibit F); *see also* Howard Weiss-Tisman, *"It's a Mess': Deerfield Valley Worries About Economic Impact of Hermitage Closure,* Vermont Public Radio (Apr. 11, 2018), https://www.vpr.org/post/its-mess-deerfield-valley-worries-about-economic-impact-hermitage-closure#stream/0 (attached hereto as Exhibit G).
[4] The Debtors opposed the Bank's receivership motion based on what it said were prospects for a new loan from a new lender, but the Vermont Court found there to be no evidence of such a loan.  *See* Court's Receivership Order (Ex. H) at p. 4.  Mr. Barnes did not appear at the receivership hearing.  *Id.*

unlawfully remove additional property, the Receiver caused to have issued a Notice Against

Trespass authorized pursuant to 12 V.S.A § 3705(c), which prevents Barnes from entering

onto or removing personal property from the Facilities without the Receiver's permission and

oversight. *See id.*, p. 4 and Appendix a.

16.     The Receiver Report also confirms that throughout the Receiver's tenure,

Barnes has "[r]epeatedly….announced a 'restructuring' to members and the public."  *See id.*

p. 2.   Debtor's constituents are all too familiar with these announcements of restructuring in

the offing.  *See* Treanor Decl., ¶ 11.

17.     All the while, litigation against the Debtors and Barnes in Vermont and

elsewhere mounts.  Litigation involving the Debtors include a recently concluded

administrative proceeding commenced by U.S. Department of Labor's Occupational Safety

and Health Administration (OSHA), which ordered the Hermitage Club to pay a former

employee back pay, bonuses with interest, and compensatory damages following retaliatory

discharge after the employee informed Vermont state regulators that the Hermitage Club

engaged in a scheme to pay illegal real estate referral fees.  *See* OSHA Order (attached hereto

as Exhibit J).

18.     In November 2018, HIREHCO appealed a decision by the Wilmington,

Vermont Development Review Board denying a second extension for the addition of a

condominium/hotel project to the Facilities.  *See* Chris Mays, *Company Appeals Denial of

Second Permit Extension for Hotel,* Brattleboro Examiner (Nov. 19, 2018),

https://www.reformer.com/stories/company-appeals-denial-of-second-permit-extension-for-

hotel,556878 (attached hereto as Exhibit K).

19.     Moreover, a litany of Vermont-based creditors, and others, have sued the

Debtors and Barnes in Vermont under a host of legal theories arising from the epic collapse of

the Debtors, including claims of fraud.   For example, in one such case, a Vermont federal

judge ordered Barnes in June 2018 to pay more than $6 million to resolve consumer fraud

charges stemming from his conduct as head of the Debtors and the disappearance of millions

of dollars in new construction deposits.  *See* 6/18/18 Order in *RTM Capital Partners, Inc. v.*

*Barnes*, Dkt. No. 18-cv-00056 (attached hereto as <u>Exhibit L</u>).

20.      Another creditor has sued the Debtors and Barnes in Vermont federal court,

alleging fraud in connection with the sale of five residential lots for $2.6 million.  The Court in

that action recently approved service by mail and publication on Barnes because he could not

be located for personal service of legal process.  *See* Compl. and Order for Alternative Service

in *Golden v. HIREHCO et al,* Dkt. No. 19-cv-00018 (attached hereto as <u>Exhibit M</u> and <u>Exhibit

N</u>, respectively).

21.      Due to loss of all confidence in the ability of Mr. Barnes to lead a restructuring

of the Debtors, approximately 187 members have organized themselves into an *Ad Hoc*

Committee to advocate for the collective interests of the members in any efforts to restructure

the Hermitage Club, including in cases filed by the Petitioning Creditors or the Debtors under

the Bankruptcy Code. Treanor Decl., ¶ 17.

**B.    The Connecticut Bankruptcy Petitions**

22.      On May 22, 2019, the Petitioning Creditors filed their involuntary bankruptcy

petition under chapter 7 of the Bankruptcy Code.

23.      On May 28, 2019, the Debtors filed the Connecticut cases under chapter 11 of

the Bankruptcy Code.

