**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| In re: ) | |
| ) | |
| HERMITAGE INN REAL ESTATE ) | Chapter 11 |
| HOLDING COMPANY, LLC, ) | Case Nos. 19-10214 (CAB) and |
| ) | 19-10276 (CAB) |
| and ) | Jointly Administered |
| ) | |
| HERMITAGE CLUB, LLC, ) | |
| ) | |
| Debtors. ) | |
| ) | |

**OBJECTION OF BERKSHIRE BANK TO DEBTOR'S SECOND AMENDED MOTION FOR ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO THE DIP LENDER PURSUANT TO 11 U.S.C. § 364(c), and (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Now comes Berkshire Bank (the "Bank"), by and through its undersigned counsel, and hereby objects to the Debtor's Second Amended Motion for Order (I) authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (II) Granting Liens and Superpriority Claims to the DIP Lender Pursuant to 11 U.S.C. § 364(c), and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Financing Motion").

In support of this Objection, the Bank respectfully represents as follows:

**Preliminary Statement**

Pursuant to the DIP Financing Motion, the Debtors seek to borrow $1,750,000 on a secured basis from Restructured Opportunity Investors, Inc. (the "DIP Lender"), by providing the DIP Lender with a first lien on substantially all of the Debtors' assets, thereby priming the

liens of the Debtors' secured creditors,[1] including the Bank (the "DIP Financing Facility"). The Bank objects to the DIP Financing Motion because, inter alia, (1) the funds available to the Debtors under the proposed DIP Financing are wholly inadequate to pay even ongoing basic expenses, including utilities, real estate taxes and maintenance; (2) over forty percent (40%) of the DIP Facility proceeds go to the DIP Lender and a carve out for professionals while real estate taxes and water and sewer charges are not budgeted or provided for; (3) the Debtors cannot provide the Bank or other secured creditors with adequate protection, (4) the Debtors have no ongoing operations and have not had any operations since March of 2018; and (5) given the Debtors' financial situation, these cases do not belong in Chapter 11, and the Debtors' current management has shown no interest in complying with the rules and regulations of the Bankruptcy Code by, *inter alia*, improperly lending funds to the Debtors post-petition without court approval and by posting information and improper solicitations supporting the Debtors' "Plan" on the Debtors' website. In short, the Debtors cannot provide the Bank and the other secured creditors adequate protection as required by the Bankruptcy Code and the Debtors should not be permitted to further damage their creditors by entry into the DIP Financing Facility that does not provide anywhere near sufficient financing to cover basic expenses.

### The Bank's Secured Claim

Hermitage Inn Real Estate Holding Company, LLC ("HIREHC"), one of the Debtors in these cases, is the owner of the former Haystack Mountain ski resort and related properties and assets, consisting of approximately 800+ acres in the aggregate, located in the Towns of Dover and Wilmington, Windham County, Vermont (the "Property" or the "Site"). HIREHC

---

[1] The Schedules of Assets and Liabilities filed by HIREHC (Doc # 78) list $46.5 million in total secured claims, and the secured claim of the Bank is scheduled for approximately $19,000,000, which is understated by approximately $3,000,000.

constructed a base lodge on the Property (the "Base Lodge"), and has development rights to construct other improvements on the Property (the "Proposed Improvements").

On or about September 30, 2013, HIREHC and the Bank entered into that certain Construction Loan Agreement (as amended through the date hereof, the "Loan Agreement"), pursuant to which the Bank agreed to make certain loans to HIREHC in the aggregate amount of up to $20,000,000 (the "Original Loans") to enable HIREHC to construct or complete construction of the Base Lodge and other Proposed Improvements. On or about December 3, 2014, the Bank and HIREHC amended the Loan Agreement, and bifurcated the Original Loans into: (i) a $15,000,000 loan to finance the Base Lodge (the "Base Lodge Loan"), as evidenced by a Second Amended and Restated Promissory Note (Base Lodge Loan) dated December 3, 2014 made by HIREHC and payable to the order of the Bank (the "Second Amended and Restated Base Lodge Note"); and (ii) a $5,000,000 revolving loan for costs incurred by HIREHC in connection with the construction of single family homes on the Property (the "Revolving Loan"), as evidenced by a Second Amended and Restated Revolving Credit Promissory Note dated December 3, 2014 made by HIREHC and payable to the order of the Bank (the "Revolving Note").

