## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

———————————————————————x
:
In re:                                        :        CHAPTER 11
                                              :
HERMITAGE INN REAL ESTATE                     :
HOLDING COMPANY, LLC,                         :        CASE NO.  19-10214 (CAB)
                                              :
            Debtor.                           :        (Jointly Administered)
———————————————————————x
                                              :
HERMITAGE INN REAL ESTATE                     :
HOLDING COMPANY, LLC                          :
                                              :
            Movant,                           :
                                              :
v.                                            :
                                              :
15-HERMITAGE, LLC, A&W REALTY LLC,            :
ALBERT SUBBLOIE, ANN COLEMAN,                 :
ATOMIC PROFESSIONAL AUDIO INC,                :
AUSTIN DESIGN INC.,                           :
BERKSHIRE BANK,                               :
BROWNS COUNTRY SERVICES LLC,                  :
BSA ARCHITECTS, INC.,                         :
BUILDERS SERVICES, INC.,                      :
CAROL H. BUTLER TRUST,                        :
CHARLES COLLINS & ANA CLADERA,                :
COLDBROOK FIRE DISTRICT NO. 1,                :
CRAIG DOERSCH PAINTING, LLC,                  :
DAN AND JOHN LANE                             :
dba LANE PLUMBING & HEATING, INC.             :
DAN MCLEOD,                                   :
DAN SOLAZ, DAVID MANNING INC,                 :
DELL FINANCIAL SERVICES LLC,                  :
DONALD JABRO,                                 :
FISHER AND FISHER LAW OFFICES,                :
FRED H. HAMBLET, LLC,                         :
GORDON BRISTOL CONSULTING, LLC                :
GREEN MOUNTAIN POWER CORP,                    :
GREENFIELD GLASS COMPANY,                     :
GRENOBLE GROUP,                               :
HARRINGTON ENGINEERING INC.,                  :
INTERNATIONAL FINANCIAL SVCS CORP             :
IRON HORSE STANDING SEAM                      :

ROOFING CO,                               :
JOYCE LAND SURVEYING CORP,                :
KEY DRILLING & BLASTING SVCS,             :
LAKELAND BANK,                            :
LPV,                                      :
MACROLEASE CORPORATION,                   :
MANCHESTER CARPET CARE INC.,              :
MATTHEW CURTIS,                           :
METROPOLITAN GOLF ASSN,                   :
MICHAEL FAYETTE                           :
dba MFAYETTE CARPENTRY, LLC,              :
MICHAEL FAYETTE STEPHEN KUNKLE            :
dba STEPHEN KUNKLE CARPENTRY,             :
MOUNTAIN GLASS AND LOCK CORP,             :
MR STEEL ACQUISITION CORP.,               :
NEC FINANCIAL SERVICES LLC,               :
NORDIC VALLEY PROPERTIES LLC,             :
NORTHERN BUILDING SUPPLIES, INC,          :
NS LEASING, LLC,                          :
OAKLEAF MARINE MANAGEMENT CORP,:
PIONEER TIMBER FRAMES LLC,                :
PJB HOME CENTER, INC.,                    :
PLIMPTON EXCAVATING LLC,                  :
RCN CAPITAL LLC,                          :
RCN CAPITAL LLC, ATIMA,                   :
REINHART EQUIPMENT,                       :
REINHART FOODSERVICE, LLC,                :
ROBERT FISHER,                            :
RTM CAPITAL PARTNERS, INC.,               :
SETH AND JENNIFER GOODMAN,                :
SHEFFIELD FINANCIAL,                      :
SOUTHWORTH ELECTRICAL INC,                :
SPRUNG STRUCTURES,                        :
SQUIRE CAPITAL, STEPHEN KUNKLE,           :
STEPHEN KUNKLE                            :
dba STEPHEN KUNKLE CARPENTRY,             :
SVT MASONRY INCORPORATED,                 :
SWAN ELECTRIC, INC.,                      :
SYSCO ALBANY, LLC,                        :
TEREX FINANCIAL SERVICES, INC.,           :
TEREX FINANCIAL SERVICES, INC.,           :
TFT HOLDINGS, LLC,                        :
THE INN AT SAWMILL FARM, LLC,             :
THOMAS WHIT & ELIZ ARMSTRONG,             :
TRINITY ENGINEERING &                     :
TECHNICAL SERVICES, LLC,                  :

TRIPLE T TRUCKING,                              :
TRUE WORLD FOODS BOSTON, LLC,                   :
TYLER AND ROSE DICKSON,                         :
VARESCHI PLUMBING & HEATING,                    :
VERMONT DEPARTMENT OF TAX,                      :
W&W BUILDING SUPPLY,                            :
WALKER KIMBALL,                                 :
WESTERN EQUIPMENT FINANCE, INC,                 :
WINDHAM ARCHITECTURAL METALS,                   :
                                                :
            Respondents.                        :
_____x
_____x
                                                :
In re:                                          :     CHAPTER 11
                                                :
HERMITAGE CLUB, LLC                             :     CASE NO.  19-10276 (CAB)
                                                :
            Debtor.                             :     (Jointly Administered)
_____x
                                                :
HERMITAGE CLUB, LLC                             :
                                                :
            Movant,                             :
                                                :
v.                                              :
                                                :
                                                :
BERKSHIRE BANK,                                 :
CORPORATION SERVICE CO, AS REP,                 :
DELL FINANCIAL SERVICES, LLC,                   :
INTERNATIONAL FINANCIAL SVCS CORP:
NEC FINANCIAL SERVICES LLC,                     :
REINHART FOODSERVICE, LLC,                      :
SYSCO ALBANY, LLC,                              :
TCF EQUIPMENT FINANCE,                          :
WEBBANK,                                        :
            Respondents.                        :
_____x

## DEBTORS' MOTION FOR FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362 AND 364(c) and (d), (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO THE DIP LENDER PURSUANT TO 11 U.S.C. § 364(c),  AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Hermitage Inn Real Estate Holding Company LLC ("HIREHCO") and Hermitage Club LLC (the "Club", and together with HIREHCO, the "Debtors"), the debtors and debtors-in-possession herein,  by and through their undersigned proposed counsel, submit this motion (the "Motion") for entry of an order substantially in the form submitted herewith (the "DIP Order,") pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code"), (i) authorizing the Debtors to obtain secured postpetition financing from Restructured Opportunity Investors, Inc., or its assignee (the "DIP Lender" or "Lender"), consisting of a credit facility in the aggregate principal amount of up to $1,750,000 (the "DIP Financing" or the "DIP Facility") for the purpose of funding the Debtors' general operating needs and the administration of the Debtors' chapter 11 cases, in accordance with (a) a Debtor-in-Possession Loan and Security Agreement  substantially in the form attached hereto (the "DIP Loan Agreement"), between the Debtors and the DIP Lender and (b) the budget ("Budget") attached to the DIP Order; (ii) authorizing the Debtors' entry into definitive loan documents including the DIP Loan Agreement (attached hereto as Exhibit A), and performance of such other acts as may be necessary or appropriate in connection therewith; (iii) granting to the DIP Lender valid, fully perfected, and enforceable security interests and liens (collectively, the "DIP Liens") in and upon the DIP Collateral (as defined in the DIP Loan Agreement) pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code.

In support of this Motion, the Debtors rely upon the *Declaration of James Barnes in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed on May 28, 2019 (ECF No. 10), and respectfully state as follows:

**<u>Jurisdiction, Venue And Statutory Predicates</u>**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 4001, 6004 and 9014, and Rule 4001-5 of the Local Rules of the United States Bankruptcy Court for the District of Vermont (the "Local Rules").

A.      **General Background**

3.      The  Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Connecticut on May 28, 2019.

4.      On May 22, 2019, an involuntary petition by petition for relief under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §101, et seq. (the "Bankruptcy Code") filed by Bobbi Resek, Dan Solaz and Lakeland Bank (collectively, the "Petitioning Creditors") against HIREHCO (the "Involuntary Case") in this Court.

5.      On June 19, 2019, this Court entered a Memorandum of Decision Determining Vermont to be the Proper Venue for Three Hermitage Cases (ECF No. 91) and an Order Determining Vermont to be the Proper Venue for Three Hermitage Cases (ECF No. 92)(the "Venue Order").

6.      Pursuant to the terms of the Venue Order, the Chapter 11 Cases were transferred to this Court.

7.      By Order of this Court dated June 28, 2019, the Involuntary Case was converted to

a case under Chapter 11  and  the Chapter 11 case of HIREHCO was consolidated therewith and is pending as a Chapter 11 case in this Court,  Case No. 19-10214.

8.      By Order dated July 12, 2019, this Court directed that the Debtors' cases be jointly administered and consolidated for procedural purposes only.

9.      The Debtors are managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the filing of this Motion, no request has been made for the appointment of a trustee or examiner and no statutory committee has been appointed in the Chapter 11 Cases.

10.     The Debtors own and operate a four-season private members only ski and golf club located in Wilmington, Vermont  ("Hermitage" or the "Resort").  HIREHCO was formed  in 2007 to purchase  the Hermitage Inn (the "Inn") in West Dover, Vermont.  In 2011, HIREHCO expanded its operations and purchased the nearby Haystack Mountain ski resort and an adjacent 18-hole Desmond Muirhead designed championship golf course.  The Club was organized at that time with the intent to develop the Resort into a private, members only facility with 450 private homes and condominiums to be built on site.

11.     Development of the project commenced and ski lifts were installed to link the Inn to the ski mountain.  Club membership interest were sold at an even pace to achieve the goal of 1,500 members and 450 residential properties on site.

12.     Within a couple of years, the Debtors' operations expanded to include the Snow Goose Inn, White House Inn, the Inn at Sawmill Farm, and a local airport property with an additional 450 acres for building lots and expansion of the existing runway.

13.     The purchase of the airport property proved to be troublesome for the Debtors.  The State of Vermont Department of Natural Resources took the position that the common ownership

of the Resort and the airport property through HIREHCO provided grounds to re-evaluate permits already issued by the State.   The State of Vermont slowed the permitting process as it evaluated impact on the local area.  The sale of Club memberships decreased dramatically.  Because of the financial distress caused by the declining sale of Club memberships and the lingering permitting issue, it became necessary for HIREHCO to sell the airport property and additional acreage to maintain operations.

14.      The decline in membership sales and real estate sales resulted in, *inter alia*,  a default in payment of sales and use taxes owed to the State of Vermont.  On April 1, 2018, the State of Vermont ordered the closure of the Resort due to the non-payment of taxes.  Subsequently, Berkshire Bank commenced a foreclosure action against the Debtors in the Vermont State Courts (the "Foreclosure Action").  By order of the court in the Foreclosure Action, a receiver (the "Receiver") was appointed to take possession of the HIREHCO assets.  The Receiver has maintained and preserved the property but has not sought to re-open or improve the facilities since its appointment. By Order of this Court dated May 31, 2019, the Receiver has continued to maintain the Property since the Petition Date. The Receiver retained approximately five employees to maintain the Resort.

15.      As a result of the Resort closure and the effect of the pending Foreclosure Action, it became necessary for the Debtors to file petitions for reorganization under Chapter 11 of the Bankruptcy Code.

16.      Additional information and greater detail on the history of the Resort and its operations may be found in the First Day Declaration of James Barnes, which is incorporated herein by reference.

**B.      Organizational Structure**

17.      HIREHCO is a Connecticut limited liability company.  James R. Barnes is the Manager and initial member of HIREHCO.  The Club is a Connecticut limited liability company wholly owned by HIREHCO.

**C.      The Debtors' Prepetition Capital Structure**

(i)      Prepetition Senior Credit Documents

18.      HIREHCO, as borrower, is a party to a construction loan agreement and related documents dated September 30, 2013 pursuant to which Berkshire Bank ("Berkshire" or the "Prepetition Senior Lender") extended a secured financing facility to HIREHCO in the original principal sum of $20,000,000, as evidenced by a certain Second Amended and Restated Promissory Note in the original principal amount of $15,000,000 (the "Base Lodge Note"); as further evidenced by that certain Third Amended and Restated Promissory Note dated June 28, 2016 in the original principal amount of $1,000,000 (the "Bridge Loan Note") and as further evidenced by that certain Promissory Note dated as of July 18, 2017 in the original principal amount of $1,100,000 (the "Second Bridge Loan Note"), all as secured by a Construction Mortgage and Security Agreement dated September 30, 2013 (the "Construction Mortgage") and recorded in the Town of Wilmington and the Town of Dover Land Records on real property owned by HIREHCO and located in the Towns of Wilmington and Dover, as more specifically described on Schedule A attached hereto (the "Real Property"), as amended by Amendment of Mortgage dated April 30, 2014 and as further amended by Second Amendment of Mortgage dated November 12, 2014 and as further amended by Third Amendment of Mortgage dated December 3, 2014 and as further amended by Fourth Amendment of Mortgage dated December 4, 2015 and as further amended by Fifth Amendment of Mortgage dated June 28, 2016 and as further amended

by Sixth Amendment of Mortgage dated February 1,2017 and as further amended by Sixth Amendment of Mortgage dated February 1, 2017 and as further amended by Seventh Amendment of Mortgage dated February 10, 2017 and as further amended by Eighth Amendment of Mortgage dated July 18, 2017. (The Base Lodge Note, the Bridge Loan Note, the Second Bridge Loan Note and together with the Construction Mortgage, as amended, the "Berkshire Loan Facility").

19.     A portion of the real property secured by the Berkshire Loan Facility is leased by HIREHCO from the Town of Wilmington and the Wilmington Water District. The Town of Wilmington and the Wilmington Water District, as Landlord under the ground lease entered into a certain Ground Lease Consent and Recognition Agreement dated March 9, 2015 and recorded in the Wilmington Land Records consenting to the Berkshire Loan Facility.

20.     The Club and HIREHCO granted to Berkshire a security interest in all of their respective personal property ("Personal Property") to secure the indebtedness under the Berkshire Loan Facility by Security Agreements each dated September 30, 2013. In order to perfect the security interests, Berkshire filed UCC financing statements with the Connecticut Secretary of State (the "Security Interests").

21.     On December 3, 2014, HIREHCO, the Club and James R. Barnes entered into a Second Amended and Restated Construction Loan Agreement, as amended by First Amendment of Loan Agreement and Other Loan Documents dated June 28, 2016, Second Amendment of Loan Agreement and Other Loan Documents dated February 10, 2017, Third Amendment of Loan Agreement and other Loan Documents dated June 14, 2017 and Fourth Amendment of Loan Agreement and Other Loan Documents dated July 18, 2017 to secure the Berkshire Loan Facility.

22.     By Amended and Restated Payment and Completion Guaranty dated December 3, 2014, as amended, James R. Barnes executed a guaranty of the obligations of HIRECHO to

9

Berkshire.

23.     Berkshire declared a default under the Berkshire Loan Facility and the parties
entered a certain Forbearance Agreement dated December 30, 2016 as amended by Second
Amendment to Forbearance Agreement dated July 18, 2017 and as further amended by Amended
and Restated Forbearance Agreement dated November 30, 2017.

24.     As of the Petition Date, approximately $19 million remained outstanding under
the Berkshire Loan Facility (together with any amounts incurred or accrued, but unpaid prior to
and since the Petition Date, the "First Lien Obligations"). The Security Interests granted  the
Prepetition Senior Lender first-priority security interests in and liens on all of their  respective
personal and real property (collectively, the "Prepetition Collateral"), subject only to certain
permitted encumbrances (the "Permitted Liens").

25.     **<u>Involuntary Liens and Encumbrances on the Real Property.</u>**   There are a
number of liens affecting the Real Property, which liens are subsequent and subordinate to the
liens of the Prepetition Senior Lender.  The following entities may claim an interest in the Real
Property (collectively, the "Prepetition Involuntary Liens"):

        a.      BSA Architects, Inc. d/b/a Bull Stockwell Allen may claim an interest in
the Real Property by virtue of a Mechanic's Lien dated June 24, 2016 in the amount of $338,717.81
and recorded on June 27, 2016 in the Town of Dover Land Records, and that certain Writ of
Attachment and Order of Approval dated August 31, 2016 and recorded in the Town of
Wilmington and Town of Dover Land Records and that certain Judgment order to Stipulation dated
February 8, 2017 in the amount of $430,000 and recorded in the Wilmington Land Records and
the Dover Land Records.

        b.      MR Steel Acquisition Corp. d/b/a Ameri-Fab may claim an interest in the

Real Property in the amount of $58,750.00 by virtue of a Notice of Mechanics Lien dated February 13, 2017 and recorded in the Wilmington Land Records.

   c. Thomas Whit Armstrong, Jr. and Elizabeth Armstrong may claim an interest in the Real Property by virtue of a Writ of Attachment and order of Approval dated April 20, 2017 in the amount of $227,186.36 and by Order dated October 23, 2017 in the amount of $198,242.12 recorded in the Wilmington Land Records.

   d. PJB Home Center, Inc. d/b/a Perkins Home Center may claim an interest in the Real Property by virtue of a Mechanics Lien dated May 10, 2017 in the amount of $4,093.35 recorded in the Wilmington Land Records  and a Notice of Mechanics Lien dated May 10, 2017 in the amount of $30,645.19 recorded in the Wilmington Land Records and a Contractor's Lien dated May 8, 2017 in the amount of $7,556.11, recorded in the Dover Land Records.

   e. Green Mountain Power Corporation may claim an interest in the Real Property by virtue of a Stipulated Writ of Attachment dated June 12, 2017 in the amount of $257,628.11 recorded in the Wilmington Land Records.

   f. Michael Fayette d/b/a MFayette Carpentry, LLC may claim an interest in the Real Property by virtue of a Notice of Mechanics Lien in the amount of $18,844.00 recorded on July 6, 2017 in the Wilmington Land Records.

   g. Stephen Kunkle d/b/a Stephen Kunkle Carpentry may claim an interest in the Real Property by virtue of a Notice of Mechanics Lien in the amount of $19,140 recorded on July 6, 2017 in the Wilmington Land Records.

   h. Dan and John Lane d/b/a Lane Plumbing & Heating, Inc. may claim an interest in the Real Property by virtue of a Notice of Mechanics Lien dated July 6, 2017 in the amount of $68,504.33 recorded  in the Wilmington Land Records.

i.      Southworth Electrical, Inc. may claim an interest in the Real Property by virtue of a Memorandum of Lien dated July 10, 2017 in the amount of $66,090.44 recorded in the Wilmington Land Records.

j.      Swan Electric, Inc. may claim an interest in the Real Property by virtue of a Notice of Contractor's Lien dated July 10, 2017 in the amount of $62,510.60 recorded in the Wilmington Land Records.

k.      SVT Masonry Incorporated may claim an interest in the Real Property by virtue of a Judgment in the amount of $103,719.21 recorded on May 30, 2018 in the Wilmington Land Records and relating to a Notice of Lien dated July 14, 2017 in the amount of $89,950 recorded in the Wilmington Land Records.

l.      Seth Goodman and Jennifer Goodman may claim an interest in the Real Property by virtue of a Writ of Attachment dated July 21, 2017 in the amount of $986,495.21 recorded in the Wilmington Land Records.

m.      Craig Doersch Painting, LLC may claim an interest in the Real Property by virtue of a Notice of Lien dated August 2, 2017 in the amount of $76,834.00 recorded in the Wilmington Land Records.

n.      Mountain Glass & Lock Corporation may claim an interest in the Real Property by virtue of a Notice of Claim of Lien dated August 11, 2017 in the amount of $44,872.50 and by Stipulated Writ of Attachment dated November 8, 2017 in the amount of $54,057.02 recorded in the Wilmington land Records.

o.      Vareschi Plumbing & Heating may claim an interest in the Real Property by virtue of  a Notice of Lien dated August 17, 2017 in the amount of $15,220.00 recorded in the Wilmington Land Records.