24.      The Debtors did not file in Connecticut any Statements of Financial Affairs, or

any other required schedules of assets, liabilities or creditors, but instead filed only bare-bones

lists of the 20 largest unsecured creditors and equity holders.  The Connecticut Cases are subject to dismissal if these deficiencies are not cured promptly.

25.     As indicted in the Receiver Report, a number of business records of the Debtors are located in Vermont and under the control of the Receiver.  Treanor Decl. (Ex. B), ¶ 6.

26.     Further evidencing the Debtors' operations in Vermont, the Connecticut Secretary of State's website lists HIREHCO's mailing address in West Dover, Vermont.  *See* HIREHCO Registration Form (attached hereto as <u>Exhibit O</u>).

<u>**ARGUMENT**</u>

**I.     TRANSFERRING VENUE OF THE DEBTORS' CHAPTER 11 CASES TO THE VERMONT BANKRUPTCY COURT IS IN THE "INTERESTS OF JUSTICE" AND FAVORS THE "CONVENIENCE OF THE PARTIES" UNDER 28 U.S.C. § 1412.**

27.     This Court is vested with sole statutory authority to adjudicate the issue of transfer of the Connecticut Cases to this Court.  Rule 1014(b) of the Bankruptcy Rules, states as follows:

> If petitions commencing cases under the Code … are filed in different districts by, regarding, or against . . . the same debtor…, *the court in the district in which the first-filed petition is pending* may determine, in the interest of justice or for the convenience of the parties, the district or districts in which any of the cases should proceed.  The court may so determine on motion and after a hearing… The court may order the parties to the later-filed cases not to proceed further until it makes the determination.

Fed R. Bankr. P. 1014(b) (emphasis added).

28.     Although generally the Debtors may choose their forum in the first instance, under 28 U.S.C. § 1412 and Bankruptcy Rule 1014, a bankruptcy court shall transfer a properly filed case under title 11 to another district where it is necessary "in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  Section 1412 is worded in the disjunctive allowing a case to be transferred under either the interest of justice rationale *or* the convenience

of parties rationale.  *See In re TS Empl., Inc.*, 2015 Bankr. Lexis 2747, *9, (Bankr. S.D.N.Y.

Aug. 18, 2015); *In re Patriot Coal Corp.*, 482 B.R. 718, 739 (Bankr. S.D.N.Y. 2012); *In re*

*Dunmore Homes, Inc.*, 380 B.R. 663, 670 (Bankr. S.D.N.Y. 2008).  The decision to transfer

venue under § 1412 lies within the discretion of the court and should be made according to

"'an individualized . . . consideration of convenience and fairness'" in each particular case.

*See Patriot Coal*, 482 B.R. at 739 (quoting *Gulf States Exploration Co. v. Manville Forest*

*Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990)). The

party requesting the transfer has the burden to show it is warranted on the particular facts.  *See*

*id.*

29.      The Petitioning Creditors have clearly met that burden here.  As explained

below, both the interests of justice *and* convenience of the interested parties would best be

served by transfer to the Vermont Bankruptcy Court.

### A.      Transferring the Connecticut Cases to the Vermont Bankruptcy Court Serves the Interests of Justice Under 28 U.S.C § 1412.

30.      The "interest of justice" portion of § 1412 is a "broad and flexible standard which

must be applied on a case-by-case basis" and "contemplates a consideration of whether

transferring venue would promote the efficient administration of the bankruptcy estate, judicial

economy, timeliness, and fairness-factors."  *See Manville Forest*, 896 F.2d at 1391.  Courts

within the Second Circuit evaluating the interests of justice standard consider the following

factors:  (i) whether transfer would promote the economic and efficient administration of the

bankruptcy estate; (ii) whether the interests of judicial economy would be served by the transfer;

(iii) whether the parties would be able to receive a fair trial in each of the possible venues; (iv)

whether either forum has an interest in having the controversy decided within its borders; (v)

whether the enforceability of any judgment would be affected by the transfer; and (vi) whether

the plaintiffs original choice of forum should be disturbed. *Dunmore*, 380 B.R. at 672; *see also TS Empl.,* 2015 Bankr. Lexis 2747, *9 (citing justice factors outlined in *Dunmore* in support of venue transfer); *Patriot Coal*, 482 B.R. at 740 (same).