On or about June 28, 2016, HIREHC executed and delivered to the Bank a Third Amended and Restated Promissory Note (Bridge Loan) in the principal amount of One Million Dollars ($1,000,000) (the "Bridge Loan Note"), which Bridge Loan Note amended and restated the Revolving Note in its entirety on a non-revolving basis.

On or about July 18, 2017, pursuant to further borrowings and amendments to the Loan Agreement, HIREHC executed and delivered to the Bank an additional promissory note in the original principal amount of $1,100,000 (the "Second Bridge Loan Note").

3

The loans evidenced by the Second Amended and Restated Base Lodge Note, the Bridge Loan Note and the Second Bridge Loan Note are hereinafter referred to as the "Bank Loans," and the three Notes are collectively referred to hereinafter as the "Notes".

As of July 9, 2019, the unpaid balance, including accrued and unpaid interest, late charges and certain capitalized expenses, due to the Bank under the Bank Loans is as follows:

|  | Balance |
|---|---|
| Second Amended and Restated Base Lodge Note: | $18,177,054.17 |
| Bridge Loan Note | $1,116,186.16 |
| Second Bridge Loan Note: | $1,168,852.54 |
| Total | $20,462,092.87 |

In addition to the foregoing, the Bank has incurred over $1,615,209.08 in additional expenses since September of 2018 to simply preserve its collateral and protects its interest under the Bank Loans, including the following expenses[2]: (a) real estate taxes in the amount of $1,433,000, (b) utilities in the amount of $882,000, (c) insurance in the amount of $290,000, (d) $1,000,000 in fees to the Receiver appointed in the State Court Foreclosure Action (as defined below), of which $611,000 was incurred for employee payroll and benefits for the Debtors' employees who are working for the Receiver ($336,000), and basic repairs and maintenance on the Bank's collateral ($266,000), (e) $169,000 for lease payments on the so-called Glebe Lot, and (e) legal and appraisal fees of $390,000. The total amount of the Bank's secured claim is approximately $22,077,000 as of the date hereof.

---

[2] These amounts are rounded to the nearest $1,000, and may not include all charges and expenses incurred by the Bank to date. These amounts also include expenses incurred before September 30, 2018 in the aggregate amount of $2,593,000, which were capitalized and added to the balance of the Second Amended and Restated Base Lodge Note.

4

To secure all of the indebtedness and obligations due to the Bank under the Loan Agreement (collectively, the "Obligations"), HIREHC executed in favor of the Bank that certain Construction Mortgage and Security Agreement dated as of September 30, 2013, as amended by (i) that certain Amendment of Mortgage between HIREHC and the Bank dated as of April 30, 2014, (ii) that certain Second Amendment of Mortgage between HIREHC and the Bank dated as of November 12, 2014, (iii) that certain Third Amendment of Mortgage between HIREHC and the Bank dated as of December 3, 2014, (iv) that certain Fourth Amendment of Mortgage between HIREHC and the Bank dated December 4, 2015, (v) that certain Fifth Amendment of Mortgage between HIREHC and the Bank dated June 28, 2016, (vi) that certain Sixth Amendment of Mortgage between HIREHC and the Bank dated February 1, 2017, (vii) that certain Seventh Amendment of Mortgage between HIREHC and the Bank dated February 10, 2017, and (viii) that certain Eight Amendment of Mortgage between HIREHC and the Bank dated Jul 18, 2017, with respect to the Property (said Construction Mortgage and Security Agreement, as so amended through the date hereof, being hereinafter referred to as the "Mortgage").  The Mortgage and all amendments thereto have been properly recorded with the Dover (Vermont) Land Records and the Wilmington (Vermont) Land Records, thereby properly perfecting the Bank's rights under the Mortgage.

In connection with the Original Loans, on September 30, 2013, James Barnes, the principal of the Debtors (the "Guarantor"), executed a Guaranty in favor of the Bank, under which the Guarantor guaranteed the Obligations of HIREHC to the Bank under the Loan Agreement (the "Guaranty"), which Guaranty has been amended and restated through the date hereof, and continues in full force and effect with respect to the Bank Loans.