12

p.      Manchester Carpet Care, Inc. may claim an interest in the Real Property by virtue of a Notice of Lien dated August 9, 2017 in the amount of $39,875.09 recorded in the Wilmington Land Records.

q.      Windham Architectural Metals may claim an interest in the Real Property by virtue of a Notice of Lien dated October 4, 2017 in the amount of $16,209.16 recorded in the Wilmington Land Records.

r.      Sysco Albany, LLC may claim an interest in the Real Property by virtue of a Judgment Order dated August 31, 2017 in the amount of $23,541.61 recorded in the Wilmington Land Records.

s.      Greenfield Glass Company may claim an interest in the Real Property by virtue of a Notice of Lien dated October 24, 2017 in the amount of $4,928.88 recorded in the Wilmington Land Records.

t.      Austin Design Inc. may claim an interest in the Real Property by virtue of a Notice of Lien dated October 24, 2017 in the amount of $20,501.25 recorded in the Wilmington Land Records.

u.      Iron Horse Standing Seam Roofing Co. a/k/a Iron Horse Roofing Co. may claim an interest in the Real Property by virtue of a Preliminary Lien Notice dated November 27, 2017 in the amount of $25,631.11 recorded in the Wilmington Land Records.

v.      Reinhart FoodService, LLC may claim an interest in the Real Property by virtue of a Writ of Attachment dated November 27, 2017 in the amount of $1,587,448.10 recorded in the Wilmington and Dover Land Records.

w.      Reinhart FoodService LLC may further claim an interest in the Real Property by virtue of a Writ of Attachment dated January 25, 2018 in the amount of $1,587,448.10

13

recorded in the Wilmington and Dover Land Records.

x.      Gordon Bristol d/b/a Gordon Bristol Consulting, LLC may claim an interest in the Real Property by virtue of a Notice of Lien dated December 18, 2017 in the amount of $57,080.58 recorded in the Wilmington Land Records.

y.      Michael Fayette and Stephen Kunkle d/b/a Stephen Kunkle Carpentry may claim an interest in the Real Property by virtue of a Writ of Attachment and Order of Approval dated January 2, 2018 in the amount of $30,959.55 recorded in the Wilmington Land Records.

z.      Pioneer Timber Frames LLC may claim an interest in the Real Property by virtue of a Notice of Lien dated January 5, 2018 in the amount of $16,520.00 recorded in the Wilmington Land Records.

aa.      Trinity Engineering & Technical Services, LLC may claim an interest in the Real Property by virtue of a Notice of Mechanics Lien dated January 16, 2018 in the amount of $13,557.75 recorded in the Wilmington and Dover Land Records.

bb.      Trinity Engineering & Technical Services, LLC may further claim an interest in the Real Property by virtue of a Notice of Mechanic's Lien dated January 16, 2018 in the amount of $9,743.65 recorded in the Dover Land Records.

cc.      Metropolitan Golf Association may claim an interest in the Real Property by virtue of a Judgement Order dated October 30, 2017 and certified on January 16, 2018 in the amount of $50,358.84 recorded in the Wilmington Land Records.

dd.      Pamela Keefe, Trustee of the Carol H. Butler Trust may claim an interest in the Real Property by virtue of a Writ of Attachment dated January 30, 2018 in the amount of $1,092,993.16 recorded in the Wilmington Land Records.

ee.      Fred H. Hamblet, LLC may claim an interest in the Real Property by virtue

14

of a Notice of Lien dated April 13, 2017 in the amount of $21,990.00 recorded in the Dover Land Records.

ff.     Joyce Land Surveying Corp. may claim an interest in the Real Property by virtue of a Notice of Contractors Lien dated February 5, 2018 in the amount of $7,374.98 recorded in the Wilmington and Dover Land Records.

gg.     Tyler Dickson and Rose Stewart Dickson may claim an interest in the Real Property by virtue of a Writ of Attachment dated February 9, 2018 in the amount of $1,005,000.00 recorded in the Wilmington Land Records.

hh.     Brown's Country Services, LLC may claim an interest in the Real Property by virtue of a Notice of Lien in the amount of $150,382.86 recorded on February 21, 2018 in the Wilmington Land Records.

ii.     Dan Solaz may claim an interest in the Real Property by virtue of a  Writ and Order in the amount of $314,000.00 recorded on February 26, 2018 in the Wilmington Land Records.

jj.     Plimpton Excavating, LLC may claim an interest in the Real Property by virtue of an Order in the amount of $37,102.84 recorded on August 9, 2018 in the Wilmington Land Records relating to a  Mechanic's Lien   recorded on March 7, 2018 in the Wilmington Land Records.

kk.     Key Drilling & Blasting Services, Inc. may claim an interest in the Real Property by virtue of a Mechanic's lien in the amount of $66,600.00 recorded on March 7, 2018 in the Wilmington Land Records.

ll.     Builders Services, Inc. may claim an interest in the Real Property by virtue of an interest recorded on March 12, 2018 at Book 347, Page 247 of the Dover Land Records.

mm.     Harrington Engineering, Inc. may claim an interest in the Real Property by virtue of an interest in the amount of $39,953.59 recorded on March 12, 2018 at Book 339, Page 159 of the Wilmington Land Records and recorded on March 9, 2018 at Book 11, Page 404 of the Dover Land Records.

nn.     Ann Coleman may claim an interest in the Real Property by virtue of a lien in the amount of $1,670.44 recorded on March 12, 2018 in the Wilmington Land Records.

oo.     Northern Building Supplies, Inc. may claim an interest in the Real Property by virtue of an Order in the amount of $151,744.44 recorded on July 2, 2018 in the Wilmington Land Records and relating to a Mechanic's Lien in the amount of $121,999.13 recorded on March 13, 2018 in the Wilmington Land Records and recorded on March 6, 2018 in the Dover Land Records.

pp.     Triple T Trucking may claim an interest in the Real Property by virtue of a Mechanic's Lien in the amount of $34,634.31 recorded on March 20, 2018 in the Wilmington and Dover Land Records.

qq.     Triple T Trucking may claim a further interest in the Real Property by virtue of a Mechanic's Lien in the amount of $1,981.50 recorded on March 20, 2018 in the Wilmington Land Records.

rr.     Dan Solaz may claim a further interest in the Real Property by virtue of a Writ in the amount of $314,000 recorded on April 2, 2018 relating to a Mechanic's Lien recorded on March 21, 2018 in the Wilmington Land Records.

ss.     Charles T. Collins and Ana Cladera may claim an interest in the Real Property by virtue of a Judgment in the amount of $1,107,192.00 recorded on June 29, 2018 in the Wilmington Land Records relating to a Writ recorded on March 21, 2018 in the Wilmington Land

Records.

tt.     David Manning, Inc. may claim an interest in the Real Property by virtue of an Order in the amount of $34,805.97 recorded on August 29, 2018 in the Wilmington Land Records relating to a Mechanic's Lien recorded on April 6, 2018 in the Wilmington Land Records.

uu.     TFT Holdings, LLC may claim an interest in the Real Property by virtue of a Judgment in the amount of $1,458,249.00 recorded on June 29, 2018 in the Wilmington Land Records relating to a Writ recorded on April 9, 2018 in the Wilmington Land Records.

vv.     Cold Brook Fire District may claim an interest in the Real Property by virtue of a lien in the amount of $255.42 recorded on May 10, 2018 in the Wilmington Land Records.

ww.     Atomic Professional Audio, Inc. may claim an interest in the Real Property by virtue of a Judgment in the amount of $71,372.96 recorded on June 21, 2018 in the Wilmington Land Records.

xx.     True World Foods Boston LLC may claim an interest in the Real Property by virtue of an Order in the amount of $10,790.58 recorded on August 9, 2018 in the Wilmington Land Records.

yy.     Cold Brook Fire District may claim a further interest in the Real Property by virtue of a lien in the amount of $6,250.00 recorded on August 15, 2018 in the Wilmington Land Records.

26.     **Tax Liens on the Real Property.**  The State of Vermont Department of Taxes may claim an interest in the Real Property by virtue of (i) a State Tax Lien dated July 25, 2017 in the amount of $185,239.07 and recorded in the Wilmington Land Records; (ii) a State Tax Lien dated September 7, 2017 in the amount of $114,450.24 and recorded in the Wilmington Land Records; (iii) a State Tax Lien dated September 13, 2017 in the amount of $299,151.87 and recorded in the

Wilmington Land Records; (iv) a State Tax Lien dated August 10, 2017 in the amount of $185,897.61 and recorded in the Wilmington Land Records; and (v) a State Tax Lien dated October 20, 2017 in the amount of $4,396.90 and recorded in the Wilmington Land Records (collectively, the "Tax Liens").

27.    **Mortgages Affecting the Real Property**. In addition to the mortgage held by Berkshire Bank, the following entities hold mortgages secured by the Real Property (collectively, the "Prepetition Subordinate Mortgages"):

a.    Donald and Savannah Jabro may claim an interest in the Real Property by virtue of a mortgage securing the original principal amount of $450,000.00 which mortgage was recorded on May 1, 2017 in the Wilmington Land Records.

b.    Fisher & Fisher Law Offices may claim an interest in the Real Property by virtue of a mortgage securing the original principal amount of $143,727.72 which mortgage was recorded on November 17, 2017 in the Wilmington Land Records.

c.    RTM Capital Partners, Inc., LPV, 15-Hermitage, LLC and Matthew Curtis may claim an interest in the Real Property by virtue of a mortgage deed securing the original principal amount of $2,080,527.77, which mortgage was recorded on December 20, 2017 in the Wilmington Land Records.

28.    Barnstormer Summit Lift, LLC may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement No. 0003128812 recorded with the Connecticut Secretary of State and Original Financing Statement No. 16-300965 recorded with the Vermont Secretary of State covering certain ski lifts owned by HIREHCO (the "Barnstormer Collateral"). The Barnstormer Collateral is not included in the Personal Property Liens (as defined herein) to be subordinated herein.

29.     In addition to the liens affecting the Real Property, there are liens affecting the Personal Property assets of the Debtors.  The following entities may claim an interest in the Debtors' Personal Property  (collectively, the "Personal Property Liens"):

a.      Berkshire Bank may claim an interest in the Personal Property owned by the Debtors by virtue of Original Financing Statement Nos. 0002961631 and 0002993655 recorded with the Connecticut Secretary of State;

b.      Corporation Service Company, as Representative may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement No. 0003016672 recorded with the Connecticut Secretary of State;

c.      Dell Financial Services, LLC may claim an interest in the Personal Property owned by the Club virtue of Original Financing Statement No. 0002956221 recorded with the Connecticut Secretary of State;

d.      International Financial Services Corporation may claim an interest in the Personal Property owned by the Debtors by virtue of Original Financing Statement No. 0003021288 recorded with the Connecticut Secretary of State and Original Financing Statement No. 14-274506 recorded with the Vermont Secretary of State;

e.      Lakeland Bank may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement No. 0003103361 recorded with the Connecticut Secretary of State;

f.      Macrolease Corporation may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement No. 0003021633 recorded with the Connecticut Secretary of State;

g.      NEC Financial Services, LLC may claim an interest in the Personal

19

Property owned by the Club by virtue of Original Financing Statement Nos. 0003057636, 0003059810, 0003093807, and 0003095460 recorded with the Connecticut Secretary of State;

h.      Nordic Valley Properties, LLC may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement No. 14-277361 recorded with the Vermont Secretary of State;

i.       NS Leasing, LLC may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement Nos. 16-301105 and 17-309506 recorded with the Vermont Secretary of State;

j.       RCN Capital, LLC, ATIMA may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement No. 0003026452 recorded with the Connecticut Secretary of State and Original Financing Statement No. 14-275621 recorded with the Vermont Secretary of State;

k.      Reinhart Foodservice, LLC may claim an interest in the Personal Property owned by the Debtors by virtue of Original Financing Statement No. 0003214434 recorded with the Connecticut Secretary of State and Writ of Attachment 17-325079 recorded with the Vermont Secretary of State;

l.       Sysco Albany, LLC may claim an interest in the Personal Property owned by the Club by virtue of Original Financing Statement No. 0003176847 recorded with the Connecticut Secretary of State;

m.     TCF Equipment Finance division  of TCF National Bank may claim an interest in the Personal Property owned by the Club by virtue of Original Financing Statement Nos. 0003060165 and 0003122563 recorded with the Connecticut Secretary of State;

n.      Terex Financial Services, Inc. may claim an interest in the Personal Property

owned by HIREHCO by virtue of Original Financing Statement No. 0003161474 recorded with the Connecticut Secretary of State and Original Financing Statement No. 17-310389 recorded with the Vermont Secretary of State;

   o. The Inn at Sawmill Farm, LLC may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement Nos. 15-278506 and 15-278507 recorded with the Vermont Secretary of State;

   p. Webbank may claim an interest in the Personal Property owned by the Club by virtue of Original Financing Statement No. 0003019760 recorded with the Connecticut Secretary of State; and

   q. Western Equipment Finance, Inc. may claim an interest in the Personal Property owned by HIREHCO by virtue of Original Financing Statement No. 0003159592 recorded with the Connecticut Secretary of State.

   30. The Prepetition Involuntary Liens, the Prepetition Subordinated Mortgages, and the Personal Property Liens shall be hereinafter referred to as the "Prepetition Subordinated Obligations".

   31. As of the Petition Date, the Debtors have aggregate unsecured debts (excluding claims by members of the Resort) totaling approximately $4.5 million, for merchandise, utilities, professional fees, insurance, and employee-related expenses.

<u>**Need For Postpetition Financing**</u>

   32. The Debtors intend to use the Chapter 11 Cases to restructure their debt obligations, propose a feasible plan of reorganization or market the Resort property for an orderly sale. The Debtors will be irreparably harmed if they are not granted the authority to obtain postpetition financing from the DIP Lender in accordance with the terms of the DIP Loan

Agreement. The relief sought herein is necessary in order to permit, among other things, the ability

to fund payroll, payroll taxes, real estate taxes, water and sewer use charges as well as the ability

to provide maintenance to the Resort, insurance and other ongoing necessary chapter 11 expenses

including professional fees and United States Trustee Fees. The access of the Debtors to sufficient

liquidity made available through the incurrence of new indebtedness for borrowed money is vital

to the preservation and maintenance of the going concern value of the Debtors and maximizing a

recovery for creditors.

33.    Absent the additional funds provided by the DIP Financing, the Debtors project that

they will not have sufficient cash to maintain the Resort and its assets.  It is critical that the Debtors

have sufficient funding to meet their ordinary course and bankruptcy-related obligations in order to

effectuate an orderly reorganization or sale. The Debtors believe that the DIP Financing, will enable

them to meet their obligations in these Chapter 11 Cases.

34.    Given the Debtors' existing capital structure and financial condition, the Debtors

were unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the

Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured

credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without

granting the DIP Lender, subject to the carve out and professional fee escrow, the DIP Liens and

the DIP superpriority administrative expense claim under the terms and conditions set forth in the

DIP Loan Agreement.

35.    After good faith arm's length negotiations with respect to the terms and conditions

of the DIP Financing, and after soliciting proposals from other potential DIP lenders, including

Berkshire, the Debtors concluded, in an exercise of their sound business judgment, that the

financing to be provided by the DIP Lender pursuant to the terms of the DIP Loan Agreement and

the DIP Order clearly represents the most favorable terms and adequate source of financing presently available to the Debtors.

36.     The Debtors sought and received proposals for alternative financing. In the weeks prior to the Petition Date, the Debtors solicited a financing proposal from Berkshire, among others. Berkshire has reported that it is not interested in providing post-petition financing to the Debtors. The DIP Financing is the only option available to the Debtors at this critical time.  As outlined in more detail below, the DIP Financing (a) provides for up to $1,750,000 of financing, (b) has a maturity date that is the earlier of  six months  from approval or entry of a final order confirming a plan of reorganization (c) is not secured by any avoidance actions, and (d)  contains reasonable covenants and conditions.

37.     The Debtors submit that the terms of the proposed DIP Financing are fair, reasonable and balanced, reflect the Debtors' exercise of sound business judgment consistent with their fiduciary duties, are the best available under the circumstances, supported by reasonably equivalent value and fair consideration, and should be approved on a final basis.

### Summary of Dip Financing Terms

38.     In accordance with the disclosure requirements of Bankruptcy Rule 4001(c), a summary of the material terms of the DIP Loan Agreement, are set forth in the chart below.[1]

| | |
|---|---|
| *Borrowers* | Hermitage Inn Real Estate Holding Company LLC and Hermitage Club LLC |
| *Lender* | Restructured Opportunity Investors, Inc.<br>or its assignee (the "Lender") |
| *Commitment, Availability and* | The DIP Financing shall be a first priority secured credit facility of up |

---

[1] The descriptions of the material terms of the proposed DIP Financing provided in this Motion are intended only as a summary thereof. Parties should refer to the full DIP Loan Agreement for complete terms of the financing.  In the event of any inconsistency between the descriptions set forth herein and the terms of the DIP Loan Agreement, the terms of the DIP Loan Agreement and DIP Order shall govern. All capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the DIP Loan Agreement.

| | |
|---|---|
| *Purpose* | to $1,750,000 for which the DIP Lender will receive protection under Sections 364(c) and 364(d) of the Bankruptcy Code. |
| *Term, Maturity and Benchmarks* | The maturity date (the "Maturity Date") of the DIP Financing is as follows: the earlier of (i) six months from entry of order approving DIP or (ii) final order confirming Debtors' plan of reorganization. The benchmarks are: <br> a. Hiring Jonathan Joslow, or such other professional acceptable to Lender, as Chief Restructuring Officer with motion, to be filed within 10 days of entry of Order and hearing thereon within 21 days after filing of such motion; <br> b. Meeting of Resort members on or before August 7, 2019 with the result that at least sixty-five percent (65%) of existing members commence paying one hundred percent (100%) of their monthly dues into an escrow account to be used solely for purposes provided in a confirmed plan of reorganization (the "Membership Payments") on or before August 19, 2019, however, failure to obtain the Membership Payments shall not be an event of default if the Debtors file a Motion to Sell its Assets under 11 U.S.C. § 363 on or before August 26, 2019; <br> c. Payment of monthly interest from Interest Reserve to commence on the first of the month succeeding the Closing Date; and <br> d. Filing of a confirmable plan of reorganization within one hundred twenty (120) days of the Petition Date and confirmation of a plan of reorganization within sixty (60) days thereafter. |
| *Interest Rate, Payments, Fees and Expenses* | **Interest Rate**: Prime + 5.5% per annum <br><br> **Default Rate**: In the event of a default by the Debtors as specified in the DIP Loan Agreement, the interest rate charged will be the lesser of (i) 18% per annum or (ii) maximum rate permitted by law. At closing, Lender shall advance $280,000 from the DIP Facility to fund an Interest Reserve. Interest payments will be drawn from the Interest Reserve monthly in arrears. <br><br> Structuring Fee: $50,000 <br><br> Commitment Fee: $52,500 <br><br> Exit Fee: Three Percent (3%) of the loan amount ($52,000) will be payable upon repayment of the loan |
| *Carve Out and Professional Fee* | Superpriority administrative expense claim granted to Lender shall be subject to carve out for the payment of all unpaid fees payable to the |

| | |
|---|---|
| *Escrow* | U.S. Trustee under 28 U.S.C. § 1930. In addition, Lender shall consent to the funding of a professional fee escrow of no less than $150,000 to be used for the payment of approved professional fees and expenses for professionals retained on behalf of the Debtors and any official committee of unsecured creditors appointed in these cases. |
| *Valid Liens* | **DIP Liens**. The senior first priority DIP Liens granted to the DIP Lender pursuant to the DIP Order and the DIP Loan Agreement are deemed valid and perfected upon the entry of the DIP Order. The Lender shall have an allowed superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code. |

## Relief Requested

39.     By this Motion, the Debtors seek entry of the DIP Order granting the following relief: (i) authorizing and approving the Debtors' entry into the DIP Loan Agreement and performance of such other acts as may be necessary or appropriate in connection therewith, to obtain up to $1,750,000 of secured postpetition loans and advances pursuant to the DIP Order; (ii) granting to the DIP Lender the DIP Liens in and upon the DIP Collateral pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code; (iii) granting an allowed DIP Superpriority Claim to the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code; and (iv) vacating and modifying the automatic stay to the extent necessary to effectuate the terms and provisions of the DIP Loan Agreement.

## Basis For Relief

40.     The Debtors do not have sufficient cash or other assets to operate their business during these Chapter 11 Cases or to effectuate a reorganization. The Debtors will be irreparably harmed if they are not granted the authority to obtain postpetition financing from the DIP Lender in accordance with the terms of the DIP Loan Agreement in order to permit, among other things, the orderly maintenance of its business, the ability to fund payroll and payroll taxes, the ability to pay accruing water and sewer use charges as well as the ability to provide critical Resort maintenance, insurance and other necessary chapter 11 expenses, including the out-of-pocket

expenses of a realtor to market the Resort property for sale. The access of the Debtors to sufficient liquidity made available through the incurrence of new indebtedness for borrowed money is vital to the preservation and maintenance of the going concern value of the Debtors and to a successful reorganization of the Debtors.

41.     In the absence of sufficient funds to support the Debtors' ongoing operations, the value of the Debtors' assets and operations will dissipate, jeopardizing their ability to maximize value to the detriment of the Debtors' estates, creditors and all parties in interest.

42.     Thus, the  DIP Financing is in the best interests of the Debtors' estates, creditors and all other stakeholders and, therefore, should be approved by this Court.

**I.     The Proposed DIP Financing Should be Approved Pursuant to
        Sections 364(c) 364(d) of the Bankruptcy Code**

43.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). The Debtors propose to obtain the DIP Financing by providing the DIP Lender, *inter alia*, the DIP Liens and the DIP Superiority Claims pursuant to sections 364(c)(1)–(2) and 364(d)(1) of the Bankruptcy Code.