31.      Courts also consider the learning curve factor in deciding if transfer is in the interest of justice. *TS Empl.*, 2015 Bankr Lexis, *11 (citation omitted).  "The learning curve analysis involves consideration of the time and effort spent by the current judge and corresponding effect on the bankruptcy case in transferring venue." *Id.*  For the reasons advanced below, a Vermont venue best serves the interests of justice here.

### i.      The Economic and Efficient Administration Factor Supports Transfer to the Vermont Bankruptcy Court

32.      In considering whether to transfer venue, the efficient and economical administration of the bankruptcy case is the most important factor.  *Enron,* 274 B.R. at 343 (*citing In re Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239, 1247 (5th Cir. 1979);  *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 422 (Bankr. S.D.N.Y. 2014); *In re Pinehaven Assocs.*, 132 B.R. 982, 989 (Bankr. E.D.N.Y. 1991).  Courts evaluating this factor have looked at the nexus between the competing venues and practical issues that arise in the administration of bankruptcy estate, including (1) the whereabouts of primary assets for due diligence purposes, (2) the source of financing for the purchase or management of assets, and (3) the location of the various professionals who will be involved in the case.  *See, e.g. Dunmore,* 380 B.R. at 672.  This factor weighs strongly in favor of transfer to Vermont.

33.      The Facilities are in Wilmington and Dover, Vermont, constitute the Debtors' primary assets, and will be the main source of future operating revenue, as well as security for any potential loan transaction.  *See* Treanor Decl., ¶ 4.  Thus, the Facilities, located in Vermont, will be the locus of any diligence required for administration of assets.  Any due diligence efforts

12

would likely need to be coordinated with any on-site fiduciary responsible for the assets.

Vermont state and local regulatory and land use agencies and taxing authorities will similarly

play critical roles in any diligence required to get the Facilities sold or operationally "up, open

and running," or both. *See id.*, ¶ 7.

34.      In other cases involving debtors with primarily real estate assets, bankruptcy

courts have concluded that it is most efficient and economical to transfer the case to the district

where the debtor's real estate assets are located. *See In re Pavilion Place Assoc.*, 88 B.R. 32

(Bankr. S.D.N.Y. 1988)("Improved real estate is a peculiarly local concern often better

administered by a court in the district in which it is located."); *In re Greenridge Apartments*, 13

B.R. 510, 513 (Bankr. D. Haw. 1981) (in case where debtor's asset was real estate in

Washington, court held that a Washington court would be "in a better position to evaluate any

appraisals of the property and the appraisers who make the appraisals, as well as be in closer

touch with the condition and operation of the property").

35.      Second, the source of any acquisition financing is just as likely to come from

Vermont as it is from anywhere else.   Certainly, the location of the Facilities in Vermont and the

state's vibrant ski industry make it more likely that any financing would come from a local

source that has unique knowledge regarding both the Vermont ski economy and Debtors'

business model.  While financing could also potentially come from outside Vermont, there is no

evidence that the Debtor's CEO Barnes can obtain such financing, particularly given his prior

promises that such financing was forthcoming. *See* Exs. B, ¶ 9 & C.

36.      Third, as of the Petition Date, there are few Connecticut "professionals" engaged

in the Connecticut Cases.   Conversely, there are a substantial number of Vermont-based

professionals who (i) represent Vermont-based creditors and parties in interest; (ii) represent

state and local regulatory and land use agencies; and (iii) represent the largest secured creditor

and the Receiver.