5

Also in connection with the Original Loans, on September 30, 2013, Hermitage Club, LLC, the other Debtor in these jointly administered proceedings (the "Hermitage Club"), executed a Security Agreement in favor of the Bank, under which Hermitage Club granted to the Bank a security interest and lien on all assets owned by Hermitage Club (the "HC Security Agreement"), which HC Security Agreement continues in full force and effect.

The Debtors defaulted in the Obligations in September of 2016 and the Bank, the Debtors and the Guarantor entered into a series of forbearance agreements, with the last dated November 30, 2017. During the period of time while the forbearance agreements were in effect, the Debtors were presented with viable opportunities to refinance their obligations, but the Debtors failed or refused to enter into those refinancing opportunities because, upon information and belief, they did not provide for a sufficient return to the Debtors' principal, James Barnes. The Debtors ultimately failed to comply with the terms of these forbearance agreements and on February 23, 2018, the Bank commenced an action to foreclose its Mortgage in the Vermont Superior Court, Windham Division (the "State Court Foreclosure Action").

On June 6, 2018, on request of the Bank, the State Court appointed Alan Tantleff of FTI Consulting Inc. as the Receiver for the Bank's collateral (the "Receiver").[3] The Bank prosecuted the State Court Foreclosure Action until the involuntary petition was filed against HIREHC on May 22, 2019.

Upon the filing of the involuntary petition, the Bank moved for an order retaining the Receiver in place in the early stages of these cases to maintain the status quo and to continue to protect and preserve the Debtors assets, which motion was allowed by the Court at the hearing on the motion on May 30, 2019. As such, the Receiver has remained in place thus far in these cases. The Bank has paid $150,000 to the Receiver since the commencement of these cases,

---

[3] The Bank's collateral represents substantially all of Debtor's assets.

which amount includes continued payment of the Debtors' employees working for the Receiver. The Bank has also paid an additional $66,000 in utility bills since the commencement of these cases.

**The DIP Financing Motion is Wholly Inadequate to Finance the Debtor's Basic Obligations**

Under the DIP Financing Facility the Debtors propose borrowing $1,750,000 at an interest rate of approximately 11% per annum. The DIP Facility has a term of only six months, yet the Debtors are required to deposit $280,000 into an interest reserve account, which is almost 18 months of interest. In reviewing the proposed loan documents attached to the DIP Financing Motion, it is clear that the Debtors will never see a return of any of the $280,000 deposited in the interest reserve account. Further, the DIP Financing Facility includes $155,000 in fees payable to the DIP Lender including a structuring fee ($50,000), a commitment fee ($52,500) and an exit fee ($52,500). As such, almost 25% of the proceeds from the proposed DIP Financing is going to the DIP Lender in fees and interest reserve (435,000/1,750,000 = 24.9%). Another $300,000 of the DIP Facility proceeds are going to fund a professional fee escrow for the professional fees of the Debtors' and possible other professionals in these cases. Accordingly, 42% of the DIP financing (735,000/1,750,000 = 42%) is going to the DIP Lender and professionals. The Debtors' submit in the DIP Financing Motion that the terms of the DIP Financing are fair, reasonable and appropriate under the circumstances, in a very conclusory fashion. The Bank submits that the terms of the DIP Financing may be fair, reasonable and appropriate for the DIP Lender and the Debtors' professionals, but they are very far from fair, reasonable and appropriate to the $46+ million in secured creditors whose liens are to be primed under the DIP Facility.

If the basic borrowing terms of the DIP Financing are not egregious enough, the DIP Facility will also be wholly inadequate to meet the Debtors' most basic obligations, or even

58853368 v2

maintain the status quo. Attached to the proposed Order filed with the DIP Financing Motion the Debtors have attached a proposed ten-week cash flow budget (the "Budget")[4]. The Budget does not include any money for the payment of real estate taxes or water and sewer charges. Real estate taxes in the approximate amount of $350,000 are due to the Towns of Wilmington and Dover by September 15, 2019. If these taxes are not paid, they accrue interest at a statutory rate of twelve percent (12%) per annum (which goes up to eighteen percent 18% per annum after 3 months of non-payment), and constitute a priming lien on the Debtors' real estate assets (32 V.S.A. §5061), which make up 95% of the Debtors assets.