44.     In seeking to obtain post-petition financing under section 364(c) of the Bankruptcy Code, the Debtors have the burden of demonstrating that:

    i.     They are unable to obtain unsecured credit pursuant to 11 U.S.C. § 364(b), *i.e.*, by allowing a lender only an administrative expense

claim pursuant to 11 U.S.C. § 503(b)(1)(A);

ii.        The credit transaction is necessary to preserve the assets of the estate; and

iii.       The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Los Angeles Dodgers, LLC*, 457 Bankr. 308, 312-13 (Bkrtcy. D. Del. 2011). *See also In re Ames Dept. Stores, 115* Bankr. *34 (*Bkrtcy S.D.N.Y. 1990*).* Further, section 364(d) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior lien on property of the estate only if the debtor is unable to obtain such credit otherwise and there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).  The Debtors submit that the interests of Berkshire, the State of Vermont Department of Taxes, and the Prepetition Subordinated Obligations are adequately protected by the value of the Debtors' Real Property and Personal Property and the continued maintenance of these assets that will be facilitated by the DIP Financing. Absent the DIP Financing the Debtors will not have adequate funds to maintain its Real Property and Personal Property thereby diminishing the value of these assets.

45.     For the reasons set forth herein, the Debtors submit that they have satisfied the standards required to access postpetition financing under section 364(c) and 364(d) of the Bankruptcy Code.

**A.     The Debtors were Unable to Obtain DIP Financing on More Favorable Terms**

46.     The Court may not approve a credit transaction under section 364(c) unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section

364(a) or (b). *In re Photo Promotion Associates, Inc., 89* Bankr. 328, 332 (S.D.N.Y. 1988*); In re*

*Ames Dep't Stores, Inc.*, 115 Bankr. 34, 37 (Bkrtcy. S.D.N.Y. 1990). To satisfy the requirements

of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort

that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re*

*Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). The statute does not impose a duty to seek

credit from "every possible lender before concluding that such credit is unavailable." *See In re*

*Reading Tube Indus.*, 72 Bankr.. 329, 332 (Bkrtcy. E.D. Pa. 1987) (citing *In re Snowshoe Co*., 789

F.2d at 1088).

47.     The  Debtors have been unable to procure any financing in the form of unsecured

credit allowable as an administrative expense claim under section 503(b)(1) of the Bankruptcy

Code. The Debtors face severe liquidity constraints, and were forced to file these Chapter 11 Cases

in order to preserve the value of their assets for the benefit of their creditors, and other parties in

interest.

48.     As explained above, the Debtors sought proposals for alternative financing. The

DIP Financing, provides for the funds  required by the Debtors to fund the Debtors' Chapter 11

expenses, allows for maintenance work that is critical for the winter season, provides for the

funding of the expenses relating to the marketing of the Resort property for sale, contains a six

month term, and is otherwise fair, reasonable and balanced.

49.     Unless the Debtors are able to immediately access postpetition financing on a

secured basis through the DIP Financing, the Debtors will not be able to pay employees, insurance,

maintenance costs, and other necessary and critical expenses necessary to maintain and maximize

the value of the Debtors' assets. Indeed, absent the DIP Financing, the Debtors would not be

afforded the opportunity to reorganize under Chapter 11 which would irretrievably damage the

value of the Debtors' assets. By contrast, approval of the DIP Financing will allow the Debtors to maintain the Resort property and allow the Debtors sufficient time to maintain and maximize the value of their assets, instill confidence in the Resort members and permit the Debtors the opportunity to proceed expeditiously to either confirmation of a feasible chapter 11 plan or a sale of the Resort property within an aggressive timetable.

50.     As it stands, the DIP Lender has provided the Debtors with the most favorable and flexible post-petition financing terms that the Debtors have been able to procure. The Debtors submit that their efforts to obtain sufficient postpetition financing on the most favorable terms available satisfies the standard required under section 364(c) and 364(d) of the Bankruptcy Code.

**B.      The DIP Financing is Necessary to Preserve the Debtors' Assets
and Going Concern Value**

51.     As debtors-in-possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Wolf v. Weinstein* 372 U.S. 633, 649, 83 S. Ct 969 (1963); *In re Battinelli*, 169 Bankr. 522 (Bkrtcy. E.D.N.Y. 1994) *In re Mushroom Transp. Co.,* 382 F.3d 325, 339 (3d Cir. 2004). As noted above, without the DIP Financing, there is a significant risk that the Debtors would be forced to liquidate their assets in a chapter 7 liquidation or foreclosure without the benefit of an organized national marketing effort designed to maximize the sale price and a recovery for creditors. *In re Ames Dept. Stores*, 115 Bankr.. at 38 (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").

52.     As explained herein, the Debtors require access to funds in the form of postpetition financing to enable it to maintain the Resort , meet their chapter 11-related obligations, and reorganize their estates. Accordingly, the DIP Financing is necessary to preserve the Debtors'

assets and the going concern value of the Company.

**C.   The Terms of the DIP Financing are Fair, Reasonable, and
Appropriate Under the Circumstances**

53.    The DIP Financing was negotiated in good faith and at arm's length between the

Debtors and the DIP Lender, resulting in an agreement designed to permit the Debtors to continue

to operate, satisfy all of their post-petition obligations, fund the out-of-pocket expenses of a broker

to be retained to market the Resort property for sale and maximize the value of their assets through

an orderly sale process. *See, e.g., In re Snowshoe Co.,* 789 F.2d at 1088 (stating that section 364

of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly

when "time is of the essence to preserve a vulnerable seasonal enterprise"); *In re Western Pacific

Airlines, Inc*., 223 Bankr. 567, 573 (Bnkrtcy. D. Colo. 1997) (authorizing postpetition financing to

preserve value of aircraft leaseholds where to hold otherwise would result in the elimination of

value and the "immediate collapse of the Debtor as a going concern").

54.    Accordingly, and as set forth in more detail herein, the Debtors submit that the

terms and conditions of the proposed DIP Financing are fair, reasonable and appropriate under the

circumstances.

**D.   Entry Into the DIP Loan Agreement Constitutes a Sound Exercise of
the Debtors' Business Judgment**

55.    Provided that an agreement to obtain secured credit does not run afoul of the

provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable

deference in acting in accordance with its sound business judgment in obtaining such credit. *See,

e.g., In re Trans World Airlines, Inc.,* 163 Bankr. 964, 974 (Bkrtcy. D. Del. 1994) (approving

postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent

business judgment."); *Ames Dep't Stores*, 115 B.R. at 40 ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.");

56.     Bankruptcy courts consistently defer to a debtor's business judgment onbusiness operations g decisions, including a debtor's decision to borrow money. *See, e.g., In re AMR Corp.*, 485 Bankr.. 279, 287 (Bkrtcy. S.D.N.Y. 2013) ("[i]n determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment); "M]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

57.     The Debtors believe that the proposed terms of the DIP Financing as set forth in the DIP Loan Agreement are the best available to the Debtors and are reasonable under the circumstances. The Debtors further believe that entry into the DIP Financing represents a sound exercise of the Debtors' business judgment because the funds provided by the DIP Financing are essential to enable the Debtors to reorganize their estates, and satisfy all of their chapter 11-related obligations. The Debtors respectfully submit that because the circumstances of these Chapter 11 Cases require the Debtors to obtain financing under section 364(c) and 364(d) of the Bankruptcy Code, their entry into the DIP Credit Facility, and approval of the DIP Financing reflects a sound exercise of their sound business judgment and is in the best interests of the Debtors' estates as a

whole when compared with the alternatives.

58.     The collateral securing the Prepetition Obligations to Berkshire, the Tax Liens, and the Prepetition Subordinated Obligations was recently appraised by the Debtors at $50 million, and by Berkshire's valuation professional at approximately $53 million, in the fall of 2018 significantly greater than the amount owed under the Berkshire Loan Facility, the State of Vermont Department of Taxes and to the Prepetition Subordinated Obligations.[2] This equity cushion is more than sufficient to constitute adequate protection.   "It is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection" In re AMR Corp. 490 Bankr. 470, 478 (S.D.N.Y. 2013); *See, e.g., In re James River Assocs., 148 Banrk. 790, 796 (E.D. Va. 1992)* In sum, the adequate protection offered by the Debtors to the prepetition secured creditors is fair, reasonable and sufficient to protect against the diminution of their collateral position. Accordingly, the Debtors respectfully submit that the use of Cash Collateral on the terms set forth in the proposed DIP Order provides Berkshire, the Vermont Department of Taxes, and the Prepetition Subordinated Obligations with adequate protection and is in the best interest of the Debtors, the Debtors' estates, their creditors and all parties in interest, and, therefore should be authorized by this Court.

## II.     Request for a Final Hearing

59.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing for July 26, 2019 for the entry of the DIP Order.

60.     By Order dated July 12, 2019, this Court denied a previous motion to authorize

---

[2]  A copy of the appraisal obtained by the Debtors was filed on July 3, 2019 as part of the Debtors' Supplement (ECF No. 117) to its Motion to Approve Insurance Financing. A full copy of the Berkshire appraisal is available upon request. Attached as Exhibit B is the Letter of Transmittal and initial twelve (12) pages of the Berkshire appraisal including the Executive Summary.

borrowing on an interim basis on previous terms negotiated with the DIP Lender.  By this Motion, the Debtors seek a final order on the revised terms set forth in the DIP Loan Agreement.  The revised terms negotiated between the Debtors and the DIP Lender include DIP Collateral that is now limited to the Debtors' real property, account receivables, ski lifts (other than the Barnstormer Summit Lift) and Membership Payments.  The DIP lender is not seeking a lien on the Debtors' remaining personal property.  The Budget contains, among other things, funding for the CRO position required by the DIP Lender, as well funding for other payroll obligations, obligations to the Cold Brook Fire District, real estate tax obligations, a professional fee escrow of $150,000 and monthly payments  to Berkshire Bank.

### Notice

61.     Notice of this Motion shall be given to (i) the Office of the United States Trustee for the District of Vermont, Leo O'Brien Federal Building, 11A Clinton Avenue, Room 620, Albany, New York  12207-2190; Attn: Amy J. Ginsberg, Esq. and Lisa M. Penpraze, Esq.; (ii) Halloran & Sage, One Goodwin Square, 225 Asylum Street, Hartford, Connecticut 06103, Attn. Craig I. Lifland, Esq., attorneys for the DIP Lender; (iii) the Internal Revenue Service, Centralized Insolvency Operation, PO Box 7346, Philadelphia, PA  19101-7346; (iv) the Vermont Department of Taxes, 133 State Street, Montpelier, Vermont 05633; (v) (a) Ryan Smith & Carbine, Ltd, Mead Building, 98 Merchants Row, Rutland, VT  05702-0310; Attn: Elizabeth A. Glynn, Esq. and James B. Anderson, Esq. and (b) Hinckley, Allen & Snyder LLP., 28 State Street, Boston, Massachusetts 02109; Attn: Paul F. O'Donnell III, Esq., counsel for Berkshire Bank; (vi) (a) Andre Denis Bouffard, PO Box 190, Burlington, VT  05402-0190 and (b) Robinson & Cole LLP, 280 Trumbull Street, Hartford, CT  06103; Attn: Patrick M. Birney, Esq, counsel for Ad Hoc Committee of Unsecured Creditors; (vii) the holders of Prepetition Subordinated Obligations; (viii) each of the

Debtor's twenty largest unsecured creditors; and (ix) all parties that have requested notice.  In light

of the nature of the relief requested herein, the Debtors respectfully submit that no other or further

notice is required.

WHEREFORE, the Debtors respectfully request entry of the DIP Order, substantially in

the form submitted herewith, (a) authorizing the Debtors to obtain the DIP Financing from the DIP

Lender pursuant to the DIP Loan Agreement and (b) granting the Debtors such other and further

relief as the Court deems just and proper.

Dated: July 15, 2019
     New Haven, Connecticut

THE DEBTORS,
HERMITAGE INN REAL ESTATE
HOLDING COMPANY, LLC and
HERMITAGE CLUB, LLC


By:   /s/Douglas S. Skalka
    Douglas S. Skalka (ct00616)
    NEUBERT, PEPE & MONTEITH, P.C.
    195 Church Street, 13th Floor
    New Haven, Connecticut  06510
    Telephone 203.821.2000
    dskalka@npmlaw.com

    *and*

    Thomas P. Simon, Esq.
    McCormick, Fitzpatrick,
    Kasper & Burchard, P.C.
    40 George Street
    Burlington, Vermont  05401
    (802) 863-3494
    tps@mc-fitz.com

# EXHIBIT
# A

**DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

**THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement") is made this ___ day of July, 2019, by and among **HERMITAGE INN REAL ESTATE HOLDING COMPANY LLC**, a Connecticut limited liability company ("HIREHCO"), **HERMITAGE CLUB LLC**, a Connecticut limited liability company (the "Club"; together with HIREHCO, collectively, jointly and severally, the "Borrowers" and each individually a "Borrower"), each having an address at 145 Deercliff Road, Avon, Connecticut 06001, and **RESTRUCTURED OPPORTUNITY INVESTORS, INC.**, a Connecticut corporation having an address at 11 Scovill Street, P.O. Box 2763, Waterbury, Connecticut 06723-2763 or its designee ("Lender").

**WITNESSETH:**

**WHEREAS**, Borrowers have each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut; and

**WHEREAS**, an involuntary petition for relief was filed against HIREHCO on May 22, 2019 (the "Filing Date") in the United States Bankruptcy Court for the District of Vermont (the "Bankruptcy Court"); and

**WHEREAS**, the Bankruptcy Court entered an order transferring venue of the Borrowers' cases from the United States Bankruptcy Court for the District of Connecticut to the Bankruptcy Court; and

**WHEREAS,** Borrowers have requested that Lender provide to Borrowers a debtor-in-possession line of credit secured by a first-priority lien on the Properties and the Collateral in the manner set forth herein and in the Orders and Lender is willing to make said line of credit to Borrowers on the terms and conditions and in reliance upon the representations and warranties of Borrowers hereinafter set forth:

**NOW, THEREFORE,** in consideration of the foregoing and in further consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1.     **Security Interest.**

(a)     Each Borrower hereby grants to the Lender a first-priority lien on and security interest in, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, all of such Borrower's present and future right, title and interest in and to the Included Assets (the "Collateral"), including without limitation, the following property, whether now existing or hereafter created:

(i)     All Accounts and all Supporting Obligations related thereto (as such capitalized terms are defined in the Uniform Commercial Code as in effect in Connecticut, as may be amended from time to time) of the Borrower, whether now existing or hereafter arising,

including without limitation, all Membership Payments, accounts receivable, health-care-insurance receivables, notes, drafts, acceptances or other forms of obligations and receivables, whether now or hereafter received by or belonging to the Borrower, for inventory sold or for services rendered, and all rights to payments under contracts, whether or not earned by performance, together with all guarantees and security therefor, all accounts arising or to arise therefrom, and all proceeds thereof (whether cash proceeds or otherwise), and including, without limitation, all rights of Borrower in and to the goods represented thereby including reclaimed, returned or repossessed goods, and all rights Borrower may have or acquire for securing or enforcing the foregoing, including without limitation, the rights to reserves, deposits, income tax refunds, choses in action, judgments, insurance proceeds and all other rights of the Borrower to receive payments;

(ii)      All Instruments, including Promissory Notes, Documents and Chattel Paper, whether tangible or electronic, and all Supporting Obligations related thereto (as such capitalized terms are defined in the Uniform Commercial Code as in effect in Connecticut, as may be amended from time to time) of Borrower, whether now existing or hereafter arising, including without limitation, all documents of title, policies and certificates of insurance, securities, deposits, cash or other property owned by Borrower or in which it has an interest, including but not limited to, all property allocable to unshipped orders and merchandise returned by or reclaimed by or repossessed from customers, all rights of stoppage in transit, replevin, repossession and reclamation and all other rights of an unpaid vendor or lienor;

(iii)      All Deposit Accounts, Letter of Credit Rights and all Supporting Obligations related thereto (as such capitalized terms are defined in the Uniform Commercial Code as in effect in Connecticut, as may be amended from time to time) of the Borrower, whether now existing or hereafter arising, together with the rights to withdraw from said Deposit Accounts and make deposits to the same and the right to draw under Letters of Credit (as defined in the Uniform Commercial Code as in effect in Connecticut, as may be amended from time to time); and

(iv)      Proceeds (as such capitalized term is defined in the Uniform Commercial Code as adopted in Connecticut, as may be amended from time to time) including without limitation, insurance proceeds and condemnation awards and products of all of the foregoing property described in (i) through (vii) hereof, whether such Proceeds take the form of Accounts, Instruments, Documents, Chattel Paper, or Fixtures, or otherwise.

It is expressly agreed that Lender shall not have a lien or grant of security interest in or to the Excluded Collateral.

(b)      <u>Obligations Secured</u>.  The grant of the security interest herein by each Borrower to the Lender shall secure the payment and performance of all liabilities and obligations now or hereafter owing from any Borrower or Borrowers to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including without limitation, (i) all obligations of Borrowers, absolute or contingent, for the Loan, together with interest thereon, and all reasonable costs of collection in connection therewith and all other fees and

2

charges which may at any time be due and payable, as provided for in this Agreement, the agreements, instruments and documents required to be executed and delivered by Borrowers to Lender pursuant to the terms hereof and executed by Borrowers, the amount due on any notes of Borrowers given to, received by or held by Lender for or on account of the Loan; and (ii) all obligations of Borrowers, actual or contingent, in respect of Letters of Credit or banker's acceptances issued by the Lender for the account of or guaranteed by the Borrowers (the "Obligations", which term shall include all accrued interest and all reasonable costs and expenses, including attorney's fees, costs and expenses relating to the appraisal and/or valuation of assets and all costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, administering, enforcing or protecting any of its rights under the Obligations or hereunder or with respect to the Collateral or in any litigation arising out of the transactions evidenced by the Obligations).  Upon the occurrence of an Event of Default and during the continuance thereof, the Lender shall have the unrestricted right from time to time to apply (or to change any application already made) the proceeds of any of the Collateral to any Obligations, as the Lender, in its sole discretion, may determine.

(c)      [Intentionally Omitted].

(d)      <u>Superpriority Administrative Expense Claim</u>.  Subject to the Carve-Out, the Lender shall have, with respect to the Obligations, a superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over any and all administrative expenses, whether heretofore or hereinafter incurred, of any kind or nature specified in sections 503(b) and 507(b) of the Bankruptcy Code.

2.      **Definitions.**  As used herein the following terms shall have the following meanings:

"Accounts" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect in the State of Connecticut, but including, without limitation, any right to payment held by any Borrower, whether in the form of accounts receivable, notes, drafts, acceptances or other forms of obligations and receivables now or hereafter received by or belonging to any Borrower for Inventory sold or leased by it or for services rendered by it whether or not earned by performance, together with all Supporting Obligations, guarantees and security therefor and all proceeds thereof, whether cash proceeds or otherwise, including, but not limited to, all right, title and interest of any Borrower in the Inventory which gave rise to any such Accounts, including, but not limited to, the right of stoppage in transit and all returned, rejected, rerouted or repossessed Inventory.

"Account Debtor" means any Person who is or may become obligated to a Borrower.

"Advance" means an advance of proceeds of the Loan.

"Affiliate" means any Person (i) that, directly or indirectly, controls, is controlled by, or is under common control with, any Borrower; (ii) that is a member, director, manager, or officer of any Borrower or of any Person that, directly or indirectly, controls, is controlled by, or is under common control with, any Borrower, together with, heirs, executors, administrators,

personal representatives, successors, and assigns; and (iii) any trust of which any of the foregoing Persons is a settlor, trustee, or beneficiary. For the purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Anti-Terrorism Laws" means any laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the Laws comprising or implementing the Bank Secrecy Act, and the Law administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Laws may from time to time be amended, renewed, extended, or replaced).

"Application" shall have the meaning set forth in Section 6(n)(i) hereof.

"Article 9" shall have the meaning set forth in Section 10 hereof.

"Bankruptcy Code" shall mean the United States Bankruptcy Code (11 U.S.C. Sec. 101 et seq.), as amended, and any successor statute.

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Blocked Person" shall have the meaning set forth in Section 3(r) hereof.

"Budget" means the budget of Borrowers as approved by the Lender and the Bankruptcy Court.

"Business Day" any day other than a Saturday, a Sunday, or a legal holiday on which Lender is not open for business, subject to adjustment in accordance with the Following Business Day Convention.

"Capital Leases" means leases under which any obligor is the lessee or obligor, the discounted future rental payment obligations under which are required to be capitalized on the balance sheet of the lessee or obligor in accordance with GAAP; and leases of goods or other property, whether real or personal, which is treated as an operating lease under GAAP and as a loan or financing for United States income tax purposes.

"Carve-Out" shall have the meaning set forth in the Order.