     37.     By way of examples, (i) the State of Vermont's Department of Taxes has pursued,

and continues to pursue, approximately $2 million in unpaid taxes from the Debtors; and (ii)

Vermont-based professionals represent the Bank and subsequent encumbrancers in the Vermont

Action, and have sued the Debtors and Barnes in Vermont on theories of fraud related to the

disappearance of millions of dollars in construction deposits and the sale of residential lots.  *See*

Treanor Decl., ¶ 7; *see also* Exs. L, M, N.  It would greatly increase the efficiency and

administration of the bankruptcy cases if these Vermont-based professionals could bring their

working knowledge of the issues to the Connecticut Cases without traveling to Connecticut or

engaging local counsel.  *In re B.L. of Miami, Inc.*, 294 B.R. 325, 334 (Bankr. D. Nev. 2003)

(need to retain local counsel adds difficulty and expense to administration of bankruptcy case).[5]

     38.     Additionally, to the extent professionals are hired in the future, it would be far

more efficient and economical to engage Vermont-based professionals who are likely to have

knowledge and experience with Vermont's unique ski economy.  Vermont—which boasts the

largest ski industry in the eastern United States[6]—is more likely to have the qualified and

experienced professionals needed to get the Facilities expeditiously opened.  If venue is

transferred to Vermont, the Debtors, creditors, and other interested parties will all benefit from

the knowledge and expertise of professionals who understand the ski industry and the local

economy.

---

[5] *See* D. Conn. L. R. 83.1(c) (absent an order by the Court for good cause shown, all visiting lawyers are required to retain local counsel with offices in the District of Connecticut).

[6] *Vermont ski resorts report nearly 4 million visitors, slight increase for 2017-2018,* Vermont Business Magazine (June 18, 2018), https://vermontbiz.com/news/2018/june/18/vermont-ski-resorts-report-nearly-4-million-visitors-slight-increase-2017-18 (attached hereto as Exhibit P).

39.      Under similar circumstances, other bankruptcy courts have concluded that economic and efficiency concerns weighed in favor of transferring venue.  For instance, in *In re Newport Creamery, Inc.,* 265 B.R. 614 (M.D. Fla. 2001), the bankruptcy court transferred a Chapter 11 case from Florida to Rhode Island, where the debtor sought to reorganize its Rhode Island-based restaurant business and the vast majority of the debtor's assets were located in Rhode Island, Connecticut, or Massachusetts.  *Id.* at 620.  The court noted that several professionals, including expert witnesses and appraisers, would need to be hired in case and that there would be a substantial burden in having these professionals travel to and from a court that was over a thousand miles from the debtor's core business operations.  *Id.*  Based on these facts, the court concluded that it was far more economical to administer the Chapter 11 case from Rhode Island.  *Id.*

40.      Additionally, in *In re EB Capital Mgmt. LLC*, No. 11-12646, 2011 WL 2838115, at *4 (Bankr. S.D.N.Y. July 14, 2011), the bankruptcy court granted a motion to transfer venue after concluding that transfer to South Dakota would promote economic, efficient administration of estate because the debtor's principal assets and four of the seven creditors were located in South Dakota.  The bankruptcy court held that "[i]t would be far more cost effective for the interested parties to participate in the bankruptcy proceedings if the case were transferred to South Dakota."  *Id.*  Similarly here, it would be similarly cost-effective and efficient to administer all the Cases in this Court.  *See In re B.L. of Miami, Inc.*, 294 B.R. 325, 334 (Bankr. D. Nev. 2003).

41.      The efficient and economical administration factor weighs heavily in favor of transferring the Connecticut Cases to Vermont.

### ii.      The Interests of Judicial Economy Would Be Served By the Transfer to the Vermont Bankruptcy Court.

15

42.    Courts also evaluate whether the interests of judicial economy would be best served by the transfer.  This analysis requires courts to consider whether there will be judicial efficiencies in transferring the case or whether a "learning curve" will be imposed on the transferring court.  *Manville,* 896 F.2d at 1391; *Patriot Coal,* 482 B.R. at 740–41.  Courts have noted that the judicial economy factor is intertwined with other factors, including the economic and efficient administration of the estate.  *Enron,* 317 B.R. 629, 640 (Bankr. S.D.N.Y. 2004).

43.    Judicial economy will be served by transferring the Connecticut Cases to the Vermont Bankruptcy Court.  The Vermont Bankruptcy is most familiar with applicable Vermont law, as well as the issues that may arise regarding the administration of Debtors' Vermont real estate assets.  The creditor body is mostly located in Vermont.  All facts point to Vermont as the most economical place for this proceeding.