In addition, there are obligations owing to the Cold Brook Fire District No. 1 ("Cold Brook FD1"). Cold Brook FD1 provides water and sewer services to a portion of the Debtors' properties. Cold Brook FD1 charges an annual general fee along with an operations and maintenance fee. Copies of the July 2, 2019 invoices to HIREHC from Cold Brook FD1 for the portions of the Debtors property that constitute the Bank's collateral are attached hereto collectively as Exhibit A. HIREHC owes $62,002.82[5] for operations and maintenance fees and general assessment fees on August 3, 2019. Interest accrues on any unpaid charges at a statutory rate of 18% per annum. The Debtors make no provisions for payment of these fees in the Budget. Further, on October 2, 2019, the Debtors will owe $439,291.92 to Cold Brook FD1 as a special benefit assessment, which amount varies based upon interest rates and payment schedule, and is due bi-annually by HIREHC to Cold Brook FD1 as a result of borrowings from the Vermont Bond Bank that Cold Brook FD1 employed, at the request of the Debtors, to finance

---

[4] Standard industry norms would indicate that the Debtors propose and present a thirteen-week cash flow. It seems apparent that the Debtors did not provide a thirteen-week cash flow because the DIP Facility does not provide enough liquidity to get through thirteen weeks.

[5] The attached invoices only relate to the Bank's collateral and total $57,334.07. The Debtors owe an additional $4,668.75 for portions of their property that are not part of the Bank's collateral. These other invoices total almost 40 pages and copies have not been attached hereto for purposes of brevity.

8

58853368 v2

and construct infrastructure on the Site. The fees and charges due to Cold Brook FD1 prime other liens on the properties just like unpaid real estate taxes (24 V.S.A. §507-5). The Debtors are asking the Court to approve the DIP Financing Motion, which would prime the Debtors' secured creditors, while the Debtors propose no payment for $850,000 in expenses directly related to the Debtors' real estate, that will further prime the Bank and other secured creditors, and if unpaid will accrue interest at 12% (real estate taxes) and 18% (Cold Brook FD1) per annum. Once again, this is far from fair, reasonable and appropriate.

In addition to the foregoing, the proposed Budget has other failings and raises other questions. The Receiver has incurred an average of $30,500 per month for employee payroll and benefits[6] (See Fifth Report of Receiver Alan Tantleff dated May 6, 2019, and attached as Exhibit 9 to the Rule 9014(e) Notice of Evidentiary Hearing filed by Bank's counsel on May 29, 2019 (Doc # 18). The Receiver has been employing only a portion of the Debtors' payroll – it is unclear how the Debtors' other employee have been or are being paid. The Budget projects $20,000 per month without explanation as to what employees are included in this list, or why the Debtors project incurring less in payroll than the Receiver has over the past year plus. In addition, the DIP Financing Facility requires the Debtors to hire Jonathan Joslow, or such other professional acceptable to the DIP Lender, to act as the Debtors' Chief Restructuring Officer. However, the Budget does not appear to have funds necessary to pay such a Chief Restructuring Officer[7]. As noted above, the Receiver has spent $266,000 in basic property repairs and maintenance over the 11 months since he was appointed. The Budget has no money for basic property repairs and maintenance. How the Debtors can propose that their assets are worth more

---

[6] Pursuant to an arrangement made between the Debtors and the Receiver, the Receiver is funding the payroll for the employees working for the Receiver directly through the Debtors' payroll service.

[7] The operations payroll included in the Budget goes up in weeks 8-10 from $20,000 per month to $60,000 per month without explanation – this may or may not account for the hiring of the CRO – it is impossible to determine from the Budget or the DIP Financing Motion.

than $50,000,000+, while at the same time not allocating any funds for the basic repair and maintenance of those assets is beyond absurd.

The Budget also contains a line item for "Administrative Obligations" in the amount of $90,000 each in weeks 1 and 5 without any explanation of what these "Administrative Obligations" are, and a line item for marketing in week 3 of $30,000, again without explanation. Creditors should not have to guess at the Debtors proposed use of funds under the DIP Facility.