"Chamonix Village Liened Properties" shall mean the following real property owned by the Debtor and known as (i) Unit # 502, 6 Garmisch Court; (ii) Unit# 504, 6 Garmisch Court; (iii) Unit # 603, 5 Garmisch Court;  (iv)  Unit # 402, 3 Garmisch Court; and  (v) Unit # 401, 3 Garmisch Court, Wilmington Vermont.

"Chapter 11 Case" shall mean, collectively, the cases under Chapter 11 of the Bankruptcy Code commenced by the Borrowers and pending in the United States Bankruptcy Court for the District of Vermont.

"Charter Documents" means, for any entity, the documents pursuant to which such entity has been formed and by which it is governed, including, in the case of a corporation, its certificate of incorporation and its bylaws; in the case of a partnership, its agreement of partnership and certificate of limited partnership, if applicable; in the case of a limited liability company, its certificate or articles of organization and operating agreement; and in the case of a trust, its declaration of trust.

"Chattel Paper" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of Connecticut.

"Closing" means the closing of the Loan in accordance with the terms of this Agreement.

"Closing Date" means the date on which Closing occurs.

"Collateral" shall have the meaning set forth in Section 1 hereof.

"Commercial Tort Claims" shall mean all Commercial Tort Claims as that term is defined in Article 9 of the Uniform Commercial Code as in effect in Connecticut from time to time.

"Commitment" shall have the meaning set forth in Section 4 hereof.

"Commitment Fee" shall have the meaning set forth in Section 4(g) hereof.

"Distribution" means the declaration or payment of any dividend on or in respect of any shares of any class of membership or other equity interest of any Borrower; the purchase, redemption, or other retirement of any shares of any class of membership or other equity interests of any Borrower (or rights, warrants or options exercisable or convertible into such membership or other equity interests), directly or indirectly through a Subsidiary of any Borrower or otherwise; the return of capital by any Borrower to its members, as such; or any other distribution on or in respect of any shares of any class of membership or other equity interests of any Borrower.

"Drawdown Date" means, with respect to any Advance, the date on which any such Advance is made or is to be made.

"Equipment" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of Connecticut.

"ERISA" shall have the meaning set forth in Section 3(m) hereof.

"Event of Default" shall mean the existence of a state of facts which constitute a default under the provisions of Section 12 of this Agreement.

"Excluded Collateral" shall mean (i) those ski lifts located at the Properties which are subject to the lien of Barnstormer Summit Lift, LLC; (ii) the Chamonix Village Liened

5

Properties; (iii) all assets owned by Hermitage Inn, LLC; (iv) all personal property owned by the Debtors that is not an Included Asset;  and (v) all avoidance actions under Chapter 5 of the Bankruptcy Code.

"Exit Fee" shall have the meaning set forth in <u>Section 4(g)(2)</u> hereof.

"Filing Date" shall have the meaning set forth in <u>Section 6(n)(v)</u> hereof.

"Final Order" shall mean the final order of the Bankruptcy Court, in form acceptable to Lender, in its sole discretion, approving of this Agreement, the other Loan Documents and the funding of the full Loan amount, as such order may be amended, modified or supplemented from time to time with the express written consent of the Lender and the approval of the Bankruptcy Court.

"Following Business Day Convention" shall mean the convention for adjusting any relevant date if it would otherwise fall on a day that is not a Business Day, and provides that, in such event, such date shall be adjusted to the first following day that is a Business Day, except that if such following day shall be a day in the following month, such date shall be adjusted to the immediately preceding Business Day.

"Funds" shall have the meaning set forth in <u>Section 5(a)</u> hereof.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"General Intangibles" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of Connecticut, including without limitation, Payment Intangibles, as defined in Article 9 of the Uniform Commercial Code in effect in Connecticut from time to time, but excluding Accounts, Chattel Paper and Instruments.

"Governmental Authority" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state, commonwealth, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"Included Assets" shall mean Accounts, Accounts Receivable, all ski lifts not subject to the liens of Barnstormer Summit Lift, LLC Membership Payments, and all Proceeds (as such capitalized term is defined in the Uniform Commercial Code as adopted in Connecticut, as may be amended from time to time) including without limitation, insurance proceeds and condemnation awards and products of all of the foregoing property.

"Indebtedness" as applied to a Borrower, means, without duplication:

       (i)     all obligations for money loaned,

       (ii)    all obligations secured by any Lien on the real or personal property of Borrower, including without limitation Purchase-Money Obligations,

(iii)   all obligations which are evidenced by bonds, debentures, notes or other loan instruments,

(iv)   Capital Lease obligations,

(v)   all obligations of other Persons which Borrower has guaranteed,

(vi)   all reimbursement obligations in connection with letters of credit or letter of credit guaranties issued for the account of Borrower,

(vi)   the Obligations, and

(vii)   Subordinated Debt.

"Indemnifiable Liabilities" shall have the meaning set forth in Section 16 hereof.

"Indemnities" shall have the meaning set forth in Section 16 hereof.

"Instruments" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of Connecticut, or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which, in the ordinary course of business, is transferred by delivery with any necessary endorsement or assignment, whether now or hereafter held by any Borrower.

"Interest Reserve Escrow Account" shall have the meaning set forth in Section 5 hereof.

"Interest Reserve Funds" shall have the meaning set forth in Section 5 hereof.

"Inventory" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of Connecticut.

"Letters of Credit" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of Connecticut.

"Lien" means any lien, charge, deed of trust, mortgage, security interest, tax lien, pledge, hypothecation, assignment, preference, priority, other charge or encumbrance, or any other type of preferential arrangement of any kind or nature whatsoever by or with any Person (including, without limitation, any conditional sale or title retention agreement), whether arising by contract, operation of law, or otherwise.

"Loan" shall have the meaning set forth in Section 4 hereof.

"Loan Documents" shall have the meaning set forth in Section 13 hereof.

"Maturity Date" shall have the meaning set forth in Section 4(f) hereof.

7

"Membership Payments" shall have the meaning set forth in Section 6(n)(iii) hereof.

"Minimum Reserve Balance" shall have the meaning set forth in Section 6(n)(iv) hereof.

"Mortgage" means that certain Mortgage Deed, Assignment of Rents and Leases, Security Agreement and Fixture Filing granted contemporaneously herewith by HIREHCO to Lender, encumbering the Properties as a first-priority mortgage lien.

"Note" shall have the meaning set forth in Section 4(a) hereof.

"Obligations" shall have the meaning set forth in Section 1(b) hereof.

"Order" shall mean the Final Order.

"OSHA" shall have the meaning set forth in Section 3(m) hereof.

"Permitted Exceptions" shall have the meaning set forth in the Mortgage.

"Permitted Indebtedness" shall mean the Indebtedness set forth in Exhibit D attached hereto and incorporated herein.

"Permitted Liens" shall mean those Liens set forth on Exhibit B attached hereto and incorporated herein, which are subject and subordinate to the security interests and liens created by this Agreement and the other Loan Documents in all respects.

"Person" shall mean a natural person, a corporation, a partnership, a limited liability company or any other entity.

"Plan" shall have the meaning set forth in Section 6(n)(v) hereof.

"Prime Rate" shall mean the highest interest rate published in the "Money Rates" section of the Wall Street Journal, Eastern Edition (the "Journal" or the "WSJ") and shown as the "Prime Rate." If more than one "Prime Rate" is published in the "Money Rates" section, the highest rate will be the Prime Rate for purposes of this Agreement. The Prime Rate is not necessarily the lowest or best rate at which the Lender loans money. In the event the Prime Rate is unavailable for any reason then the Lender will substitute a comparable rate therefor. The selection of the comparable rate shall be made in Lender's sole discretion. Any change in the Prime Rate shall become effective immediately upon any change in the Prime Rate, and such changed interest rate shall be effective without notice from Lender.

"Properties" shall mean, collectively, the premises commonly known as 259 Route 100, Dover, Vermont, 34 Look Road, Wilmington, Vermont, 183 Gatehouse Drive, Wilmington, Vermont, and being more particularly described in the Mortgage but, excluding the Chamonix Village Liened Properties.

8

"Purchase-Money Obligations" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of Connecticut.

"Resort" shall mean the four-season private members only ski and golf club located at the Properties.

"Sale Motion" shall have the meaning set forth in Section 6(n)(iii) hereof.

"Structuring Fee" shall have the meaning set forth in Section 4(g) hereof.

 "Subordinated Debt" means any Indebtedness incurred by any Borrower with the consent of Lender which is subordinated to the Obligations (including loans made by the members of any Borrower) pursuant to a subordination agreement in form and substance satisfactory to Lender.

"Subsidiary" shall mean a corporation, limited liability company or other entity of which fifty percent (50%) or more of the outstanding equity having voting power to control the management of such corporation, limited liability company or other entity (whether or not at the time the holders of any other class or classes of securities of such entity shall or might have such voting power by reason of the happening of any contingency) is at any time directly or indirectly owned by any Borrower.

"USA Patriot Act" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

3.      **Representations and Warranties.**   Borrowers represent and warrant to Lender that, except as disclosed to Lender in writing:

(a)      Each Borrower is a limited liability company duly organized, validly existing and legally existing under the laws of the State of Connecticut and in good standing in every jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary.  Each Borrower has the requisite power, authority, permits, consents, authorizations and licenses necessary to carry on its business,  has the requisite power and authority to own and operate the Properties, and has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and the other Loan Documents to which it is a party; all consents necessary to authorize the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party have been duly adopted or obtained and are in full force and effect; and this Agreement and the other Loan Documents to which it is a party have been duly executed and delivered by each Borrower, and constitute valid and binding obligations of each Borrower.

(b)      The execution, delivery and performance by each Borrower of this Agreement and the other Loan Documents to which any Borrower is a party are (i) within the powers of such Borrower, having been duly authorized by all necessary action, enforceable against such Borrower in accordance with their respective terms, (ii) do not contravene or constitute a default under or violation of any applicable Charter Document or any other material agreement (or

9

require the consent of any Person under any agreement that has not been obtained and delivered to the Lender in writing) to which such Borrower is a party or by which such Borrower or any of its properties are bound, and (iii) do not and will not result in the creation or imposition of any Lien on any asset of such Borrower, except the Lien securing the Loan Documents.

(c)     Subject to the Orders, no authorization, consent, approval, license, exemption of or filing or registration with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, is or will be necessary to the valid execution, delivery or performance by Borrowers of this Agreement, the note evidencing the Loan or any other Loan Documents to which any Borrower is a party.

(d)     There have been filed all federal, state and local tax returns with respect to Borrowers and their direct and indirect business operations which are required to be filed. Except with respect to Permitted Exceptions, Borrowers have paid or caused to be paid to the respective taxing authorities all taxes as shown on such returns or on any assessments received by them to the extent that such taxes have become due with the exception of Vermont sales and use tax identified in Borrowers' liabilities.  Borrowers know of no proposed material tax assessment against any Borrower, and no Borrower is obligated by any other agreement, tax treaty, instrument or otherwise to contribute to the payment of taxes owed by any other person or entity.  All material tax liabilities are adequately provided for or reserved against on the books of the Borrowers.

(e)     Each Borrower is the legal and beneficial owner of the Collateral and upon the execution of the Loan Documents and entry of the Orders, the Lender shall hold a valid, perfected and continuing first-priority Lien in the Collateral as secured for the Obligations, senior in priority to all Liens, including, without limitation, Permitted Liens.  Except with respect to Permitted Liens, no effective financing statement or other instrument similar in effect cover all or any portion of the Collateral is on file in any recording office other than those in favor of Lender.

(f)     The Collateral, the records relating thereto and the place of business and chief executive office of each Borrower are located at the addresses set forth in <u>Exhibit C</u> attached hereto and incorporated herein.

(g)     Subject to any limitations stated therein or in connection therewith, all information furnished or to be furnished by Borrowers pursuant to the terms hereof, when taken as a whole, will not, at the time the same is furnished, contain any untrue statement of a material fact and will not omit to state a material fact necessary in order to make the information so furnished, in the light of the circumstances under which such information is furnished, not misleading.

(h)     [Intentionally Omitted].

(i)     [Intentionally Omitted].

(j)     To the best of Borrowers' knowledge, each Borrower is in material compliance with all laws, ordinances, rules, or regulations, applicable to it, of all federal, state or local

governments or any instrumentality or agency thereof, including, but not limited to, the Employee Retirement Income Security Act ("ERISA"), the United States Occupational Safety and Health Act ("OSHA") and all federal, state and municipal laws, ordinances, rules and regulations relating to the environment.

(k)     Except for the Chapter 11 Case, there is no pending, or to Borrowers' knowledge, threatened action or proceeding or investigation, injunction, writ or order affecting any Borrower before or by any court, Governmental Authority or arbitrator which purports to affect the legality, validity or enforceability of this Agreement or any other Loan Document.

(l)     No Borrower has invested in the stock, common or preferred, of any other corporation, or in any equity of any other entity, and there are no fixed, contingent or other obligations on the part of any Borrower to issue any additional membership interests.

(m)     No Borrower owns any Subsidiaries, except that the Club, Hermitage Inn, LLC, Hermitage Realty, LLC, and 300 RTE 100 Dover, LLC are each a Subsidiary of HIREHCO, and Hermitage Deerfield Valley Real Estate LLC is 50% owned by HIREHCO.

(n)     Except as set forth in the Orders, no investment banking, brokerage, finders' or similar fees are payable to any Person (other than Lender under the Loan Documents) in connection with the execution, delivery and performance of this Agreement and the other Loan Documents.

(o)     Each Borrower possesses all the trademarks, trade names, copyrights, patents, licenses and governmental permits, licenses, orders and approvals, or rights in any thereof, adequate for the conduct of its businesses as now conducted and presently proposed to be conducted, without conflict of the rights or claimed rights of others, and no action or filing with or consent by, any Person or any governmental or public body or authority, is required to authorize or is otherwise required in connection with the conduct of such Borrower's business as now and presently proposed to be conducted.

(p)     Each Borrower conducts its businesses solely in its own name without the use of any trade names or the intervention of or through any other entity of any kind.

(q)     To the best knowledge of Borrowers, no Borrower is in violation of any Anti-Terrorism Law nor engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(r)     To the best knowledge of Borrowers, no Borrower is any of the following (each a "Blocked Person"):

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

11

(ii)      a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)     a Person with which Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; or

(v)      a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list.

(s)      To the best knowledge of Borrowers, no Borrower (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

(t)      To the best knowledge of Borrowers, no Borrower is a "Special Designated National" or "Blocked Person" as those terms are defined in the office of Foreign Asset Control Regulations (31 C.F.R. § 500 et seq.).

(u)      All licenses, permits and approvals which are reasonably required for the use and operation of the Properties have been duly and properly obtained.

4.      **Amount and Terms of the Loan**.  Pursuant to the terms of this Agreement and the Orders, and upon the satisfaction of the conditions precedent referred to in Section 13 hereof, Lender shall make certain line of credit loans to the Borrowers (collectively, the "Loan"), upon request, which in the aggregate do not exceed One Million Seven Hundred and Fifty Thousand and 00/100 Dollars ($1,750,000.00) (the "Commitment").  Borrowers may not reborrow amounts advanced and repaid under the Loan.  The Loan shall be made to Borrowers, and Borrowers shall borrow the Loan, on the following terms and conditions:

(a)      Promissory Note.  The principal amount of the Loan shall be evidenced by Borrowers' promissory note, in the form of Exhibit A annexed hereto and made a part hereof, in the amount of One Million Seven Hundred Fifty Thousand and 00/100 Dollars ($1,750,000.00) (the "Note").

(b)      Advances.  To request the funding of Advances under the Loan, the Borrowers shall deliver to the Lender by electronic mail (email) transmission, a request for advance specifying (i) the principal amount of such Advance, (ii) the proposed Drawdown Date of such Advance, (iii) a summary of the Budget line item for which such Advance is requested, and (iv) an additional information as Lender may request to verify the substance of the Advance request.  Any request for an Advance must be received by Lender by 2:00 pm (Connecticut time) on the day that Borrowers make such request in order for Lender to fund the Advance on such

12

day.  Any request for an Advance made after 2:00 p.m. (Connecticut time) shall, at Lender's sole discretion, be treated as received on the next following Business Day.  Each such request shall be irrevocable and binding on Borrowers and shall obligate Borrowers to accept the Advance requested from the Lender on the proposed Drawdown Date.  In no event shall Lender have any obligation to make an Advance which would cause the aggregate outstanding principal balance of the Loan to exceed the Commitment.  Notwithstanding anything to the contrary contained in this Agreement, Lender shall be permitted holdback (and not Advance to Borrowers) an amount reasonably determined by Lender to be sufficient to pay reasonable legal costs and title expenses incurred by Lender arising out of or in connection with the Chapter 11 Case and the transactions contemplated by this Agreement.  Such amounts shall be Advanced by Lender from time to time, in its reasonable discretion, directly to legal counsel representing the Lender or the title company, as the case may be, for payment of such reasonable legal costs and title expenses, and Borrowers' hereby expressly consent to the making of such Advances.

(c)     Interest Rate.  Except as otherwise provided herein or in the Note, the outstanding principal balance of the Loan shall bear interest at a floating rate per annum equal to the Prime Rate, plus five and one-half percent (5.5%); provided, however, that the rate of interest charged hereunder shall never exceed the maximum amount, if any, allowable by law.  Interest shall be charged on the principal balance outstanding from time to time on the basis of the actual number of days elapsed computed on the basis of a three hundred sixty (360) day year.

(d)     Payments.  Borrowers shall repay the Loan as follows:  Commencing on **[INSERT MONTH FOLLOWING CLOSING]** 1, 2019, and continuing on the first (1st) day of each calendar month to occur thereafter, both before and after maturity by acceleration or otherwise, until the Note is fully paid, Borrowers shall be required to make monthly payments of accrued interest on the outstanding principal balance of the Loan.  All outstanding principal and accrued and unpaid interest on the Loan, and all other sums and charges due the Lender in respect of the Loan, unless sooner paid, shall be due and payable on the Maturity Date.

(e)     Prepayment.  Borrowers shall have the right to prepay at any time in advance of the Maturity Date all or any portion of the principal indebtedness of the Loan, together with accrued interest on the principal so prepaid to the date of such prepayment, provided, that Lender has collected a minimum of twelve (12) months interest on the Loan, and provided, further, that in the event of a prepayment in full of the Loan, Borrowers shall have paid to Lender the Exit Fee contemporaneously with such prepayment.

(f)     Term.  The provisions of this Section 4 shall continue in effect until the earliest to occur of (i) **[INSERT DATE THAT IS 6 MONTHS FROM CLOSING]**, or (ii)  the entry of a final order by the Bankruptcy Court confirming the Plan (the "Maturity Date"), provided, however, that Lender may terminate the provisions of this Section 4 at any time upon the happening of an Event of Default hereunder.  No such termination shall (i) in any way affect or impair the security interest granted to Lender hereunder or any other rights of Lender hereunder or under any other agreements, instruments or documents required to be executed and delivered to Lender pursuant to the terms of this Agreement, arising prior to any such termination or by reason thereof, (ii) relieve Borrowers of any obligation to Lender under this Agreement, any such other agreement, instrument or document, or otherwise, until all the

13

Obligations are fully paid and performed, or (iii) affect any right or remedy of Lender, hereunder or under any, such other agreement, instrument or document.

       (g)      <u>Fees</u>.  The Borrowers shall pay to Lender the following fees:

       (1)      A commitment fee equal to $52,500.00 (the "<u>Commitment Fee</u>"), which shall be fully earned as of the Closing Date and shall be due and payable in full on the Closing Date.

       (2)      A structuring fee equal to $50,000 (the "<u>Structuring Fee</u>"), which shall be fully earned as of the Closing Date and shall be due and payable in full on the Closing Date.

       (3)      An exit fee (the "<u>Exit Fee</u>") equal to $52,500, which Exit Fee shall be fully earned as of the Closing Date and shall be due and payable in full on the earlier to occur of (i) a prepayment in full of the Loan, (ii) the Maturity Date, or (iii) an Event of Default and acceleration of the Loan.

       (h)      <u>Use of Proceeds</u>.  The proceeds of the Loan shall be used exclusively to fund (i) the initial deposit of $280,000 into the Interest Reserve Escrow Account, (ii) costs associated with the closing of the Loan, including without limitation the legal fees of the Lender, (iii) legal fees of the Lender in connection with the Chapter 11 Case, (iv) payment of the Commitment Fee and the Structuring Fee, and (v) payment of operating expenses for the Properties in accordance with the Budget.