44.    Moreover, if the Connecticut Cases are transferred now, there is minimal concern that the Connecticut Court would have developed substantial knowledge of the Connecticut Cases, which could be lost if the Connecticut Cases were transferred.[7]  This Motion was filed one day after the Connecticut petitions were filed.  The Connecticut Court has not been asked to address any first day motions.  Bankruptcy courts faced with similarly early motions have held that there is no "learning curve" lost in transferring the case to a new court.  *See Dunmore,* 380 B.R. at 674 (rejecting debtor's argument that ruling of first day motions created familiarity that weighed against transfer, noting that such a rule "would eviscerate the transfer venue statute, 28 U.S.C. § 1412"); *see also In re EB Capital Mgmt. LLC,* No. 11-12646 MG, 2011 WL 2838115, at *4 (holding "there has been no 'learning curve' in this case because this is the first motion pending before the Court and no other issues have arisen that required the Court's attention").

---

[7] The Petitioners seek expedited consideration of this motion to alleviate unnecessary strain on judicial resources.

Accordingly, transferring venue at this early stage promotes judicial economy and best serves the interests of justice.

### iii.        The Parties Can Get A Fair Trial In Each of the Possible Venues.

45.        There is no reason any creditor or party in interest cannot receive a fair trial in Connecticut or Vermont.  Thus, this factor is neutral and other factors should determine the appropriate venue.  *See e.g., In re Bruno's, Inc*., 227 B.R. 311, 328 (Bankr. N.D. Ala. 1998) ("fair trial" factor did not weigh for or against transfer where both courts could provide a fair trial).

46.        Other factors weigh heavily in favor of transfer of the Connecticut Cases to the Vermont Bankruptcy Court.  Connecticut would be inconvenient for the majority of the parties (other than the Debtors' founder).  In sum, because the Debtors' economic and legal "center of gravity" is and has always been in Vermont, and the claims against them arose from activity and transactions occurring in Vermont, their estates should be administered in Vermont.

47.        Moreover, Vermont law is likely to govern issues arising in this case concerning Vermont real estate assets and contracts made in Vermont.  Accordingly, when all factors are considered, transfer to the Vermont Bankruptcy Court is particularly appropriate given the fact that the Debtors can receive a fair trial in either forum.

### iv.        Vermont Has a Greater Interest in Having the Controversy Decided Within its Borders.

48.        When analyzing the "greater interest" factor, bankruptcy courts have recognized the critical importance of the "state interest in deciding local controversies within its borders by those familiar with its laws."  *Enron Corp.*, 317 B.R. at 645.  This factor includes consideration of the law to be applied, as well as the state's interest in deciding the matter.  *In re Centennial Coal, Inc.,* 282 B.R. 140, 148 (Bankr. D. Del. 2002).  Here, this factor weighs heavily in favor of

transfer, as Vermont has a substantially greater interest in adjudicating the Debtors' bankruptcy

Cases than Connecticut, and Vermont law would likely apply to any claims or objections

asserted.

49.     As the U.S. Supreme Court has recognized, "[t]here is a local interest in having

localized controversies decided at home." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509 (1946).

Here, the Cases are clearly a local Vermont matter.  By way of example, when the Debtors'

business operations ceased, nearly 100 local employees lost their jobs.  *See* Treanor Decl., ¶ 13.

Additionally, Wilmington and Dover have lost (and continue to lose) substantial tax and tourism

revenue derived from the operations of the Facilities.  Exs. F & G.  *Indeed, concern for the local

community was so great that local authorities engaged in an economic analysis to evaluate the

impact of the Debtors' closing their business.  See* Ex. F (reporting that some local businesses

anticipated a 10-20% decline in business and real estate agents were reporting a decline in the

local real estate market).  Vermont has a strong economic interest in the prompt administration

of the Debtor's assets.