The Court should not approve a DIP Facility that primes all of the Debtors' secured creditors, benefits the DIP Lender with an immediate windfall, does not have sufficient liquidity to pay for basic expenses, and will very quickly make these Chapter 11 cases administratively insolvent, while providing no benefit to the Debtors' creditors. This is the Debtors' management/principal attempting a last ditch effort to hold off the inevitable, and the Court should not allow the Debtors to continue these efforts.

## The Debtors Cannot Provide the Bank and Other Secured Creditors Adequate Protection

Section 364(d) of the Bankruptcy Code provides as follows:

> (d)(1) The court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
>
> (A) the trustee is unable to obtain such credit otherwise; and
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is to be granted.
>
> (2) In any hearing under this subsection, the Trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. §§ 364(d)(1) and (2).

"The ability to prime an existing lien is extraordinary, and in addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide adequate

10

protection for the interest of the holder of the existing lien or obtain such lien holders consent" (See, Collier on Bankruptcy, 16th Ed., § 364.05, citing *In re Resolution Trust Corp. v. Swedeland Dev. Group, Inc.*, (*In re Swedeland Dev. Group, Inc.*) 16 F. 3d 552, and *In re First South Sav. Ass'n.,* 820 F.2d 700). Adequate protection is not defined in the Bankruptcy Code, but examples of adequate protection are provided in Section 361 of the Bankruptcy Code, which provides that adequate protection may be provided by cash payments, or granting of replacement liens, to protect the interest holder from a decrease in the value of such entities' interest in such property. 11 U.S.C. §361. The Debtors do not have any unencumbered assets, or any income or cash with which they could provide adequate protection to the Bank or other secured creditors. As such, the Debtors only ability to provide adequate protection to the Bank and other secured creditors is by establishing that the Debtors' assets have a value, and therefore an equity cushion, over and above the amount of secured liens encumbering such assets.

The Debtors' submit that their assets are worth $50,000,000, based upon an appraisal report prepared for the Debtors by Realty Advisors, dated October 25, 2018 (the "Debtors' Appraisal"), which was attached to the Debtors' Supplement to Emergency Motion for Order Authorizing the Debtors to Assume Insurance Premium Finance Agreement and to Provide Adequate Protection (Doc. # 117).

The Bank submits that the Debtors' Appraisal is deficient because it includes three properties no longer owned by the Debtors. Brookbound Inn, valued at $950,000, was conveyed to AS Realty, LLC, and 38 Stags Leap valued at $400,000 and 18 Haystack Lane valued at $2,500,000 were foreclosed by the mortgagee on those properties on or about April 12, 2019. Accordingly, there is at least $3,850,000 that should be deducted from the overall $50,000,000 valuation set forth in the Debtors Appraisal. Further, the Debtor's Appraisal asserts that the

11

development rights at the Property have a value of $12,500,000.  The Bank submits that this value is overstated and does not account for the costs, fees and time that it will take to have those development rights come to fruition.[8]

Most importantly, the Debtors' Appraisal is based on the overriding assumption that the Hermitage Club would be open and operated as a private ski resort with 525 members paying increased annual membership fees of $15,000 in December of 2018. The Hermitage the Club did not reopen in 2018 (and it is still not open), and 525 members did not start paying increased annual membership fees of $15,000.  As such, the going concern values and the income approaches to valuation on which the Debtor's Appraisal are based are highly questionable, and such values should be reduced based upon the fact that certain fundamental assumptions on which such values are based are no longer true.

The Bank had its own appraisal report prepared by Colliers International in September of 2018, which has been recently updated (the "Bank's Appraisal").  The Bank's Appraisal values the Bank's collateral at $21,310,000.  There was a significant reduction in value in the Bank's appraisal from 2018 to 2019 because of the fact that none of the Debtors' assets are up and operating.  Once again, a fundamental assumption in the Bank's Appraisal in 2018 was that the resort would be open, operating and providing services to its members and receiving membership fees and dues in exchange.  The same is true for the inns owned by the Debtors - they have a much greater value when up and operating rather than in a mothballed state.  It is not surprising that the inns and ski resort owned by the Debtors will have significantly more value as operating assets rather than mothballed assets.  However, the current state of those assets (which has been true now for over 16 months) is mothballed and idle rather than up and operating.