       5.      <u>Interest Reserve</u>.  On or before the Closing Date, Borrowers shall have established with Lender a deposit account (the "<u>Interest Reserve Escrow Account</u>").  On the Closing Date, Lender shall advance proceeds of the Loan in the amount of $280,000 (the "<u>Interest Reserve Funds</u>") into the Interest Reserve Escrow Account.  Subject to the limitations set forth in this <u>Section 5</u> and availability of Funds, Lender shall disburse and charge the Interest Reserve Escrow Account for interest due under the Loan on each date such interest payments become due.  Borrowers shall from time to time deposit such additional amounts into the Interest Reserve Escrow Account as required pursuant to <u>Section 6(n)(iv)</u> below.  The Interest Reserve Escrow Account shall be subject to the following terms and conditions:

       (a)      All interest earnings and other returns on the Interest Reserve Funds and any additional amounts deposited by Borrowers pursuant to <u>Section 6(n)(iv)</u> hereof (collectively, the "<u>Funds</u>") shall be payable for the account of Borrowers and added to the Funds on deposit in the Interest Reserve Escrow Account.  Borrowers represent and warrant that they shall be responsible for payment of state and federal income taxes in respect of the Funds, and Lender agrees to issue Borrowers in the normal course the necessary federal tax reporting statements (e.g., Form 1099) for the interest earned or other returns on the Funds.  Lender shall provide Borrowers with statements of account with respect to activity in the Interest Reserve Escrow Account in accordance with its customary practices.  Borrowers acknowledge that Federal Deposit Insurance Corporation (FDIC) insurance for the Interest Reserve Escrow Account is

limited to $250,000.  Borrowers agree to execute and deliver such additional documents as may be necessary to establish the Interest Reserve Escrow Account.

(b)    Lender shall have the sole right of access to the Interest Reserve Escrow Account and the Funds and Lender shall have sole right to make transfers and withdrawals from the Interest Reserve Escrow Account in accordance with the terms of this Agreement.  Without limiting the foregoing, the Interest Reserve Escrow Account shall be under the exclusive dominion and control of Lender.  Neither Borrowers nor any representatives of Borrowers shall have signature authority with respect to the Interest Reserve Escrow Account, nor the right or ability to effect withdrawals or disbursements from, or the right or ability to exercise any other form of dominion or control over, the Interest Reserve Escrow Account, and Borrowers shall not seek to effect any such withdrawal or disbursement or to exercise any such dominion or control.

(c)    Lender may effectuate disbursements from the Interest Reserve Escrow Account either by internal debit, check or other method Lender deems appropriate.  All conditions to Lender's obligation to disburse Funds from the Interest Reserve Escrow Account in accordance with this Agreement are for the exclusive benefit of Lender.  Any or all such conditions may be waived or relaxed at any time or times by Lender, at its option.  No such waiver or relaxation in any particular instance shall affect Lender's discretion  in dealing with any such condition in any other instance.

(d)    In addition to any other rights, powers or remedies it may have, upon an Event of Default, Lender shall be authorized and directed to draw upon the Funds, the proceeds of which shall, in Lender's sole discretion, either (i) be applied to the outstanding Loan balance in accordance with the terms of this Agreement and the other Loan Documents or (ii) continue to be held and maintained by Lender as additional collateral for the Loan subject to the terms of this Agreement.

(e)    Borrowers do hereby surrender and divest themselves of any and all right, title and interest in and to the Funds.  Nevertheless, to the extent of any continuing right, title or interest that Borrowers may have or claim in and to the Funds, Borrowers do hereby pledge to Lender, and grant to Lender a security interest in, the Funds as additional security for the Loan and for the obligations of Borrowers under the Loan Documents.  It is the intention of Borrowers and Lender that the security interests granted by Borrowers to Lender shall be made effective and shall be perfected to the fullest extent possible by Lender.  Borrowers warrant, covenant and agree as follows:

(i)    Borrowers have full right, power and authority to pledge, assign and grant a security interest in the Funds.

(ii)    Borrowers will defend the security interest of Lender in the Funds against all claims and demands of all persons at any time claiming the same or any interest therein adverse to Lender.

(iii)    There are no security interests, liens or encumbrances on all or any of the interest of Borrowers in the Funds, and there are no deposit account control agreements or other notices, statements or agreements creating or evidencing a security

15

interest or lien naming any Borrowers' interest in any of the Funds, other those in favor of Lender.

(iv)     Borrowers will not sell or transfer an interest in or grant, permit or suffer to exist any security interest, lien, encumbrance or other interest in any of the Funds, except as may be granted to Lender.

(v)     Borrowers shall perform, at their cost and expense, any and all actions, and shall pay the amount of all reasonable expenses necessary to obtain, preserve, perfect, defend and enforce the security interest of Lender in any of the Funds, as provided herein.

(f)     Upon the occurrence and during the continuance of any Event of Default, Lender shall have, in addition to its other rights, powers and remedies under this Agreement, the other Loan Documents and applicable law, all rights, powers and remedies relating to the Funds as a secured party under the Uniform Commercial Code of the State of Connecticut.  Borrowers' pledge and grant of a security interest pursuant to this Section shall not be deemed or construed to modify, impair, override or otherwise affect the aforesaid surrender and divestiture.  Instead, such pledge and grant is intended to protect Lender's interests in the event that, notwithstanding such surrender and divestiture, Borrowers may be deemed or found to have any continuing right, title or interest in and to all or any part of the Funds.

(g)     Upon the occurrence and during the continuance of an Event of Default, Lender may, at its option, without demand or notice, setoff or recoup all or any part of the Funds so received by Lender against all or any part of the Loan (whether matured or unmatured), such order and priority as Lender may elect in its discretion.

(h)     No application of all or any part of the Funds to the Loan pursuant this Section shall in any way release, satisfy or discharge any of the remaining unpaid Loan or any security therefor.  No delay or omission of Lender to insist upon strict performance of any obligations of any other party hereto under or in connection with this Agreement or to exercise any right, power or remedy available under or in connection with this Agreement (after the occurrence of any Event of Default or otherwise) shall waive, exhaust or impair any such obligation or any such right, power or remedy, nor shall any such delay or omission be deemed to be a waiver of, or acquiescence in or to, any Event of Default.  Notwithstanding any such delay or omission, Lender thereafter shall have the right, from time to time and as often as Lender deems advisable, to insist upon strict performance of any and all obligations of the parties hereto and to exercise any and all rights, powers and remedies available under or in connection with this Agreement.

6.     **Affirmative Covenants**.   While this Agreement is in effect, and until full payment of the Obligations, Borrowers agree to comply with, observe and keep the following covenants and agreements:

(a)     Each Borrower shall comply with and perform, in all material respects, all of its obligations under the Loan Documents, and under all other contracts and agreements to which such Borrower is a party relating to the ownership, occupancy, use, or management of the

Properties and the Collateral and shall comply with all requests by Lender which are consistent with the terms thereof.

(b)     Each Borrower shall pay and discharge all taxes, general and special, charges and assessments, and other governmental obligations, which may have been or shall be levied, charged or assessed on or against it, its property, or its income or profits before they become delinquent (except for Vermont sales and use tax, which shall be paid to the extent required pursuant to a negotiated settlement) and pay and discharge on or before their due date any and all other lawful claims and demands whatsoever, including, but not limited to, trade obligations, provided, however, that the payment of any such taxes, assessments, governmental obligations or other claims and demands may be postponed so long as they or any of them are being diligently contested in good faith and by appropriate proceedings, appropriate reserves have been provided therefor by such Borrower and no Lien is placed on any assets of such Borrower in connection with such taxes, assessments, governmental obligations or other claims or demands so contested by such Borrower.

(c)     Borrowers shall maintain at all times:

(i)     Insurance on the Collateral against loss by all risks in such amounts and with such insurers as may be reasonably satisfactory to Lender, naming Lender, its successors and assigns, as their interests may appear, as additional insured and loss payee, as applicable, which insurance shall by the terms of the policy provide that (x) in the event of loss or damage, if any, the proceeds thereof shall be payable to Lender, as the holder of a security interest in the personal property of Borrowers insured under the policy as Lender's interest may appear; (y) the insurance, as to the interest of Lender, shall not be invalidated by any act or neglect of any Borrower, its manager(s), officers, agents or employees; by any proceeding, or notice of sale relating to said property or any of it; by any change in the title or ownership of the property, or any of it; or by the occupation of the premises where the property, or any of it, is located for purposes more hazardous than are permitted by the policy; and (z) if the policy is canceled, for whatever reason, the insurance shall continue in full force and effect for the benefit of Lender for not less than thirty (30) days after written notice of cancellation to Lender from the insurer which notice the insurer shall agree to give to Lender.  Borrowers shall cause the insurer to supply to Lender certificates, or other evidence of insurance satisfactory to Lender, indicating compliance with the foregoing, including evidence of continuation thereof no later than thirty (30) days prior to the expiration of any policy of insurance. Lender shall have the right to apply the proceeds of any such insurance in reduction of the Obligations, whether or not then due and payable, in such manner as Lender, in its sole discretion may determine or to pay over, at such times and in such amounts, such proceeds or part thereof, as Lender in its sole discretion may determine, to the respective Borrower for the purpose of replacing the Collateral affected by any loss relating thereto;

(ii)     General public liability insurance against claims for personal injury death or property damage in such amounts as are satisfactory to Lender and Workmen's Compensation insurance in statutory amounts and errors and omissions insurance with

coverages not less than Two Million Dollars ($2,000,000) with companies licensed to do business in the State of Connecticut; and

        (iii)    Such other insurance coverages as Lender shall reasonably request from time to time.

        (d)    Borrowers shall maintain and preserve the Collateral in good order and condition, free of all liens and encumbrances except for those securing the Loan and Permitted Liens, and shall not permit or suffer the Collateral to be wasted or destroyed. Notwithstanding anything contained herein to the contrary, Borrowers shall immediately notify Lender of any event (other than the passage of time) causing loss or depreciation in the value of the Collateral and the amount of such loss or depreciation.

        (e)    Borrowers shall furnish, or cause to be furnished, to Lender promptly upon request therefor, such financial and other information relating to any Borrower and its affairs, the Properties and the Collateral, as Lender may from time to time reasonably request.

        (f)    Borrowers shall defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein and, in the event Lender's security interest in the Collateral, or part thereof, would be impaired by an adverse decision, allow Lender to contest or defend any such claim or demand in any Borrower's name and pay, upon demand, Lender's reasonable costs, charges and expenses, including, but not limited to, attorneys' fees, incurred by Lender in connection therewith.

        (g)    Borrowers shall pay to Lender, on demand, any and all reasonable expenses, including attorney's fees, incurred or expended by Lender in the preparation of this Agreement, and all related agreements, instruments and documents, in making or processing and administering the Loan, including without limitation in connection with any modifications or amendments to the Loan, in the collection or attempted collection of the Obligations and in protecting and/or enforcing the rights of Lender against Borrowers and sustaining and/or enforcing the security interest and other liens, if any, granted to Lender hereunder and under all related agreements, instruments and documents.

        (h)    Borrowers shall keep complete and accurate books and records reflecting all facts concerning the Properties and the Collateral and pertaining to the Obligations and Borrowers' covenants under this Agreement. Upon prior written or electronic (email) notice to Borrowers, Borrowers will permit representatives of Lender to have access to and to inspect and copy such books and records and contracts of Borrowers and to inspect the Properties and the Collateral and to discuss Borrowers' affairs, finances and accounts with any of its principal officers, all at such times and as often as may be requested. Any such inspection by Lender shall be for the sole benefit and protection of Lender, and Lender shall have no obligation to disclose the results thereof to Borrowers or to any third party. Borrowers shall reimburse Lender with respect to the cost of any such inspection.

        (i)    Each Borrower shall comply in all material respects with all laws, ordinances and rules and regulations applicable to such Borrower of any Federal, state or local

government or any instrumentality or agency thereof, including, but not limited to, ERISA, OSHA, and Federal, state and municipal laws, ordinances, rules and regulations concerning the environment except to the extent any such law, ordinance, rule or regulation, is being contested in good faith by appropriate proceedings provided that said contest or an adverse decision therein will not have a material adverse effect on the condition, financial, operating or otherwise, of such Borrower.

(j)    Borrowers shall promptly notify Lender in writing of (i) the happening of an Event of Default or the existence of a state of facts which by the passage of time, the giving of notice, or both, would constitute an Event of Default, (ii) the occurrence of a default under any other Indebtedness of any Borrower, or (iii) the existence of any judgements rendered against any Borrower.

(k)    Each Borrower shall (i) do or cause to be done all things necessary to preserve and keep in full force and effect its legal existence, (ii) remain or become qualified to engage in business in good standing in all jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, and (iii) take all reasonable action to maintain, preserve and protect the franchises, licenses, trademarks, copyrights and patents owned or licensed to it that are necessary or desirable in the normal conduct of its business.

(l)    In the event any Borrower decides to engage a third party management company to manage the Properties or any portion thereof, Borrower agrees to engage a management company reasonably satisfactory to Lender, pursuant to a property management agreement in form and substance reasonably satisfactory to Lender, and to cause such management company to execute a subordination agreement in form and substance reasonably satisfactory to Lender, and to deliver to Lender promptly upon such engagement, a fully-executed copy of the property management agreement, together with the subordination agreement signed by such manager.

(m)    Each Borrower shall comply with the Orders and take all actions necessary or appropriate to ensure that:

(i)    The Liens granted to Lender shall be deemed valid and perfected by entry of the Order;

(ii)    The lien priorities, administrative expense claim priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the Orders and the other Loan Documents shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion to cases under chapter 7 of the Bankruptcy Code of the Chapter 11 Case, or by any other act or omission whatsoever;

(iii)    No costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same to cases under chapter 7 of the

Bankruptcy Code or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against the Borrowers in respect of the Obligations;

(iv)    The Liens granted to Lender shall constitute valid and perfected first-priority Liens on all of the Collateral of the Borrowers;

(v)    The Mortgage granted to Lender shall constitute a valid and enforceable first-priority mortgage and lien on the Properties;

(n)    Borrowers shall comply with and satisfy the following benchmarks:

(i)    Within 10 days of the date of entry of the Order, Borrowers must file an application (the "Application") to seek approval to retain Jonathan A. Joslow, or such other professional acceptable to Lender, as Chief Restructuring Officer with respect to the Chapter 11 Case;

(ii)    Borrowers shall schedule a hearing for approval of Jonathan A. Joslow, or such other professional acceptable to Lender, as Chief Restructuring Officer, with the Bankruptcy Court, which shall take place within 21 days of the filing of the Application and shall seek nunc pro tunc approval to the date the Application was filed;

(iii)    On or before August 7, 2019, Borrowers shall convene a meeting of the membership of the Resort with result being that at least 65% of existing members commence paying 100% of monthly dues into an escrow account to be used solely for purposes provided in a confirmed Plan of Reorganization on or before August 19, 2019 (the "Membership Payments"), provided, however, that failure to obtain the Membership Payments by August 19, 2019 shall not be an Event of Default if the Borrowers file a Motion to Sell substantially all of their assets under Section 363 of Title 11, U.S.C. (the "Sale Motion") by 5:00 p.m. on August 26, 2019, and provided, further, that if the Sale Motion is not filed by such deadline, the failure to obtain the Membership Payments by August 19, 2019 shall be an Event of Default.  In the event the Sale Motion is filed by August 26, 2019, the Borrowers' obligation to maintain the Minimum Reserve Balance as set forth in subsection (iv) below shall terminate, but Lender shall continue to receive monthly payments of accrued interest on the Loan from funds available in the Interest Reserve.  Failure to conclude a hearing on the Sale Motion within 60 days of filing the Sale Motion shall constitute an Event of Default;

(iv)    Except as otherwise provided in subsection (iii) above, Borrowers shall at all times maintain funds in the Interest Reserve in an amount sufficient to pay at least sixty (60) days of interest on the Loan (the "Minimum Reserve Balance").  In the event that the balance of funds in the Interest Reserve shall fall below the Minimum Reserve Balance, it shall be an Event of Default;

(v)    Within 120 days of the filing of the Bankruptcy petitions, Borrowers shall have filed a plan of reorganization (the "Plan"), in form and substance satisfactory to Lender and approved by a majority of the membership of the Resort.

(vi)     The Plan shall be confirmed by the Bankruptcy Court within 60 days of the filing thereof.

7.     **Negative Covenants.**  While this Agreement is in effect, and until full payment of the Obligations, Borrowers agree to comply with, observe and keep the following covenants and agreements:

(a)     Except for Permitted Liens and Permitted Exceptions, no Borrower shall create, incur, assume or suffer to exist any mortgage, pledge, security interest, encumbrance, lien or charge of any kind upon or defect in title to or restriction upon the use of the Collateral or the Properties, whether owned at the date hereof or hereafter acquired.

(b)     No Borrower shall hold or acquire any property or assets of any character under conditional sales agreements, Capital Leases or other title retention agreements.

(c)     No Borrower shall transfer, assign, lease, or otherwise dispose of its properties or assets, including but not limited to the Properties and Collateral, or change the nature of its business, except for  (i) the transfer, sale or other disposition of items of the Equipment, which such Borrower determines are obsolete and no longer necessary or desirable for the proper conduct of its business, (ii) the transfer, sale or other disposition of items of Inventory in the ordinary course of such Borrower's business, and (iii) the transfer, sale or other disposition of surplus or worn out assets or the abandonment or other disposition of property that is, in the reasonable judgment of such Borrower, no longer economically practicable to maintain or useful in the conduct of the business.

(d)     No Borrower shall incur, assume, suffer to exist or otherwise have outstanding Indebtedness other than the Obligations and Permitted Indebtedness.  No Borrower shall, directly or indirectly at any time pay any amount of principal or interest or prepay, purchase or redeem any Indebtedness, including without limitation any Permitted Indebtedness, but excluding, for the avoidance of doubt, the Obligations.

(e)     No Borrower shall assume, endorse, guaranty, or become surety for the obligations of any third Person (other than another Borrower).

(f)     No Borrower shall make any advance, loan, extension of credit or capital contribution to, or purchase any equity interests, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person, without the prior written consent of Lender.

(g)     No Borrower shall enter into any transactions of any kind with any of its Affiliates (other than another Borrower) without the consent of Lender.

(h)     No Borrower shall enter into any merger or consolidation, or sell all or substantially all of its assets, or liquidate, dissolve or otherwise terminate or alter its existence, form or method of conducting its business without the consent of Lender.

(i)      No Borrower shall change its entity name, adopt any trade names, or conduct its business under any trade name or style other than as hereinabove set forth, or change its chief executive office, place of business or the present locations of the Collateral or the records relating to the Collateral, without providing notice thereof to the Lender and payment of all fees and costs related to the filing of any documents necessary or required for the protection and preservation of Lender's lien and interest in and to the Properties and the Collateral.

(j)      No Borrower shall acquire or form any Subsidiaries or acquire all or substantially all of the assets of any other Person or any portion of the assets of any other Person without the consent of Lender.

(k)      No Borrower shall change its ownership structure or senior management without the prior written consent of Lender.

(l)      No Borrower shall (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person; (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224, the USA Patriot Act or any other Anti-Terrorism Law. Each Borrower shall deliver to Lender any certification or other evidence requested from time to time by Lender in its reasonable discretion, confirming such Borrower's compliance with this Section.

(m)      No Borrower shall make any Distributions without the prior written consent of Lender.

(n)      No Borrower shall permit any Person to surcharge the Collateral under Section 506(c) of the Bankruptcy Code or to obtain a Lien with respect to the Collateral which is equal to or senior to the Lien of the Lender.

8.      **Payments by Lender**.   At its option, Lender may pay for insurance on the Collateral and taxes, assessments or other charges which Borrowers fail to pay in accordance with the provisions hereof, or of any related agreement, instrument or document, and may discharge any security interest in or lien upon the Collateral.  No such payment or discharge of any such security interest or lien shall be deemed to constitute a waiver by Lender of the violation of any covenant by Borrowers as a result of Borrowers' failure to make any such payment or Borrower's suffering of any such security interest or lien.  Any payment made or expense incurred by Lender, pursuant to this or any other provision of this Agreement shall be added to and become a part of the Obligations of Borrowers to Lender, shall bear interest at the rate per annum charged pursuant to the Note and shall be payable on demand.