50.     Perhaps the greatest impact to the state of Vermont is the Debtors' failure to pay

millions of dollars in state and local taxes.  The Debtors currently owe approximately $2 million

in back taxes (and interest) related to meal, room, sales taxes that should have been collected and

remitted to the state.  Treanor Decl., ¶ 7.  In addition, reports from 2018 indicate that one or

more of the Debtors owe Wilmington more than $800,000 in back real estate property taxes. *See*

Ex. G.  This lost tax revenue impacts Wilmington and its citizens, who have a strong local

interest in seeing these issues resolved within its boundaries and under the Bankruptcy Code.

51.     Moreover, it is likely that pre- and post-petition claims against the Debtors will

arise, in part, under Vermont law and relate to activities occurring within Vermont's borders.

Many local Vermont contractors provided construction work to the Facilities or provided goods

and services for the Debtors' business operations.  *See* Treanor Decl., ¶ 12 & Ex. G (media

article reporting on the negative impact of the closure on local contractors and vendors).  None

of these transactions had any conceivable impact on the state of Connecticut and any state law

claims related to these activities will be governed by Vermont law.  Accordingly, Vermont has a

strong interest in the outcome of this case and the impact any resolution will have on the local

community.

        52.     Courts have supported the transfer of cases where the issues to be decided would

directly impact the local economy.  For instance, in *In re Condor Expl., LLC*, 294 B.R. 370, 379

(Bankr. D. Colo. 2003), the bankruptcy court transferred a case from Colorado to Wyoming,

noting that the debtor's oil and gas lease business was substantially located in Wyoming and the

oil and gas industry was critically important to the Wyoming economy.   Based on these facts,

the court concluded that Wyoming had a "strong local interest" in the case.  *Id.*  In *In re B.L. of*

*Miami, Inc.*, 294 B.R. 325, 332 (Bankr. D. Nev. 2003), the bankruptcy court transferred a

chapter 11 case involving a Florida nightclub from Nevada to Florida.  In doing so, the court

recognized the local interest in having a plan of reorganization evaluated by a judge "in the

economic community in which it operates."  *Id.*

        53.     Courts have also recognized a state's interest in ensuring that businesses and

individuals within its borders are complying with the law.  In *In re Directory Distrib. Associates,*

*Inc.*, 566 B.R. 869, 881–82 (Bankr. S.D. Tex. 2017), the bankruptcy court transferred an

adversary proceeding to Missouri after concluding that the state had a substantial interest in

resolving the dispute.  In that case, there were allegations that the debtor's St. Louis-based

business and its employees had violated federal law.  *Id.*  The bankruptcy court noted that

Missouri had a strong interest in resolving claims that companies and individuals within its

borders were engaged in illegal activity.  *Id.*   Similarly here, there are allegations that the

Debtors and Barnes have engaged in misconduct in Vermont, including fraud and an illegal real estate fee scheme, and the state has a strong interest in resolving those claims.

54.      Other courts have recognized a local interest in resolving issues in the jurisdiction where the debtor's assets or a majority of the creditors are located or where the applicable law was to be applied.  *See e.g., Dunmore*, 380 B.R. at 675 (transferring case to California because it had a "strong interest in the impact of the disposition of [the debtor's] assets to the areas and communities in which they are located."); *In re Buffets Holdings, Inc.*, 397 B.R. 725, 730 (Bankr. D. Del. 2008) (holding that transfer was warranted, in part, because "Michigan has a greater interest in deciding issues which may affect Michigan residents";  *In re Pinehaven Assocs.*, 132 B.R. 982, 990 (Bankr. E.D.N.Y. 1991) (transferring case to Mississippi because that state had "the most substantial connection with an interest in the administration of an estate consisting of properly localized in that state.").

55.      Barnes made the conscious decision to operate a Vermont-based business since 2011.  He cannot now ignore the strong interest that Vermont has in the resolution of the Cases. *See Pinehaven,* 132 B.R. at 090 ("Having chosen to purchase a Motel in Mississippi, the Debtor cannot be heard to complain that its Chapter 11 effort is being transferred to that location."). Accordingly, this factor weighs heavily in favor of transfer.