---

[8] Further local and state permitting is required for development, including, without limitation, compliance with all of the criteria of Act 250.

58853368 v2

Based upon the Bank's Appraisal, there is no equity over and above the Bank's secured claim of $22,077,000. In addition to the secured debt owed to the Bank, there are at least $17,230,051.96 in additional secured claims against the Debtors' assets. Attached hereto as Exhibit B are two spreadsheets showing the liens recorded with the Town of Wilmington Land Records and the Town of Dover Land Records. These records do not include the $9,000,000 secured claim of the Barnstormer Summit Lift lenders.[9] These liens (the Bank's secured claim, other recorded lien claims and the Barnstormer lender claim) total $48,307,051. Even using the Debtors' Appraisal of $50,000,000 (without any reduction for going concern or income approach to valuation), and after deducting the value of the properties no longer owned by the Debtors ($3,850,000), will result in a value of $46,150,000, less than the aggregate liens against those assets. As noted above, the Bank submits that a significant reduction in the values set forth in the Debtors' Appraisal is warranted, due to the failure of one of the fundamental assumptions on which that appraisal is based. Any such reduction further supports the Bank's position that there is no equity in the Debtors' assets, and therefore no equity cushion that can provide the Bank and the other secured creditors with adequate protection. Absent providing secured creditors with adequate protection, as is required by the Bankruptcy Code, the DIP Financing Motion cannot be approved.

## **Conclusion**

As noted throughout this objection, the Debtors DIP Financing Motion is not viable under any standards and should not be allowed by the Court. As also noted herein, the Bank has incurred additional fees in excess of $200,000 since this case was commenced; in essence, securing and protecting the Debtors assets. These cases are simply not viable Chapter 11 cases

---

[9] The Bank and the Barnstormer Lift Lenders dispute which party has a first lien on the Barnstormer lift and the Bank reserves any and all rights with respect to its position and that dispute.

58853368 v2

Case 19-10214   Doc   125   Filed 07/10/19   Entered   07/10/19 16:01:28   Desc   Main Document   Page   14 of 15

as the Debtors have no cash, income or ability to fund the most basic expenses necessary to remain in Chapter 11. Accordingly, the Bank submits that the Court should deny the DIP Financing Motion and enter an order immediately converting these cases to cases under Chapter 7, so that the only viable solution - a sale of the Debtors' assets, whether by a Chapter 7 Trustee under Section 363 of the Bankruptcy Code, or through foreclosure in the State Court Foreclosure Action can be processed and consummated.

WHEREFORE, Berkshire Bank respectfully requests that the Court (a) deny the DIP Financing Motion, (b) convert these cases to cases under Chapter 7, and (c) provide such other relief as is just and reasonable.

Dated at Boston, Massachusetts, this 10th day of July, 2019.

BERKSHIRE BANK

By its attorney's

By: /s/ Elizabeth A. Glynn
Elizabeth A. Glynn, Esq.
Ryan, Smith & Carbine, Ltd.
PO Box 310
Rutland, Vermont 05702-0310
(802) 786-1065
eag@rsclaw.com

and

By: /s/ Paul F. O'Donnell, III
Paul F. O'Donnell, III
Hinckley, Allen & Snyder LLP
28 State Street
Boston, Massachusetts 02109
(617) 378-4182
podonnell@hinckleyallen.com

14
58853368 v2

## CERTIFICATE OF SERVICE

      I, Paul F. O'Donnell, III, hereby certify that on this 10th day of July, 2019, I caused to be served a copy of the Objection of Berkshire Bank to Debtor's Second Amended Motion for Order (I) authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (II) Granting Liens and Superpriority Claims to the DIP Lender Pursuant to 11 U.S.C. § 364(c), and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 filed herewith to be served by this Court's CM/ECF System.

                                                                      /s/ *Paul F. O'Donnell, III*
                                                                      Paul F. O'Donnell, III

58853368 v2