9.      **Rights of Lender; Notices.**   When the Obligations, or any of them, become immediately due and payable, whether by reason of default or as otherwise permitted by this

Agreement, Lender may, pursue any legal remedy available to it to collect Obligations outstanding at said time, to enforce its rights hereunder, and to enforce any and all other rights or remedies available to it both under the Uniform Commercial Code as in effect in the State of Connecticut and otherwise, including, but not limited to, the right to take possession of the Collateral and dispose of the same on Borrowers' premises, all without judicial process if permitted by applicable laws, Borrowers hereby waiving any right Borrowers might otherwise have to require Lender to resort to judicial process and further waiving Borrowers' right to notice, except as expressly provided in this Agreement or any of the other Loan Documents and to a hearing under the Constitution of the United States or any state or under any Federal or state law, and no such action shall operate as a waiver of any other right or remedy of Lender under the terms hereof, any other agreement, instrument or document executed and delivered to Lender pursuant to the terms hereof, or the law, all rights and remedies of Lender being cumulative and not alternative.  In addition, Lender may require Borrowers to assemble the Collateral and make it available to Lender, at the Properties.  In the event reasonable notice is required to be given by Lender to Borrowers under the provisions of the Uniform Commercial Code as in effect in Connecticut, such notice shall be deemed to have been given if mailed, postage prepaid, certified mail, return receipt requested, at least ten (10) days prior to the happening of the event for which such notice is being given, to Borrowers at Borrowers' address first hereinabove written.  Any notice required to be given by any party to another party, pursuant to the terms hereof, shall be deemed to have been given (except as otherwise specifically provided in this Agreement) upon receipt of the same, postage prepaid, certified mail, return receipt requested, to such party, as the case may be, at its address first hereinabove written.  Any of the parties hereto may notify the other that any such notice shall be given to such other address as such party may so instruct by written notice similarly given.

      10.     **Article 9**.  Borrowers hereby further acknowledges and agrees with the Lender as follows:

      (a)     In applying Article 9 of the Uniform Commercial Code as in effect in Connecticut ("Article 9"), the  Collateral shall include, without limitation, the following categories of assets as defined in Article 9: instruments (including promissory notes), documents, accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), and any and all proceeds of any thereof, wherever located, whether now owned and hereafter acquired.

      (b)     Borrowers hereby authorizes the Lender at any time and from time to time, pursuant to the provisions of this Agreement, to file financing statements, continuation statements and amendments thereto that describe the Collateral and which contain any other information required by Article 9 for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether any Borrower  is an organization, the type of organization and any organization identification number issued to such Borrower.  Borrowers shall furnish any such information to the Lender promptly upon request.  Any such financing statements, continuation statements or amendments may be prepared by the Lender on behalf of Borrowers, as provided in this Agreement, and may be filed at any time in any jurisdiction whether or not Article 9 is then in effect in that jurisdiction.

(c)      Borrowers shall at any time and from time to time, whether or not Article 9 is in effect in any particular jurisdiction, take such steps as the Lender may reasonably request for the Lender (a) to obtain an acknowledgement, in form and substance satisfactory to the Lender, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for the Lender, (b) to obtain "control" of any deposit accounts, letter-of-credit rights or electronic chattel paper (as such terms are defined in Article 9 with corresponding provisions in UCC §§ 9-104, 9-105, 9-106, 9-107 relating to what constitutes "control" for such items of Collateral), with any agreements establishing control to be in form and substance satisfactory to the Lender, and (c) otherwise to insure the continued perfection and priority of the Lender's security interest in any of the Collateral and of the preservation of its rights therein, whether in anticipation and following the effectiveness of Article 9 in any jurisdiction.

(d)      Nothing contained herein shall be construed to narrow the scope of the security interest granted hereby in any of the Collateral or the perfection or priority thereof or to impair or otherwise limit any of the rights, powers, privileges or remedies of the Lender hereunder except as (and then only to the extent) specifically mandated by Article 9 to the extent then applicable.

(e)      Borrower acknowledges and agrees that this Agreement grants, and is intended to grant, a security interest in the Collateral and that, in addition to its other legal rights, the Lender is expressly authorized to authenticate and to file or transmit a financing statement or other record to perfect such security interest which describes the Collateral.  Each Borrower represents and warrants that it shall not file a correction statement relating to the collateral or to any financing statement or fixture filing filed by the Lender without the Lender's prior written consent.  Each Borrower shall, at its expense, furnish to Lender a certified copy of its organizational documents verifying its correct legal name or, at Lender's election, shall permit the Lender to obtain such certified copy at such Borrower's expense.  From time to time, at Lender's election, the Lender may obtain a certified copy of each Borrower's organizational documents and a search of such Uniform Commercial Code filing offices as it shall deem appropriate, at such Borrower's expense, to verify such Borrower's compliance with the terms of this Agreement.  Notwithstanding the foregoing, Borrowers shall have no obligation to reimburse Lender for the cost of more than one (1) such search in any calendar year, unless an Event of Default shall have occurred and be continuing.

11.      **Collection of Accounts.**      During the continuation of an Event of Default hereunder, Borrowers shall make collections of proceeds upon its Accounts, hold the proceeds received from collections in trust for Lender and turn over such proceeds to Lender upon Lender's request for same.  Upon payment, Lender shall immediately apply such proceeds, and any proceeds of Accounts received by it pursuant to the following provisions of this <u>Section 11</u>, to the payment of the Obligations in such order of application as Lender, in its sole discretion, may determine.  Borrowers shall, when requested by Lender during the continuation of an Event of Default:

(a)      Assign or endorse the Accounts to Lender, and notify Account Debtors that the Accounts have been assigned and should be paid directly to Lender;

(b)     Turn over to Lender all Inventory returned in connection with any of the Accounts;

(c)     Mark or stamp each of its individual ledger sheets or cards pertaining to its Accounts with the legend "Assigned to Restructured Opportunity Investors, Inc. ISAOA/ATIMA" and stamp or otherwise mark and keep its books, records, documents and instruments relating to the Accounts in such manner as Lender may require; and

(d)     Mark or stamp all invoices with a legend satisfactory to Lender so as to indicate that the same should be paid directly to Lender.

Notwithstanding the foregoing, Lender shall have the right, at any time, during the continuation of an Event of Default, to itself so notify such Account Debtors to make such payments of the Accounts directly to Lender and Lender shall have the further right to notify the post office authorities to change the address for delivery of mail of Borrowers to an address designated by Lender and to receive, open and dispose of all mail addressed to any Borrower.

During the continuation of an Event of Default hereunder, each Borrower hereby irrevocably constitute Lender or its assignee as such Borrower's attorney-in-fact to issue in the name and execute or endorse on behalf of such Borrower each and every notice, instrument and document necessary to carry out the purposes of the provisions of this Section 11, and to take such action in connection with the collection of the Accounts, including, but not limited to, suing thereon, compromising or adjusting the same, as Lender, in its sole discretion, deems necessary and proper.  The power of attorney granted hereby shall be self-executing, but each Borrower shall promptly execute and deliver to Lender or its assignee, upon written request of Lender or its assignee such additional separate powers of attorney, as Lender may from time to time reasonably request.

12.     **Default Provisions.**  Except as may be otherwise set forth in the Orders, Lender may at its option declare the Obligations and any note evidencing the same to be due and payable whereupon the same shall become due and payable forthwith, without presentment, protest, demand or notice of any kind, or Lender may pursue any and all remedies provided for hereunder, or under any one or more of the other Loan Documents, or under applicable law, in any of the following cases:

(a)     If any payment of interest or any other payment required by the terms hereof or by any note or other instrument, agreement or document executed and delivered to Lender pursuant to the terms hereof shall not be fully paid within sixty (60) days of when due;

(b)     If Borrower shall fail to repay in full the Obligations on the Maturity Date;

(c)     Subject to the Orders, if payment required by any of the obligations of Borrowers for money borrowed by any of them from any third Person shall not be fully paid when demand is made for the payment of the same (to the extent payable on demand) or, subject to any grace, notice or cure period, when the same shall fall due, or if any of said obligations shall be declared in default;

(d)      If any warranty or representation by Borrowers contained herein or in any related agreement, instrument or document, or in any, statement furnished by Borrower to Lender, including without limitation the Loan Documents, proves to have been incorrect in any material respect when made;

(e)      If a default exists in the due observance of any of the covenants or agreements of Borrowers set forth in this Agreement (other than Section 6(n) hereof), after notice from Lender of such default and thirty (30) days to cure such default to the reasonable satisfaction of Lender;

(f)      If a default exists in the due observance of any of the covenants set forth in Section 6(n) hereof;

(g)      An order shall be entered by the Bankruptcy Court converting the Chapter 11 Case to a case or cases under chapter 7 of the Bankruptcy Code;

(h)      An order shall be entered by the Bankruptcy Court amending, supplementing, staying, vacating, revoking, reversing or otherwise modifying this Agreement and the rights of Lender hereunder or the Order, without the prior written consent of Lender;

(i)      Any Borrower makes payment on, makes an application to make payment on or supports, directly or indirectly, or does not actively contest in good faith any application by another Person to make payment on, any material prepetition claim without the prior written consent of the Lender;

(j)      An order shall be entered by the Bankruptcy Court granting any creditor material relief from the automatic stay to exercise rights with respect to property of the estate;

(k)      The proceeds of the Loan are utilized to prosecute actions, claims, demands or causes of action against the Lender or to object to or contest in any manner or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the Obligations or of the rights, claims, liens and security interest granted to the Lender hereunder or under the Order;

(l)      An order shall be entered by the Bankruptcy Court dismissing any part of the Chapter 11 Case;

(m)      An order with respect to the Chapter 11 Cases shall be entered without the express prior written consent of the Lender (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement, any Loan Document or the Order, or (ii) to permit any claim against or obligation of the Borrowers (now existing or hereafter arising, of any kind or nature whatsoever) to have priority equal to or superior to the priority of the Lender in respect of the Obligations;

(n)      The dissolution or termination of the legal existence of any Borrower; and

(o)      The occurrence of an "Event of Default" under any of the other Loan Documents.

26

13.   **<u>Conditions Precedent to Making Loan</u>**.    On or prior to the Closing of the Loan, Lender shall have actually received, in form and content satisfactory to Lender:

(i)   A borrowing resolution of each Borrower authorizing the Person executed this Agreement on behalf of such Borrower to execute and deliver this Agreement and all other agreements, instruments and documents required to be executed and delivered by it to Lender by the terms hereof;

(ii)   The following documents evidencing and securing the Loan (together with all other documents, instruments and agreement evidencing, securing or otherwise executed by Borrowers in connection with the Loan, collectively, the "<u>Loan Documents</u>"):

(1)   This Agreement;

(2)   The note evidencing the Loan all as executed by Borrower;

(3)   The Mortgage from HIREHCO, as mortgagor, to Lender, as mortgagee, as to the Properties;

(4)   An Assignment of Leases and Rents from HIREHCO, as assignor, to Lender, as assignee;

(5)   A Collateral Assignment of Contracts, Licenses, Permits and Agreements between Borrowers and Lender;

(6)   UCC-1 Financing Statements as to the Collateral and the Properties naming each Borrower, as a debtor and Lender, as secured party;

(7)   An Environmental Indemnification Agreement from Borrowers to Lender; and

(8)   Such other instruments, documents, agreements and certificates as Lender reasonably requires.

(iii)   UCC and lien searches as Lender requests;

(iv)   Certificates or other proof of insurance satisfactory to Lender evidencing compliance with the provisions of <u>Section 6(e)</u> of this Agreement;

(v)   Flood insurance for the Properties, if located in a flood zone, or if determined to be in a flood zone at a future date;

(vi)   Title abstracts for the Properties; and

(vii)   Such other documents, instruments or agreements as Lender may reasonably request.

14.   **Set-Off**.   Borrowers hereby grant to Lender, a lien on and a right of set-off against all monies, deposits and securities and the proceeds thereof, now or hereafter held or received by, or in transit to, Lender from or for any Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all deposits (general or special), balances, sums and credits with and all claims of any Borrower against Lender at any time existing.   Lender may at any time during the continuation of an Event of Default herein apply the same or any part thereof to the Obligations, or any part thereof.

15.      **[Intentionally Omitted]**

16.      **Indemnification**.   In consideration of the Lender's execution and delivery of this Agreement and making of the Loan hereunder and in addition to all other obligations of Borrowers under this Agreement, Borrowers hereby agree to defend, protect, indemnify and hold harmless the Lender and its successors, assigns, officers, directors, employees and agents (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages and expenses in connection therewith (irrespective of whether any such Indemnitees are a party to any action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnifiable Liabilities") incurred by the Indemnitees or any of them as a result of, or arising out of, or relating to (a) the execution, delivery, performance or enforcement of this Agreement and the other Loan Documents and any instrument, document or agreement executed pursuant hereto; (b) the Lender's status as lender to, or creditor of, any Borrower; or (c) the operation of each Borrower's respective business from and after the date hereof, provided that, with respect to (a), (b) and (c) above, the Borrowers shall not be required to indemnify any Indemnitee for any Indemnifiable Liabilities resulting from such Indemnitee's own gross negligence or willful misconduct.   To the extent that the foregoing undertaking by the Borrowers may be unenforceable for any reason, the Borrowers shall make the maximum contribution to the payment and satisfaction of each of the Indemnifiable Liabilities which is permissible under applicable law.

17.      **General Provisions**.

(a)      No delay or failure of Lender in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise preclude any further exercise thereof or the exercise of any other rights, powers or privileges.

(b)      This Agreement, the security interest hereby granted to Lender by Borrowers and every representation, warranty, covenant, promise and other agreements contained herein shall survive until the Obligations have been paid in full.

(c)      This Agreement is an integrated document and all terms and provisions are embodied herein and shall not be varied by parol evidence.

(d)     This Agreement shall in all respects be governed, construed, applied and enforced in accordance with the internal laws of the State of Connecticut without regard to principles of conflicts of law.

(e)     The captions for the paragraphs contained in this Agreement have been inserted for convenience only and form no part of this Agreement and shall not be deemed to affect the meaning or construction of any of the covenants, agreements, conditions or terms hereof.

(f)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that Borrowers shall not assign, voluntarily, by operation of law or otherwise, any of their rights hereunder without the prior written consent of Lender and any such attempted assignment without such consent shall be null and void.  The term "Lender" as used herein shall mean not only the original Lender named herein but also future holders of this Agreement and the Note.

(g)     All notices, approvals, consents, requests, demands and other communications with, to, from or upon the respective parties hereto shall be in writing and shall be hand delivered, sent by electronic mail (e-mail) or sent by guaranteed overnight delivery service or by registered mail, return receipt requested, postage prepaid, addressed as follows:

if to Lender, at:

Restructured Opportunity Investors, Inc.
11 Scovill Street, P.O. Box 2763
Waterbury, Connecticut 06723-2763
Attention:      Keith S. Mahler
Email:          keith@mahlercompany.com

with a copy to:

Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Attention:      Craig Lifland, Esq.
Email:          lifland@halloransage.com

if to Borrowers, at:

Hermitage Inn Real Estate Holding Company LLC
Hermitage Club LLC
145 Deercliff Road
Avon, Connecticut 06001
Attention:      James Barnes

Email:         jbarnes@hermitageclub.com

with a copy to:

Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Attention:     Douglas S. Skalka, Esq.
Email:         DSkalka@npmlaw.com

or to such other address as either party may designate from time to time by notice to the other in the manner set forth herein.  All such communications shall be deemed to be given (i) if hand delivered, sent by electronic mail (e-mail) or sent by guaranteed overnight delivery service, on the day received (or, if such day is not a Business Day, on the first Business Day thereafter), or (ii) if mailed, on the third Business Day following deposit thereof in the U.S. Mail.

(h)    Borrowers hereby agree that Lender, in its sole discretion, may freely sell, assign or otherwise transfer participations, portions, co-lender interests or other interests in all or any portion of the indebtedness, liabilities or obligations arising in connection with or in any way related to the financing transactions of which this Agreement is a part provided that such transferee is a recognized financial institution and such transfer is at no cost, expense or additional obligation to Borrowers.  In the event of any such transfer, the transferee may, in Lender's sole discretion, have and enforce all the rights, remedies and privileges of Lender in accordance with this Agreement and the other Loan Documents.  Borrowers consent to the release by Lender to any potential transferee of any and all information (including without limitation, financial information) pertaining to Borrowers as Lender, in its sole discretion, may deem appropriate, provided that Lender makes reasonable efforts to preserve in confidence any proprietary or confidential material identified to it as such.  If such transferee so participates with Lender in making loans or advances hereunder or under any other agreement between such Lender and Borrowers and Lender identifies such transferee to Borrowers in writing, Borrowers hereby grants to such transferee and such transferee shall have and is hereby given a continuing lien and security interest in any money, securities or other property of Borrowers in the custody or possession of such transferee, including the right of setoff under circumstances consistent with this Agreement, to the extent of such transferee's participation in the Obligations of Borrowers to Lender.

(i)    **BORROWERS ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278a TO 52-278n, INCLUSIVE, OR BY OTHER APPLICABLE LAW BORROWERS HEREBY WAIVE THEIR RIGHTS TO NOTICE AND HEARING WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH LENDER MAY DESIRE TO USE, AND FURTHER WAIVE ALL RIGHTS TO: 1) REQUEST THAT LENDER POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY LENDER, 2) REQUEST THAT THE PREJUDGMENT REMEDY BE DISSOLVED OR**

30

MODIFIED OR THAT THE BORROWERS BE ALLOWED TO SUBSTITUTE A BOND FOR THE PREJUDGMENT REMEDY, AND 3) SHOW THAT THE PROPERTY SUBJECTED TO THE PREJUDGMENT REMEDY IS EXEMPT FROM SUCH A PREJUDGMENT REMEDY.

(j)     BORROWERS HEREBY WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE FINANCING TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART AND/OR THE ENFORCEMENT OF ANY OF LENDER'S RIGHTS, INCLUDING WITHOUT LIMITATION, TORT CLAIMS.  BORROWERS FURTHER ACKNOWLEDGE THAT LENDER HAS NOT REPRESENTED TO BORROWERS THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

(k)     BORROWERS ACKNOWLEDGE THAT THEY MAKE THE FOREGOING WAIVERS IN (i) AND (j) ABOVE, KNOWINGLY, VOLUNTARILY, WITHOUT DURESS AND ONLY AFTER CONSIDERATION OF THE RAMIFICATIONS OF SUCH WAIVERS WITH ITS ATTORNEYS.

(l)     Borrowers agree that any state or federal court of competent jurisdiction over the State of Connecticut shall have jurisdiction to hear and determine any claims or disputes pertaining to the financing transactions of which this Agreement is a part and/or to any matter arising or in any way related to this Agreement or any other agreement between Lender and Borrowers, and Borrowers expressly submit and consent in advance to such jurisdiction in any action or proceeding.

(m)     This Agreement may be executed in multiple counterparts, each of which when executed and delivered shall be deemed to be an original, but all of which together shall constitute one instrument.

[Remainder of page intentionally left blank; signature page to follow]

31

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

BORROWERS:

HERMITAGE INN REAL ESTATE
HOLDING COMPANY LLC


By: _____
      Name:
      Title:

HERMITAGE CLUB LLC


By: _____
      Name:
      Title:


LENDER:

RESTRUCTURE OPPORTUNITY
INVESTORS, INC.


By:_____
      Name:
      Title:

[Signature Page to Debtor-In-Possession Loan and Security Agreement]

**EXHIBIT LIST**

EXHIBIT A    Note
EXHIBIT B    Permitted Liens
EXHIBIT C    Locations
EXHIBIT D    Permitted Indebtedness

EXHIBIT A
Note

EXHIBIT B
Permitted Liens

[TO BE COMPLETED UPON RECEIPT OF CURRENT UCC SEARCH]

EXHIBIT C
Locations

The Properties.

336 Olde Stage Road, 2nd Floor, Glastonbury, Connecticut

EXHIBIT D
Permitted Indebtedness

[COMPANY TO PROVIDE CURRENT LIST OF OUTSTANDING INDEBTEDNESS]

6004582v.1

# EXHIBIT B



# THE HERMITAGE CLUB

10 Gatehouse Trail
Wilmington, Vermont 05363

**APPRAISAL REPORT**

Date of Report: September 10, 2018

Colliers File #: BOS180250

Client File #: 18-000330-01



THE HERMITAGE
Club
AT HAYSTACK MOUNTAIN

PREPARED FOR
Christopher Haddock
Assistant Vice President, Senior Review Appraiser
Berkshire Bank
381 West Main Street
West Winfield, NY 13491

PREPARED BY
COLLIERS INTERNATIONAL
VALUATION & ADVISORY SERVICES

# LETTER OF TRANSMITTAL

**COLLIERS INTERNATIONAL**
**VALUATION & ADVISORY SERVICES**

160 Federal Street
Boston, MA 02110-1701 USA
MAIN +1 617 330 8000
FAX  +1 617 330 8093
WEB    www.colliers.com/valuationadvisory

September 10, 2018


Christopher Haddock
Assistant Vice President, Senior Review Appraiser
**Berkshire Bank**
381 West Main Street
West Winfield, NY 13491


**RE: The Hermitage Club**
   10 Gatehouse Trail
   Wilmington, Vermont 05363

Colliers File #: BOS180250

Client File #: 18-000330-01

Mr. Haddock:

Pursuant with our engagement, the above captioned property was appraised utilizing best practice appraisal principles for this property type. This appraisal report satisfies the scope of work and requirements agreed upon by Berkshire Bank and Colliers International Valuation & Advisory Services.

At the request of the client, this appraisal is presented in an Appraisal Report format as defined by *USPAP* Standards Rule 2-2(a). Our appraisal format provides a detailed description of the appraisal process, subject and market data and valuation analyses.