> **v.      The Enforceability of Judgments Supports Transfer to the Vermont Bankruptcy Court.**

56.      In deciding transfer motions, bankruptcy courts also consider whether the enforcement of any judgment would be affected by the transfer.  *In re Enron Corp.*, 317 B.R. at 645; *In re Suntech*, 520 B.R. at 422 (Bankr. S.D.N.Y. 2014).  This factor is largely irrelevant because out-of-state judgments are enforceable under the Full Faith and Credit Clause.  *In re Hayes Lemmerz Int'l Inc.*, 312 B.R. 44, 47 (Bankr. D. Del. 2004) (noting that Full Faith and

Credit Clause renders factor largely irrelevant in evaluating a § 1412 motion to transfer venue);

*Titus v. Smith*, No. 3:12-CV-21, 2012 WL 2255498, at *6 (N.D.W. Va. June 15, 2012) (granting

§ 1412 motion, noting that any judgment rendered would not be affected by transferring venue).

Thus, the enforceability of judgments is no barrier to transfer of the Connecticut Cases to the

Vermont Bankruptcy Court, particularly given the fact that any judgments involving the Debtors

or their assets can be enforced in Vermont, where the Facilities are located.

> **vi.      The Great Weight of the Evidence Supports Disturbing Barnes'
> Choice of Venue.**

57.      While a debtor's choice of venue is afforded some deference, this preference is

readily overcome when the interests of justice so require.  The interests of justice weigh heavily

in favor of transfer.  The Vermont Bankruptcy Court can efficiently administer the Connecticut

Cases, if transferred, and Vermont has a substantially greater interest in the outcome of the

Connecticut Cases than Connecticut given the nature of the Facilities and the Debtor's business.

Indeed, the focus of these Cases should be a quick bankruptcy sale and satisfaction of the

Debtors' secured debt.  With this as the playbook, there is no significant connection between the

Connecticut Cases and the state of Connecticut.  This is a localized controversy that has, and will

continue to have, a significant impact on the local economies in Vermont.  The administration of

the bankruptcy cases would be greatly enhanced by transferring venue to the District of

Vermont.

> **B.      Transferring the Connecticut  Cases to this Vermont Bankruptcy
> Court Is More Convenient for the Parties.**

58.      In addition to being in the interest of the justice, the transfer of the Connecticut

Cases to Vermont would also be more convenient for the parties.  In analyzing the "the

convenience of parties" prong under § 1412, courts within the Second Circuit consider six

factors.  *Dunmore*, 380 B.R. at 672; *TS Empl.,* 2015 Bankr. Lexis 2747, *12.  These factors

include: (i) proximity of creditors of every kind to the court; (ii) proximity of the debtor; (iii)

proximity of witnesses necessary to the administration of the estate; (iv) location of the assets;

(v) economic administration of the estate; and (vi) necessity for ancillary administration if

liquidation should result.  *Dunmore*, 380 B.R. at 672.

59.     Several of the "convenience of the parties" factors overlap with the "interest of

justice" factors, including the location of the assets, the economic administration of the estate,

and the proximity of the parties.  Accordingly, the Petitioning Creditors incorporate by reference

all of the arguments made above as if fully set forth herein.  For those reasons, as well as the

reasons set forth below, transfer would best serve the convenience of the parties.

### i.     The Debtors' Creditors Have a Close Nexus to Vermont.

60.     In evaluating this factor, courts look to the proximity of the creditors, the number

of creditors, and the amounts owed.  *Dunmore*, 380 B.R. at 676.  Here, the substantial

connection between the majority of the creditors and the state of Vermont weighs in favor of

transfer.

61.     Petitioners believe the vast majority of the Debtors' creditors are either located in

Vermont or have claims that arose from activities in the state.  Many of the known creditors are

local "trade" contractors who provided work to improve or expand the buildings or other

structures on the Debtors' real property.  Other creditors are local merchants that provided goods

and services for the Debtors' business operations, such as food service that was provided to

members.  Each of these creditors failed to receive payment for the goods and services they

provided at the Facility.

62.     The Bank, the Debtors' largest secured creditor, also has a nexus to Vermont as it

made loans to the Debtors for use in Vermont, maintains a security interest in the Facility, has

invested substantial sums related to the Receiver's responsibilities, and has previously

commenced the Vermont Action.  The Bank would likely be inconvenienced by having to go to Connecticut to participate in the Debtors' bankruptcy cases.