The purpose of this appraisal is to develop an various opinion of value for the subject assets, which are summarized below:

1. As-is market value of the base lodge, ski parcel, undeveloped land, and remaining eight entitled units of Chamonix Village.
2. As-is going concern of The Hermitage Inn, Snow Goose Inn, Doveberry Inn, Horizon Inn, and The Hermitage Golf Club.
3. Leasehold value of the Glebe Land

The following table conveys the final opinion of market value of the subject property that is developed within this appraisal report:

Colliers International Valuation & Advisory Services, and certain of its subsidiaries, is an independently owned and operated business and a member firm of Colliers International Property Consultants, an affiliation of independent companies with over 500+ offices throughout more than 68 countries worldwide.

| HERMITAGE CLUB ASSET | VALUE TYPE | INTEREST APPRAISED | DATE OF VALUE | VALUE |
|---|---|---|---|---|
| Base Lodge | As-Is | Fee Simple | July 25, 2018 | $35,000,000 |
| The Hermitage Inn | As-Is | Going Concern | July 25, 2018 | $3,150,000 |
| Snow Goose Inn | As-Is | Going Concern | July 25, 2018 | $1,530,000 |
| Doveberry Inn | As-Is | Going Concern | July 25, 2018 | $780,000 |
| Horizon Inn | As-Is | Going Concern | July 25, 2018 | $790,000 |
| Golf Club | As-Is | Going Concern | July 25, 2018 | $3,280,000 |
| Chamonix Village Entitlements | As-Is | Fee Simple | July 25, 2018 | $990,000 |
| The Hermitage Club Ski Area | As-Is | Fee Simple | July 25, 2018 | $3,960,000 |
| The Hermitage Inn Excess Land | As-Is | Fee Simple | July 25, 2018 | $910,000 |
| Summit Meadows | As-Is | Fee Simple | July 25, 2018 | $90,000 |
| High Country Land | As-Is | Fee Simple | July 25, 2018 | $130,000 |
| Fawn Ridge | As-Is | Fee Simple | July 25, 2018 | $140,000 |
| Glebe Land (Leasehold) | As-Is | Leasehold | July 25, 2018 | $630,000 |

The subject property consists of a portion of the real estate holdings of the Hermitage Inn Real Estate Holding Company, LLC. The subject assets represent the primary components of a private, luxury ski-resort with ancillary services and amenities, a golf course, four lodging properties, entitlements to construct two townhome buildings (eight units total), and undeveloped land commonly known as The Hermitage Club, located at 10 Gatehouse Trail in Wilmington, Vermont. Portions of the subject property (both improved and undeveloped land) are also located in the neighboring town of Dover, Vermont.

The subject's non-contiguous site area contains 48,539,823 SF (or 1,114.32-Acre). Included in this land area is 252 acres of land (Glebe Land) leased by the subject property owner from the town of Wilmington. This tract is situated at the top of Haystack Mountain and contains the terminus of several chair lifts and start of the ski trails. The current lease expires November 15, 2030 and has been in place since 1977, with several different lessees over the years permitting the operation of a ski resort which is common practice for these assets. The subject sites are summarized in the following table.

| THE HERMITAGE CLUB SITES | | | | |
|---|---|---|---|---|
| NAME | GIS / PARCEL ID | LOCATION | SF | ACRES |
| Horizon Inn | 10-03-030.00 | Wilmington | 514,008 | 11.80 |
| The Hermitage Golf Club | HAYSTACK.GLF | Wilmington | 6,246,940 | 143.41 |
| The Hermitage Club Ski Area | HAYSTACK.SKI & HERMITGE.SKI | Wilmington | 16,855,542 | 386.95 |
| Base Lodge | HERMITGE.BSL | Wilmington | 111,078 | 2.55 |
| Chamonix Village | HSCHAMON.SKI | | 534,046 | 12.26 |
| Summit Meadow s | HSSUMMIT.LND & HSS00 | Wilmington & Dover | 436,036 | 10.01 |
| The Hermitage Inn | 02-01-0003.000, HL005 (Includes: HL002 & HL003) & HL021H | Wilmington & Dover | 5,234,213 | 120.16 |
| Glebe Land (Leasehold) | 01-01-007.000 | Wilmington | 10,977,120 | 252.00 |
| High Country Land | HSHIGHCO.LND & HSH00 | Wilmington & Dover | 689,119 | 15.82 |
| Doveberry Inn | NV006 | Dover | 32,670 | 0.75 |
| Snow Goose Inn | RT091 | Dover | 67,082 | 1.54 |
| Faw n Ridge | HSF00 | Dover | 720,482 | 16.54 |
| Haystack Ski Area (Bear Habitat) | HS000 | Dover | 6,121,487 | 140.53 |
| TOTAL | | | 48,539,823 | 1,114.32 |

Portions of these subject sites are improved. A summary of these improvements and their location are presented in the following table.

| | | THE HERMITAGE CLUB IMPROVEMENTS | | | |
|---|---|---|---|---|---|
| NAME | ADDRESS | LOCATION | GBA | NRA | ROOMS / UNITS |
| Horizon Inn | 861 Route 9 | Wilmington | 12,296 | 12,296 | 28 |
| The Hermitage Golf Club | 70 Spyglass Lane | Wilmington | 7,000 | 7,000 | N/A |
| The Hermitage Club Ski Area | 71 Spyglass Lane | Wilmington | - | - | - |
| Base Lodge | 183 Gatehouse Trail | Wilmington | 88,813 | 81,189 | N/A |
| Chamonix Village* | 8 & 13 Grenoble Way | Wilmington | 27,200 | 27,200 | 8 |
| Summit Meadows | 24 Handle Road | Dover | | | |
| The Hermitage Inn | 25 Handle Road | Dover | 14,143 | 14,143 | 16 |
| Carriage House | 25 Handle Road | Dover | 1,744 | 1,744 | 5 |
| Glebe Land (Leasehold) | Haystack Mountain | Wilmington | - | - | - |
| High Country Land | Haystack Mountain | Wilmington & Dover | - | - | - |
| Doveberry Inn | 284 Route 100 | Dover | 6,026 | 6,026 | 12 |
| Snow Goose Inn | 259 Route 100 | Dover | 8,035 | 8,035 | 13 |
| Fawn Ridge | Haystack Mountain | Dover | - | - | - |
| Haystack Ski Area (Bear Habitat) | Haystack Mountain | Dover | - | - | - |
| TOTAL | | | 165,257 | 157,633 | |

*Entitlements for eight townhouse units in two four-unit buildings.*

As shown above the total Gross Building Area (GBA) for the is 165,257 SF of which 157,633 SF represents the Net Rentable Area (NRA), including the remaining eight townhouse units to be constructed at Chamonix Village. Overall, the resort improvements are in good/excellent condition, whereas the off-resort improvements have varying finishes and conditions. This is discussed in detail later in this report.

As of the date of our inspection the subject's conceptual development for the entire Hermitage Club has not received full approval from either the State of Vermont or the towns of Wilmington and Dover. Further, the current status of the Act 250 Master Plan submitted by the owner received positive findings for only two criteria (#6 educational services & #7 municipal services) out of a possible 10 main criteria. There are several criteria which have sub-criteria equating to approximately 30 total criteria which **all must have positive findings prior to proceeding with any development**. The partial positive findings were issued in February 2017 and remain in effect for 10 years. Meaning that the two positive findings will not need to be presented or restated until the 10-year period expires while positive findings for the remaining criterion are sought. Discussions with the owner's representative and the district coordinator for the Vermont Natural Resources Board both reported that it took several years for these initial partial findings to be issued. Without positive findings for **all** the Act 250 criteria the owner/developer cannot proceed with any development within the scope of the master plan. Further, approvals for the plan would still need to be achieved at the town level and construction permits also need to be sought (or submitted concurrently) through both the State and towns.

The entire club, and all of the company's operations were required to close at the end of March 2018 by the State of Vermont, Department of Taxes for failure to pay more than $1,000,000 in back sales taxes to the State. It has also been reported that approximately $800,000 in back sales taxes are owed to the Town of Wilmington. A letter addressed to Jim Barnes, the principal owner of The Hermitage Club, dated March 30, 2018 from the State included the following verbiage is posted on the doors of the Club's Base Lodge front doors:

> "You shall not conduct any business. This prohibition includes but is not limited to selling memberships, paying employees including security, day care, and maintenance personnel, renting rooms, collecting greens fees, and selling taxable meals."

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

In the months following this order there has been limited maintenance of the subject assets. It was reported by the owner's representative that the property upkeep has been restricted to walk throughs and minimal maintenance of the buildings occurring two or three times a week, and maintenance of the golf course grounds (mowing, raking, and some watering) only. There has been no maintenance to the Club's ski equipment, including the chair lifts which require annual upkeep and recertification. It was reported by the owner's representative that due to the time and resources necessary to complete these certifications that it would be highly-unlikely that the ski resort would open this season.

The Base Lodge, golf course, Snow Goose Inn, The Hermitage Inn, and carriage house have been well-maintained and could be operational in approximately one to two months, assuming that the necessary operational permits and issues with the State could be remedied. The Doveberry Inn and Horizon Inn would require capital expenditures to correct deferred maintenance and upgrade the furniture, fixtures, and equipment to the standards typical of these assets in the market. These assets would require approximately six months to reopen, assuming that the necessary operational permits and issues with the State could be remedied.

Lastly, our research uncovered that our client (Berkshire Bank) commenced foreclosure proceedings as the Club had not been making payments on a reported amount of over $16,000,000 in funds owed to Berkshire Bank.

Per our engagement and subsequent communication with the client our analyses contained within this report is representative of the real estate only, without consideration to the financial obligations of the current owner excepting cost to cure physical depreciation at the subject improvements as estimated by the appraisers.

The analyses, opinions and conclusions communicated within this appraisal report were developed based upon the requirements and guidelines of the current Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute. The report is intended to conform to the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) standards.

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter. *USPAP* defines an Extraordinary Assumption as, "an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions". *USPAP* defines a Hypothetical Condition as, "that which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis".

The Extraordinary Assumptions and/or Hypothetical Conditions that were made during the appraisal process to arrive at our opinion of value are fully discussed below. We advise the client to consider these issues carefully given the intended use of this appraisal, as their use might have affected the assignment results.

## EXTRAORDINARY ASSUMPTIONS

Based on our inspection of the subject property, discussions with the owner's representative, and research completed as part of this appraisal assignment we have made the following extraordinary assumptions:

1. The subject's ski resort will not be operation for the 2018-2019 season. However, we have concluded that the necessary maintenance and recertification will be achieved in 2019, and the ski operations will be open for the 2019-2020 season.
2. Membership sales for The Hermitage Club would likely commence again in the summer of 2019.
3. The Hermitage Inn, Carriage House, Snow Goose Inn, and Doveberry Inn will permit public use and be operational by December 2019.

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

4. The Horizon Inn will permit public use and be operational by May 2019.
5. The golf course will be converted back to a public or semi-private golf course, opening for the 2019 season.
6. The remaining eight townhome units at Chamonix Village will resume construction starting Q3 2020 and completed by Q3 2021, with sell out of the remaining units completed prior to Q3 2022.

If information is made available to us which would significantly alter any of the above extraordinary assumptions, we reserve the right to modify our analysis and any value conclusions herein.

We have also made the extraordinary assumption that The Hermitage Club and all associated entities will be under prudent, experienced management focused on strong operational performance and the long-term growth of the club.

## HYPOTHETICAL CONDITIONS

No Hypothetical Conditions were made for this assignment.

## RELIANCE LANGUAGE

The Appraisal is for the sole use of the Client; however, Client may provide only complete, final copies of the Appraisal report in its entirety (but not component parts) to third parties who shall review such reports in connection with loan underwriting or securitization efforts. Colliers International Valuation & Advisory Services is not required to explain or testify as to appraisal results other than to respond to the Client for routine and customary questions. Please note that our consent to allow the Appraisal prepared by Colliers International Valuation & Advisory Services or portions of such Appraisal, to become part of or be referenced in any public offering, the granting of such consent will be at our sole and absolute discretion and, if given, will be on condition that Colliers International Valuation & Advisory Services will be provided with an Indemnification Agreement and/or Non-Reliance letter, in a form and content satisfactory to Colliers International Valuation & Advisory Services, by a party satisfactory to Colliers International Valuation & Advisory Services. Colliers International Valuation & Advisory Services does consent to your submission of the reports to rating agencies, loan participants or your auditors in its entirety (but not component parts) without the need to provide Colliers International Valuation & Advisory Services with an Indemnification Agreement and/or Non-Reliance letter.

Colliers International Valuation & Advisory Services hereby expressly grants to Client the right to copy the Appraisal and distribute it to other parties in the transaction for which the Appraisal has been prepared, including employees of Client, other lenders in the transaction, and the borrower, if any.

Our opinion of value reflects current conditions and the likely actions of market participants as of the date of value. It is based on the available information gathered and provided to us, as presented in this report, and does not predict future performance. Changing market or property conditions can and likely will have an effect on the subject's value.

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

Case 19-10214   Doc   147   Filed 07/15/19   Entered   07/15/19 15:49:14   Desc   Main Document   Page   80 of 96   BOS180250

The signatures below indicate our assurance to the client that the development process and extent of analysis for this assignment adhere to the scope requirements and intended use of the appraisal. If you have any specific questions or concerns regarding the attached appraisal report, or if Colliers International Valuation & Advisory Services can be of additional assistance, please contact the individuals listed below.

Sincerely,

**COLLIERS INTERNATIONAL**
**VALUATION & ADVISORY SERVICES**

Chris Stickney
Valuation Specialist
Certified General Real Estate Appraiser
State of Vermont License #080.0127829
+1 617 330 8171
chris.stickney@colliers.com

Corey Gustafson, MAI
Managing Director
Certified General Real Estate Appraiser
State of Vermont License #080.0114172
+1 617 330 8070
corey.gustafson@colliers.com

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

**LETTER OF TRANSMITTAL**

**INTRODUCTION** _____ 1
   Executive Summary _____ 1
   Aerial Photograph _____ 2
   Subject Property Photographs _____ 3
   Identification of Appraisal Assignment _____ 6
   Scope of Work _____ 11

**DESCRIPTIONS & EXHIBITS** _____ 13
   Regional Map _____ 13
   Regional Analysis _____ 14
   Local Area Map _____ 21
   Local Area Analysis _____ 22
   Site Description _____ 34
      Site Plan _____ 36
      Zoning Map _____ 40
      Flood Maps _____ 42
   Improvement Description _____ 49
   Assessment & Taxation _____ 76
   Zoning Analysis _____ 77
   Market Analysis _____ 80
   National Ski & Snowboard Resorts Market Overview _____ 80

**MARKET ANALYSIS** _____ 92
   National Lodging Market Overview _____ 92
   Hotel Market Supply & Demand Analysis _____ 113
   National Golf Course & Country Clubs Market Overview _____ 139
   Highest & Best Use _____ 156

**VALUATION** _____ 158
   Valuation Methods _____ 158
   Land Valuation – Base Lodge Site _____ 162
      Land Sale Summation Table _____ 163
      Land Sales Location Map _____ 164
      Land Sales Data Sheets _____ 165
      Land Sales Valuation Conclusion _____ 170
   Cost Approach – Base Lodge _____ 172
      Cost Approach Conclusion _____ 175
   Land Valuation – Remaining Land _____ 176
      Land Sale Summation Table _____ 177
      Land Sales Location Map _____ 178
      Land Sales Data Sheets _____ 179
      Land Valuation Conclusion _____ 187
   Lodging Assets Valuations _____ 188
      The Hermitage Inn _____ 189
      Snow Goose Inn _____ 220
      Doveberry Inn _____ 247
      Horizon Inn _____ 274
   Golf Course - Income Approach _____ 301
      Subject Operating Historicals _____ 301
      Investment Market Analysis _____ 303
   Golf Course - Sales Comparison Approach _____ 305
      Sales Summation Table _____ 306
      Sales Location Map _____ 307
      Sales Data Sheets _____ 308

Sales Comparison Approach Conclusion _____ 314
Allocation of Property Components _____ 315
Chamonix Village Valuation _____ 316
Reconciliation of Value Conclusions _____ 324

## CERTIFICATION OF APPRAISAL

## ASSUMPTIONS & LIMITING CONDITIONS

## ADDENDA

Engagement Letter
Subject Exhibits
Valuation Glossary
Qualifications of Appraisers
Qualifications of Colliers International Valuation & Advisory Services

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## GENERAL INFORMATION

| | |
|---|---|
| **Property Name** | The Hermitage Club |
| **Property Type** | Sport & Entertainment - Ski Resort |
| **Address** | 10 Gatehouse Trail |
| **Town** | Wilmington |
| **State** | Vermont |
| **Zip Code** | 05363 |
| **County** | Windham |
| **Market** | Southern Vermont |
| **Submarket** | Windham County |
| **Number Of Parcels** | 18 |
| **Assessor Parcels** | Various |
| **Total Assessed Value** | $21,700,133 |
| **Census Tract Number** | 9680.00 |

## SITE INFORMATION

| **Land Area** | **Acres** | **Square Feet** |
|---|---|---|
| Usable | 1,114.32 | 48,539,823 |
| Unusable | 0.00 | 0 |
| Excess | 0.00 | 0 |
| Surplus | 0.00 | 0 |
| Total | 1,114.32 | 48,539,823 |
| **Topography** | Rolling above street grade | |
| **Shape** | Irregular | |
| **Access** | Average | |
| **Exposure** | Average | |
| **Current Zoning** | Various | |
| **Flood Zone** | Zone X (Unshaded) & Zone AE | |
| **Seismic Zone** | Medium Risk | |

## IMPROVEMENT INFORMATION

| | |
|---|---|
| **Net Rentable Area (NRA)** | 157,633 SF |
| **Gross Building Area SF (GBA)** | 165,257 SF |
| **Total Number Of Buildings** | 9 |
| **Total Number Of Stories** | 1 - 4 |
| **Total Number Of Rooms** | 74 |
| **Total Number Of Golf Course Holes** | 18 |
| **Total Number of Proposed & Approved Residential Units** | 8 |
| **Year Built** | Various |
| **Year Renovated** | Various |
| **Quality** | See Description of Improvements Section |
| **Condition** | See Description of Improvements Section |
| **Parking Type** | Surface |
| **Number of Parking Spaces** | Ample |
| **Dock High Doors (Base Lodge)** | 1 |

## HIGHEST & BEST USE

| | |
|---|---|
| **As Vacant** | Residential Development |
| **As Improved** | The Current Improved Uses And The As-Proposed Eight Townhome Units |

## EXPOSURE TIME & MARKETING PERIOD

| | |
|---|---|
| **Exposure Time** | 18 to 24 Months |
| **Marketing Period** | 18 to 24 Months |