63.    The slew of litigation that is currently pending in Vermont is further evidence of the Vermont nexus to this case.  It would be inconvenient to most or all of these parties if they were forced to adjudicate these, and other, issues in Connecticut simply because Barnes resides there.  *See In re Greenhaven Associates, Ltd.,* 93 B.R. 35, 41 (Bankr. S.D.N.Y. 1988) (transferring venue after concluding that inconvenience to debtor's current management was outweighed by convenience to creditors and potential witnesses).

### ii.    The Witnesses are in Vermont.

64.    It is likely that most witnesses needed for any contested motions or proceedings would be located in Vermont, given the other facts set forth above. For example, should a party in interest move to convert the Connecticut Cases to chapter 7 or seek appointment of a chapter 11 trustee, based on alleged misconduct by the Debtors' current management, many of the witnesses would be in Vermont.

### iii.    Liquidation is Probable, Which Supports Vermont Venue.

65.    The Debtors (by and through Barnes) have repeatedly claimed for more than a year that restructuring efforts were underway.  A review of the Debtors' Connecticut Petitions reflect that this simply is not the case.  Given the many unfulfilled promises and the lack of any ongoing operations, or financing for operations, the Debtors' liquidation is much more likely than a reorganization.   The high probability of liquidation further supports the transfer to the Vermont Bankruptcy Court, which is better suited to manage the assets to be liquidated.

66.    The prospect of liquidation weighs in favor of transferring a case to the bankruptcy court where the debtor's assets are located.  In *Dunmore*, 380 B.R. at 677, the court held that if the debtor was forced to liquidate, the "marketing and selling [of the debtor's]

California real estate assets can best be overseen by a California bankruptcy court with greater familiarity with the market." *Id.*   Similarly,  In *In re Three Rivers Co., LLC*, 2009 WL 6499339, the Georgia court concluded that transfer of venue was appropriate, in part, because administering a liquidation process would be less costly and easier to administer from West Virginia where all of the assets were located.  *Id.* at *4.

67.     No prior application for the relief requested herein has been made to this Court or any other court.

## NOTICE

68.     Notice of this Motion will be provided by either: (i) First-Class Mail; (ii) E-mail, or by (iii) Facsimile (if provided by parties who filed Notices of Appearance) to: (i) the Debtors; (ii)  the United States Trustee; (ii) any parties-in-interest having filed a notice of appearance in this case; (iii) all parties requiring notice pursuant to the Rules; and (iv) counsel to Debtors in the Connecticut Cases. The Petitioning Creditors respectfully submit that no other or further notice need be provided.

## CONCLUSION

**WHEREFORE**, for the reasons stated in this Motion, the Petitioning Creditors respectfully requests that this Court enter an order (i) transferring the Debtors Chapter 11 Cases to the Vermont Bankruptcy Court, (ii) directing the parties to the Debtors' cases to cease all activity in the Connecticut Court until this Motion is decided, and (iii) granting such other and further relief as this Court may deem just and proper.

Dated:  May 29, 2019

Dan Solaz, Bobbi Resek, Lakeland Bank,
Petitioning Creditors

*/s/* Jess. T. Schwidde
Jess T. Schwidde
Schwidde & Glinka
77 Grove St., Ste.  #106
P.O. Box 28
Rutland, Vermont 05701
(802) 779-0219
jtsesq@vtbankruptcylaw.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| In re: | Chapter  7 |
| Hermitage Inn Real Estate Holding Company LLC, | Involuntary Case No.  19-10214    (CAB) |
| Putative Debtor | |

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was filed electronically on May 29, 2019, with the United States Bankruptcy Court for the District of Vermont and has been served on the parties in interest via email by the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List.

_/s/_ Jess. T. Schwidde
Jess T. Schwidde
Schwidde & Glinka
77 Grove St., Ste.  #106
P.O. Box 28
Rutland, Vermont 05701
(802) 779-0219
jtsesq@vtbankruptcylaw.com