# EXECUTIVE SUMMARY

**CONTINUED**

**BOS180250**

## VALUATION SUMMARY

| HERITAGE ASSET | BASE LODGE | THE HERMITAGE INN | SNOW GOOSE INN | DOVEBERRY INN | HORIZON INN | GOLF CLUB | CHAMONIX VILLAGE ENTITLEMENTS | THE HERMITAGE CLUB SKI AREA | THE HERMITAGE INN EXCESS LAND | SUMMIT MEADOWS | HIGH COUNTRY LAND | FAWN RIDGE | GLEBE LAND (LEASEHOLD) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VALUATION INDICES | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE | AS-IS MARKET VALUE |
| INTEREST APPRAISED | FEE SIMPLE | GOING CONCERN | GOING CONCERN | GOING CONCERN | GOING CONCERN | GOING CONCERN | FEE SIMPLE | FEE SIMPLE | FEE SIMPLE | FEE SIMPLE | FEE SIMPLE | FEE SIMPLE | FEE SIMPLE |
| DATE OF VALUE | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 | JULY 25, 2018 |
| **INCOME CAPITALIZATION APPROACH** | | | | | | | | | | | | | |
| Discounted Cash Flow | | $3,150,000 | $1,530,000 | $780,000 | $790,000 | | $990,000 | | | | | | |
| DCF $/Room | | $150,000/Room | $117,692/Room | $65,000/Room | $26,214/Room | | $123,750/Unit | | | | | | |
| Holding Period | | 10 Years | 10 Years | 10 Years | 10 Years | | | | | | | | |
| Terminal Capitalization Rate | | 10.50% | 10.50% | 11.25% | 11.25% | | | | | | | | |
| Internal Rate of Return (Reversion) | | 12.75% | 12.75% | 13.50% | 13.50% | | 18.00% | | | | | | |
| Direct Capitalization | | $3,150,000 | $1,530,000 | $780,000 | $790,000 | | | | | | | | |
| Direct Capitalization $/Room | | $150,000/Room | $117,692/Room | $65,000/Room | $26,214/Room | | | | | | | | |
| NOI Proforma | | $261,260 | $166,051 | $104,170 | $134,884 | | | | | | | | |
| NOI $/Room | | $16,732/Room | $12,961/Room | $9,089/Room | $4,859/Room | | | | | | | | |
| Capitalization Rate | | 10.00% | 10.00% | 10.75% | 10.75% | $3,280,000 | | | | | | | |
| Potential Gross Income Multiplier | | | | | | $2,625,000 | | | | | | | |
| PGI Proforma | | | | | | 1.25 | | | | | | | |
| PGIM | | | | | | | | | | | | | |
| **INCOME CONCLUSION** | | $3,150,000 | $1,530,000 | $780,000 | $790,000 | $3,280,000 | $990,000 | | | | | | |
| Income Conclusion $/Unit Of Comparison | | $150,000/Room | $117,692/Room | $65,000/Room | $26,214/Room | $182,222/Hole | $123,750/Unit | | | | | | |
| **SALES COMPARISON APPROACH** | | | | | | | | | | | | | |
| **SALES CONCLUSION** | | $3,190,000 | $1,550,000 | $790,000 | $860,000 | $3,330,000 | | | | | | | |
| Sales Conclusion $/Unit Of Comparison | | $151,905/Room | $119,231/Room | $65,833/Room | $28,571/Room | $185,000/Hole | | | | | | | |
| **COST APPROACH** | | | | | | | | | | | | | |
| **COST CONCLUSION** | $35,000,000 | | | | | | | | | | | | |
| Cost Conclusion $/SF | $431/SF | | | | | | | | | | | | |
| **FINAL VALUE CONCLUSION** | | | | | | | | | | | | | |
| **FINAL VALUE** | $35,000,000 | $3,150,000 | $1,530,000 | $780,000 | $790,000 | $3,280,000 | $990,000 | $3,960,000 | $910,000 | $96,000 | $130,000 | $140,000 | $630,000 |
| $/Unit of Comparison | $431/SF | $150,000/Room | $117,692/Room | $65,000/Room | $26,214/Room | $182,222/Hole | $123,750/Unit | $7,500/Acre | $8,000/Acre | $8,500/Acre | $8,500/Acre | $8,500/Acre | $2,500/Acre |
| **LAND VALUATION** | | | | | | | | | | | | | |
| **LAND VALUE** | $3,330,000 | | | | | | | $3,960,000 | $910,000 | $96,000 | $130,000 | $140,000 | $630,000 |
| Value/Unit Of Comparison | $30.00/SF | | | | | | | $7,500/Acre | $8,000/Acre | $8,500/Acre | $8,500/Acre | $8,500/Acre | $2,500/Acre |

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## PERSONAL INTANGIBLE PROPERTY

Many of the subject assets contain personal property as part of the ongoing real estate operation. As part of the analysis and valuation of each asset the identified personal property has been separated from the value of the real estate. The following table summarizes these items of personal property for each asset.

| THE HERMITAGE CLUB PERSONAL PROPERTY | |
|---|---|
| **ASSET** | **PERSONAL PROPERTY** |
| The Hermitage Inn | $525,000 |
| Snow Goose Inn | $279,000 |
| Doveberry Inn | $154,000 |
| Horizon Inn | $360,000 |
| The Hermitage Golf Club | $275,000 |
| **TOTAL PERSONAL PROPERTY** | **$1,590,000** |

These items of personal tangible property are included in the opinions of value for each asset.

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES



**VIEW OF BASE LODGE FACING NORTHEAST**



**VIEW OF CHAMONIX VILLAGE FACING NORTHEAST**



**VIEW OF THE HERMITAGE INN FACING NORTHWEST**



**VIEW OF CARRIAGE HOUSE FACING SOUTHEAST**



**VIEW OF GOLF COURSE CLUBHOUSE FACING WEST**



**VIEW OF SNOW GOOSE INN FACING SOUTHWEST**

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES



**VIEW OF DOVEBERRY INN FACING NORTHWEST**



**VIEW OF HORIZON INN FACING SOUTHWEST**



**VIEW OF LOWER MOUNTAIN CHAIR LIFT**



**VIEW OF BARNSTORM CHAIR LIFT (NOT SUBJECT COLLATERAL)**



**VIEW OF MAINTENANCE BUILDING**



**VIEW OF OLD POWDERHORN VILLAGE LOTS FACING SOUTH**

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES



**VIEW OF CHAIR LIFTS AT BASE LODGE FACING EAST**



**VIEW OF TAGE LIFT AT THE HERMITAGE INN FACING WEST**



**VIEW OF MIRROR LAKE FACING SOUTHEAST**



**ELECTRIC VEHICLE & TESLA CHARGING STATIONS**



**COVERED BRIDGE ACCESS FROM COLDBROOK ROAD TO THE HERMITAGE INN**



**THE HERMITAGE CLUB SIGN ALONG COLDBROOK ROAD**

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICE

## PROPERTY IDENTIFICATION

The subject property consists of a portion of the real estate holdings of the Hermitage Inn Real Estate Holding Company, LLC. The subject assets represent the primary components of a private, luxury ski-resort with ancillary services and amenities, a golf course, four lodging properties, entitlements to construct two townhome buildings (eight units total), and undeveloped land commonly known as The Hermitage Club, located at 10 Gatehouse Trail in Wilmington, Vermont. Portions of the subject property (both improved and undeveloped land) are also located in the neighboring town of Dover, Vermont.

The subject's non-contiguous site area contains 48,539,823 SF (or 1,114.32-Acre). Included in this land area is 252 acres of land (Glebe Land) leased by the subject property owner from the town of Wilmington. This tract is situated at the top of Haystack Mountain and contains the terminus of several chair lifts and start of the ski trails. The current lease expires November 15, 2030 and has been in place since 1977, with several different lessees over the years permitting the operation of a ski resort which is common practice for these assets. The subject sites are summarized in the following table.

| THE HERMITAGE CLUB SITES | | | | |
|---|---|---|---|---|
| NAME | GIS / PARCEL ID | LOCATION | SF | ACRES |
| Horizon Inn | 10-03-030.00 | Wilmington | 514,008 | 11.80 |
| The Hermitage Golf Club | HAYSTACK.GLF | Wilmington | 6,246,940 | 143.41 |
| The Hermitage Club Ski Area | HAYSTACK.SKI & HERMITGE.SKI | Wilmington | 16,855,542 | 386.95 |
| Base Lodge | HERMITGE.BSL | Wilmington | 111,078 | 2.55 |
| Chamonix Village | HSCHAMON.SKI | Wilmington | 534,046 | 12.26 |
| Summit Meadows | HSSUMMIT.LND & HSS00 | Wilmington & Dover | 436,036 | 10.01 |
| The Hermitage Inn | 02-01-0003.000, HL005 (Includes: HL002 & HL003) & HL021H | Wilmington & Dover | 5,234,213 | 120.16 |
| Glebe Land (Leasehold) | 01-01-007.000 | Wilmington | 10,977,120 | 252.00 |
| High Country Land | HSHIGHCO.LND & HSH00 | Wilmington & Dover | 689,119 | 15.82 |
| Doveberry Inn | NV006 | Dover | 32,670 | 0.75 |
| Snow Goose Inn | RT091 | Dover | 67,082 | 1.54 |
| Fawn Ridge | HSF00 | Dover | 720,482 | 16.54 |
| Haystack Ski Area (Bear Habitat) | HS000 | Dover | 6,121,487 | 140.53 |
| TOTAL | | | 48,539,823 | 1,114.32 |

Portions of these subject sites are improved. A summary of these improvements and their location are presented in the following table.

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

| THE HERMITAGE CLUB IMPROVEMENTS | | | | | |
|---|---|---|---|---|---|
| NAME | ADDRESS | LOCATION | GBA | NRA | ROOMS / UNITS |
| Horizon Inn | 861 Route 9 | Wilmington | 12,296 | 12,296 | 28 |
| The Hermitage Golf Club | 70 Spyglass Lane | Wilmington | 7,000 | 7,000 | N/A |
| The Hermitage Club Ski Area | 71 Spyglass Lane | Wilmington | - | - | - |
| Base Lodge | 183 Gatehouse Trail | Wilmington | 88,813 | 81,189 | N/A |
| Chamonix Village* | 8 & 13 Grenoble Way | Wilmington | 27,200 | 27,200 | 8 |
| Summit Meadows | 24 Handle Road | Dover | | | |
| The Hermitage Inn | 25 Handle Road | Dover | 14,143 | 14,143 | 16 |
| Carriage House | 25 Handle Road | Dover | 1,744 | 1,744 | 5 |
| Glebe Land (Leasehold) | Haystack Mountain | Wilmington | - | - | - |
| High Country Land | Haystack Mountain | Wilmington & Dover | - | - | - |
| Doveberry Inn | 284 Route 100 | Dover | 6,026 | 6,026 | 12 |
| Snow Goose Inn | 259 Route 100 | Dover | 8,035 | 8,035 | 13 |
| Fawn Ridge | Haystack Mountain | Dover | - | - | - |
| Haystack Ski Area (Bear Habitat) | Haystack Mountain | Dover | - | - | - |
| TOTAL | | | 165,257 | 157,633 | |

*Entitlements for eight townhouse units in two four-unit buildings.*

As shown above the total Gross Building Area (GBA) for the is 165,257 SF of which 157,633 SF represents the Net Rentable Area (NRA), including the remaining eight townhouse units to be constructed at Chamonix Village. Overall, the resort improvements are in good/excellent condition, whereas the off-resort improvements have varying finishes and conditions. This is discussed in detail later in this report.

As of the date of our inspection the subject's conceptual development for the entire Hermitage Club has not received full approval from either the State of Vermont or the towns of Wilmington and Dover. Further, the current status of the Act 250 Master Plan submitted by the owner received positive findings for only two criteria (#6 educational services & #7 municipal services) out of a possible 10 main criteria. It should be noted that there are several criteria which have sub-criteria equating to approximately 30 total criteria which **all must have positive findings prior to proceeding with any development**. The partial positive findings were issued in February 2017 and remain in effect for 10 years. Meaning that the two positive findings will not need to be presented or restated until the 10-year period expires while positive findings for the remaining criterion are sought. Discussions with the owner's representative and the district coordinator for the Vermont Natural Resources Board both reported that it took several years for these initial partial findings to be issued. Without positive findings for **all** the Act 250 criteria the owner/developer cannot proceed with any development within the scope of the master plan. Further, approvals for the plan would still need to be achieved at the town level and construction permits also need to be sought (or submitted concurrently) through both the State and towns.

The entire club, and all of the company's operations were required to close at the end of March 2018 by the State of Vermont, Department of Taxes for failure to pay more than $1,000,000 in back sales taxes to the State. It has also been reported that approximately $800,000 in back sales taxes are owed to the Town of Wilmington. A letter addressed to Jim Barnes, the principal owner of The Hermitage Club, dated March 30, 2018 from the State included the following verbiage is posted on the doors of the Club's Base Lodge front doors:

> "You shall not conduct any business. This prohibition includes but is not limited to selling memberships, paying employees including security, day care, and maintenance personnel, renting rooms, collecting greens fees, and selling taxable meals."

In the months following this order there has been limited maintenance of the subject assets. It was reported by the owner's representative that the property upkeep has been restricted to walk throughs and minimal maintenance of the buildings occurring two or three times a week, and maintenance of the golf course grounds (mowing, raking, and some watering) only. There has been no maintenance to the Club's ski equipment, including the chair lifts which require annual upkeep and recertification. It was reported by the owner's representative that due to the time and resources necessary to complete these certifications that it would be highly-unlikely that the ski resort would open this season.

The Base Lodge, golf course, Snow Goose Inn, The Hermitage Inn, and carriage house have been well-maintained and could be operational in approximately one to two months, assuming that the necessary operational permits and issues with the State could be remedied. The Doveberry Inn and Horizon Inn would require capital expenditures to correct deferred maintenance and upgrade the furniture, fixtures, and equipment to the standards typical of these assets in the market. These assets would require approximately six months to reopen, assuming that the necessary operational permits and issues with the State could be remedied.

Lastly, our research uncovered that our client (Berkshire Bank) commenced foreclosure proceedings as the Club had not been making payments on a reported amount of over $16,000,000 in funds owed to Berkshire Bank.

Per our engagement and subsequent communication with the client our analyses contained within this report is representative of the real estate only, without consideration to the financial obligations of the current owner excepting cost to cure physical depreciation at the subject improvements as estimated by the appraisers.

Please see the Site Description section of this report for a list of the subject's parcel numbers.

A detailed legal description was not provided.

## CLIENT IDENTIFICATION

The client of this specific assignment is Berkshire Bank.

## PURPOSE

The purpose of this appraisal is to develop an various opinion of value for the subject assets, which are summarized below:

1. As-is market value of the base lodge, ski parcel, undeveloped land, and remaining eight entitled units of Chamonix Village.
2. As-is going concern of The Hermitage Inn, Snow Goose Inn, Doveberry Inn, Horizon Inn, and The Hermitage Golf Club.
3. Leasehold value of the Glebe Land

## INTENDED USE

The intended use of this appraisal is for loan underwriting and-or credit decisions by Berkshire Bank and-or participants.

## INTENDED USERS

The intended users of this report is Berkshire Bank and-or affiliates. Use of this report by third parties and other unintended users is not permitted. This report must be used in its entirety. Reliance on any portion of the report independent of others, may lead the reader to erroneous conclusions regarding the property values. Unless approval is provided by the authors no portion of the report stands alone.

## ASSIGNMENT DATES

| | |
|---|---|
| Date of Report | September 10, 2018 |
| Date of Inspection | July 25, 2018 |
| Valuation Date - As-Is | July 25, 2018 |

## PROPERTY AND SALES HISTORY

### Current Owner

The subject title is currently recorded in the name of The Hermitage Inn Real Estate Holding Company, LLC. The properties that comprise the subject of this report have been acquired at various times. The acquisitions that we were able to confirm are as follows: The Hermitage Inn was acquired in 2007 ($1,650,000), the ski mountain operation and acreage were acquired in 2011 (approximately $6,000,000), the golf course was acquired in October 2011 ($500,000), the Horizon Inn was acquired January 2015 ($545,000), the Doveberry Inn was acquired in early 2015 (undisclosed), and the Snow Goose Inn was acquired in June 2015 ($375,000).

Many of these assets underwent significant renovation after acquisition to provide a uniform experience for members of The Hermitage Club and have been maintained at a similar level to date. The Doveberry Inn and Horizon Inn were utilized for employee housing, and reportedly did not receive any significant capital improvement after acquisition with maintenance levels commensurate with the intended use as employee housing.

### Three-Year Sales History

The subject has not sold in the last three years.

### Subject Sale Status

The subject is not currently listed for sale.

## DEFINITIONS

This section summarizes the definitions of value, property rights appraised, and value scenarios that are applicable for this appraisal assignment. All other applicable definitions for this assignment are located in the Valuation Glossary section of the Addenda.

## DEFINITIONS OF VALUE

Given the scope and intended use of this assignment, the following definition of value is applicable:

### Market Value

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming that the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

---

[1] Office of Comptroller of the Currency (OCC), Title 12 of the Code of Federal Regulation, Part 34, Subpart C - Appraisals, 34.42 (g); Office of Thrift Supervision (OTS), 12 CFR 564.2 (g); This is also compatible with the FDIC, FRS and NCUA definitions of market value.

## PROPERTY RIGHTS APPRAISED

The property rights appraised constitute the fee simple interest.

**Fee Simple Estate**

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat.[2]

**Leasehold Interest (Glebe Lot Only)**

The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.[3]

## VALUE SCENARIOS

**As-Is Value**

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.[4]

---

[2] The Dictionary of Real Estate Appraisal, Sixth Edition, Appraisal Institute, Chicago, Illinois, 2015
[3] The Dictionary of Real Estate Appraisal, Sixth Edition, Appraisal Institute, Chicago, Illinois, 2015
[4] The Dictionary of Real Estate Appraisal, Sixth Edition, Appraisal Institute, Chicago, Illinois, 2015

## INTRODUCTION

The appraisal development and reporting processes requires gathering and analyzing information about those assignment elements necessary to properly identify the appraisal problem to be solved. The scope of work decision must include the research and analyses that are necessary to develop credible assignment results given the intended use of the appraisal. Sufficient information includes disclosure of research and analyses performed and might also include disclosure of research and analyses not performed. The scope of work for this appraisal assignment is outlined below:

› The appraisers analyzed the regional and local area economic profiles including employment, population, household income, and real estate trends. The local area was further studied to assess the general quality and condition, and emerging development trends for the real estate market. The immediate market area was inspected and examined to consider external influences on the subject.

› The appraisers confirmed and analyzed legal and physical features of the subject property including sizes of the site and improvements, flood plain data, seismic zone, zoning, easements and encumbrances, access and exposure of the site, and construction materials and condition of the improvements. This process also included estimating the remaining economic life of the improvements, analysis of the subject's site coverage and parking ratios compared to market standards, a process to identify deferred maintenance and a conclusion of the subject's overall functional utility.

› The appraisers completed market analyses for the various subject property operations. Conclusions were drawn regarding the subject property's competitive position given its physical and locational characteristics, the prevailing economic conditions and external influences.

› The appraisers conducted a Highest and Best Use analysis, determining the highest and best use of the subject property As-Vacant and As-Improved. The analysis considered legal, locational, physical and financial feasibility characteristics of the subject property. Development of the Highest and Best Use As-Improved explored potential alternative treatments of the property including demolition, expansion, renovation, conversion, and continued use "as-is."

› The appraisers confirmed and analyzed financial features of the subject property including historical and budgeted income/expense data, lease documents, development plans and approvals, and tax and assessment records. This information as well as trends established by confirmed market indicators was used to forecast performance of the subject property.

› Selection of the valuation methods was based on the identifications required in USPAP relating to the intended use, intended users, definition and date of value, relevant property characteristics and assignment conditions. As a result, this appraisal developed the Income (Discounted Cash Flow & Direct Capitalization), Sales Comparison and Cost approaches to value. The resulting value indicators were reconciled within the Analysis of Value Conclusions section. The appraisal develops the following opinions of value for the subject assets:

1. As-is market value of the base lodge, ski parcel, undeveloped land, and remaining eight entitled units of Chamonix Village.
2. As-is going concern of The Hermitage Inn, Snow Goose Inn, Doveberry Inn, Horizon Inn, and The Hermitage Golf Club.
3. Leasehold value of the Glebe Land

The reasoning for including or excluding traditional approaches to value is developed within the Valuation Methodology section.

› Reporting of this appraisal is in an Appraisal Report format as required in USPAP Standard 2. The appraiser's analysis and conclusions are fully described within this document.

› We understand the Competency Rule of USPAP and the authors of this report meet the standards.

› Gage Clavet provided significant real property appraisal assistance to the appraisers signing the certification. Assistance included gathering, analyzing and reporting regional, local area, zoning, and tax information, confirming some of the comparable data, and assisting with portions of the valuation analysis.

## SOURCES OF INFORMATION

We requested several pieces of information including legal descriptions, deeds, detailed income and expense statements, land plans, building plans, operating pro forma, and other development information. We were not provided with many of these pieces of information as they were reported to be unavailable to the owner's representatives for either lack of payment to various vendors or the reduced staffing levels to aid in providing these documents.

During our analysis and market research we contacted several local and state authorities to gather as much information as possible to aid in our analysis of the subject. The key components uncovered or made available to us are presented in the following table:

| SOURCES OF INFORMATION | |
|---|---|
| ITEM | SOURCE |
| Tax Information | Wilmington & Dover Lister Offices |
| Zoning Information | Wilmington & Dover Zoning Ordinances |
| Site Size Information | Plats of Survey (Accessed from Public Record) |
| Building Size Information | Provided by the Owner |
| New Construction | Town of Wilmington / Windham County |
| Flood Map | InterFlood |
| Demographics | Pitney Bowes/Gadberry Group - GroundView® |
| Comparable Information | See Comparable Datasheets for details |
| Legal Description | None provided |
| Act 250 Status | Stephanie Gile, District 2 Coordinator - State of Vermont Natural Resources Board |
| Operational Information | Chad Bullock, Director of Finance - The Hermitage Club |

## SUBJECT PROPERTY INSPECTION

The following table illustrates the Colliers International professionals involved with this appraisal report and their status related to the property inspection.

| SUBJECT PROPERTY INSPECTION | | | |
|---|---|---|---|
| APPRAISER | INSPECTED | EXTENT | DATE OF INSPECTION |
| Gage Clavet | No | - | - |
| Chris Stickney | Yes | Interior/Exterior | July 25, 2018 |
| Corey Gustafson, MAI | No | - | - |

During the site tours the mid-mountain and summit cabins (leasehold improvements located on the Glebe Land) were not able to be toured, as the terrain leading to these improvements was reported to be impassable due to the repossession of the Club's all-terrain vehicles.

© 2018 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICE