**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| In re: ) | |
| ) | |
| HERMITAGE INN REAL ESTATE ) | Chapter 11 |
| HOLDING COMPANY, LLC, ) | Case Nos. 19-10214 (CAB) and |
| ) | 19-10276 (CAB) |
| and ) | Jointly Administered |
| ) | |
| HERMITAGE CLUB, LLC, ) | |
| ) | |
| Debtors. ) | |
| ) | |

**OBJECTION OF BERKSHIRE BANK TO DEBTORS MOTION FOR FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (II) GRANTING LIENSAND SUPERPRIORITY CLAIMS TO THE DIP LENDER PURSUANT TO 11 U.S.C. § 364(c), and (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Now comes Berkshire Bank (the "Bank"), by and through its undersigned counsel, and hereby objects to the Debtor's Motion for Final Order (I) authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (II) Granting Liens and Superpriority Claims to the DIP Lender Pursuant to 11 U.S.C. § 364(c), and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Financing Motion").

In support of this Objection, the Bank respectfully represents as follows:

**Preliminary Statement**

Pursuant to the DIP Financing Motion, the Debtors seek to borrow $1,750,000 on a secured basis from Restructured Opportunity Investors, Inc. (the "DIP Lender"), by providing the DIP Lender with a first lien on substantially all of the Debtors' real property assets, thereby priming the liens of the Debtors' secured creditors who have liens against those assets, including

the Bank (the "DIP Financing Facility").  This is the second DIP Financing Motion filed by the Debtors in these cases.  The Debtors' first DIP Financing Motion (Doc. # 115) was denied by the Court at a hearing on July 12, 2019 (the "First DIP Motion").  The Bank and a number of other creditors objected to the First DIP Motion on the basis that, inter alia, (a) the First DIP Motion and the financing contemplated thereby did not pay ongoing basic expenses of the Debtors, (b) allowance of the First DIP Motion would not add any benefit to the Debtors' estates or further a plan that would benefit the estates, (c) the Debtors have no ongoing operations and the funds available under the First DIP Motion were not sufficient to resume ongoing operations, and (d) the Debtors were unable to provide the Bank or other secured creditors with adequate protection. Although the Debtors addressed some of the objections raised by the Bank and other creditors in the DIP Financing Motion, the Bank submits that the DIP Financing Motion and the DIP Financing Facility continue to be fundamentally flawed, and continue to suffer from the same weaknesses as the First DIP Motion.

Accordingly, and as set forth more fully herein, the Bank objects to the DIP Financing Motion because, *inter alia*, (1) the funds available to the Debtors under the proposed DIP Financing are inadequate to pay ongoing expenses of the Debtors in these Chapter 11 cases, including utilities, insurance and maintenance; (2) twenty-five percent (25%) of the DIP Facility proceeds go directly to the DIP Lender upon closing and more of the DIP Facility proceeds will go to the DIP Lender for counsel and other fees at the discretion of the DIP Lender; (3) the Debtors are unlikely to meet the benchmarks set forth in the DIP Facility, which will lead to a default and/or compulsory sale process (for which the Debtors have no funds allocated or available to fund); (4) there is no sense in incurring the significant liability under the DIP Facility simply to end up in a Chapter 11 sale process that will be unfunded; (5) the carve out for

2

professionals under the DIP Facility was reduced from $300,000 to $150,000 from the First DIP Motion to the DIP Financing Motion, simply to generate available funds for another line item, but these cases did not get less expensive to prosecute over the past week so the estates will likely incur more expenses than they have funds available to pay; (6) the Debtors cannot provide the Bank or other secured creditors with adequate protection; (7) the Debtors have no ongoing operations and have not had any operations since March of 2018 and the funds from the DIP Financing Facility are insufficient to resume operations; and (8) the sole purpose of the DIP Facility seems to be to give the Debtors' time to propose their plan of reorganization (which the Debtors' have already posted on their website), and the "plan" is wholly non-confirmable and the Court should not permit the Debtors' to continue to pursue their unattainable goals at the expense of their creditors.  In short, the Debtors don't have the funds necessary to stay in Chapter 11 and pay their post-petition obligations and they cannot provide the Bank and the other secured creditors adequate protection as required by the Bankruptcy Code.  The Debtors should not be permitted to further damage their creditors by entry into the DIP Financing Facility that does not provide any value to the Debtors' estates or lead to a solution or plan that provides value to the Debtors' estates.

### The Bank's Secured Claim[1]

Hermitage Inn Real Estate Holding Company, LLC ("HIREHC"), one of the Debtors in these cases, is the owner of the former Haystack Mountain ski resort and related properties and assets, consisting of approximately 800+ acres in the aggregate, located in the Towns of Dover and Wilmington, Windham County, Vermont (the "Property" or the "Site").  HIREHC

---

[1] The description of the Bank's secured claim is exactly the same as was set forth in the Bank's Objection to the First DIP Motion.

3

58880873 v2

constructed a base lodge on the Property (the "Base Lodge"), and has development rights to construct other improvements on the Property (the "Proposed Improvements").

On or about September 30, 2013, HIREHC and the Bank entered into that certain Construction Loan Agreement (as amended through the date hereof, the "Loan Agreement"), pursuant to which the Bank agreed to make certain loans to HIREHC in the aggregate amount of up to $20,000,000 (the "Original Loans") to enable HIREHC to construct or complete construction of the Base Lodge and other Proposed Improvements. On or about December 3, 2014, the Bank and HIREHC amended the Loan Agreement, and bifurcated the Original Loans into: (i) a $15,000,000 loan to finance the Base Lodge (the "Base Lodge Loan"), as evidenced by a Second Amended and Restated Promissory Note (Base Lodge Loan) dated December 3, 2014 made by HIREHC and payable to the order of the Bank (the "Second Amended and Restated Base Lodge Note"); and (ii) a $5,000,000 revolving loan for costs incurred by HIREHC in connection with the construction of single family homes on the Property (the "Revolving Loan"), as evidenced by a Second Amended and Restated Revolving Credit Promissory Note dated December 3, 2014 made by HIREHC and payable to the order of the Bank (the "Revolving Note").

On or about June 28, 2016, HIREHC executed and delivered to the Bank a Third Amended and Restated Promissory Note (Bridge Loan) in the principal amount of One Million Dollars ($1,000,000) (the "Bridge Loan Note"), which Bridge Loan Note amended and restated the Revolving Note in its entirety on a non-revolving basis.

On or about July 18, 2017, pursuant to further borrowings and amendments to the Loan Agreement, HIREHC executed and delivered to the Bank an additional promissory note in the original principal amount of $1,100,000 (the "Second Bridge Loan Note").

4

The loans evidenced by the Second Amended and Restated Base Lodge Note, the Bridge Loan Note and the Second Bridge Loan Note are hereinafter referred to as the "Bank Loans," and the three Notes are collectively referred to hereinafter as the "Notes".

As of July 9, 2019, the unpaid balance, including accrued and unpaid interest, late charges and certain capitalized expenses, due to the Bank under the Bank Loans is as follows:

|   | Balance |
|---|---|
| Second Amended and Restated Base Lodge Note: | $18,177,054.17 |
| Bridge Loan Note | $1,116,186.16 |
| Second Bridge Loan Note: | $1,168,852.54 |
| Total | $20,462,092.87 |

Interest accrues on the Notes at the rate the following per diem rates: Second Amended and Restated Based Lodge Note ($2,536.99), Bridge Loan Note ($232.86), and Second Bridge Loan Note ($223.35), which collectively translates to $84,396.00 in interest accrual for every thirty days. In addition to the foregoing, the Bank has incurred over $1,615,209.08 in additional expenses since September of 2018 to simply preserve its collateral and protects its interest under the Bank Loans, including the following expenses[2]: (a) real estate taxes in the amount of $1,433,000, (b) utilities in the amount of $882,000, (c) insurance in the amount of $290,000, (d) $1,000,000 in fees to the Receiver appointed in the State Court Foreclosure Action (as defined below), of which $611,000 was incurred for employee payroll and benefits for the Debtors' employees who are working for the Receiver ($336,000), and basic repairs and maintenance on the Bank's collateral ($266,000), (e) $169,000 for lease payments on the so-called Glebe Lot,

---

[2] These amounts are rounded to the nearest $1,000, and may not include all charges and expenses incurred by the Bank to date. These amounts also include expenses incurred before September 30, 2018 in the aggregate amount of $2,593,000, which were capitalized and added to the balance of the Second Amended and Restated Base Lodge Note.

5

and (e) legal and appraisal fees of $390,000. The total amount of the Bank's secured claim is approximately $22,077,000 as of the date hereof.[3]

To secure all of the indebtedness and obligations due to the Bank under the Loan Agreement (collectively, the "Obligations"), HIREHC executed in favor of the Bank that certain Construction Mortgage and Security Agreement dated as of September 30, 2013, as amended by (i) that certain Amendment of Mortgage between HIREHC and the Bank dated as of April 30, 2014, (ii) that certain Second Amendment of Mortgage between HIREHC and the Bank dated as of November 12, 2014, (iii) that certain Third Amendment of Mortgage between HIREHC and the Bank dated as of December 3, 2014, (iv) that certain Fourth Amendment of Mortgage between HIREHC and the Bank dated December 4, 2015, (v) that certain Fifth Amendment of Mortgage between HIREHC and the Bank dated June 28, 2016, (vi) that certain Sixth Amendment of Mortgage between HIREHC and the Bank dated February 1, 2017, (vii) that certain Seventh Amendment of Mortgage between HIREHC and the Bank dated February 10, 2017, and (viii) that certain Eight Amendment of Mortgage between HIREHC and the Bank dated Jul 18, 2017, with respect to the Property (said Construction Mortgage and Security Agreement, as so amended through the date hereof, being hereinafter referred to as the "Mortgage"). The Mortgage and all amendments thereto have been properly recorded with the Dover (Vermont) Land Records and the Wilmington (Vermont) Land Records, thereby properly perfecting the Bank's rights under the Mortgage.

In connection with the Original Loans, on September 30, 2013, James Barnes, the principal of the Debtors (the "Guarantor"), executed a Guaranty in favor of the Bank, under which the Guarantor guaranteed the Obligations of HIREHC to the Bank under the Loan

---

[3] The Bank is submitting the Affidavit of Peter A. Landauer, First Vice President, attesting to the amounts owed by the Bank and the expenses incurred by the Bank in connection with the hearing on the DIP Financing Motion.

6

58880873 v2

Agreement (the "Guaranty"), which Guaranty has been amended and restated through the date hereof, and continues in full force and effect with respect to the Bank Loans.

Also in connection with the Original Loans, on September 30, 2013, Hermitage Club, LLC, the other Debtor in these jointly administered proceedings (the "Hermitage Club"), executed a Security Agreement in favor of the Bank, under which Hermitage Club granted to the Bank a security interest and lien on all assets owned by Hermitage Club (the "HC Security Agreement"), which HC Security Agreement continues in full force and effect.

The Debtors defaulted in the Obligations in September of 2016 and the Bank, the Debtors and the Guarantor entered into a series of forbearance agreements, with the last dated November 30, 2017. During the period of time while the forbearance agreements were in effect, the Debtors were presented with viable opportunities to refinance their obligations, but the Debtors failed or refused to enter into those refinancing opportunities because, upon information and belief, they did not provide for a sufficient return to the Debtors' principal, James Barnes. The Debtors ultimately failed to comply with the terms of these forbearance agreements and on February 23, 2018, the Bank commenced an action to foreclose its Mortgage in the Vermont Superior Court, Windham Division (the "State Court Foreclosure Action").

On June 6, 2018, on request of the Bank, the State Court appointed Alan Tantleff of FTI Consulting Inc. as the Receiver for the Bank's collateral (the "Receiver").[4] The Bank prosecuted the State Court Foreclosure Action until the involuntary petition was filed against HIREHC on May 22, 2019.

Upon the filing of the involuntary petition, the Bank moved for an order retaining the Receiver in place in the early stages of these cases to maintain the status quo and to continue to protect and preserve the Debtors assets, which motion was allowed by the Court at the hearing

---

[4] The Bank's collateral represents substantially all of Debtor's assets.

7

58880873 v2

on the motion on May 30, 2019. As such, the Receiver has remained in place thus far in these cases. The Bank has paid $150,000 to the Receiver since the commencement of these cases, which amount includes continued payment of the Debtors' employees working for the Receiver. The Bank has also paid an additional $66,000 in utility bills since the commencement of these cases.

**The DIP Financing Motion is Wholly Inadequate to Finance the Debtor's Basic Obligations**

Under the DIP Financing Facility the Debtors propose borrowing $1,750,000 at an interest rate of approximately 11% per annum. The DIP Facility has a term of only six months, yet the Debtors are required to deposit $280,000 into an interest reserve account, which is almost 18 months of interest. The DIP Facility provides that the DIP Lender is entitled to a minimum of one year's interest on the loan, regardless of how long the loan is outstanding. In reviewing the proposed loan documents attached to the DIP Financing Motion, it is clear that the Debtors will never see a return of any of the $280,000 deposited in the interest reserve account. Further, the DIP Lender is authorized to debit the interest reserve account for the DIP Lender's cost and expenses, including attorneys' fees at the DIP Lender's sole discretion. The DIP Financing Facility includes $155,000 in fees payable to the DIP Lender including a structuring fee ($50,000), a commitment fee ($52,500) and an exit fee ($52,500). As such, almost 25% of the proceeds from the proposed DIP Financing is going to the DIP Lender in fees and interest reserve (435,000/1,750,000 = 24.9%). Another $150,000 of the DIP Facility proceeds are going to fund a professional fee escrow for the professional fees of the Debtors and possible other professionals in these cases. Accordingly, 33.4% of the DIP financing (584,500/1,750,000 = 33.4%) is going to the DIP Lender and professionals.

8

The Debtors reduced the professional fee escrow from $300,000 to $150,000 from the First DIP Motion to the DIP Financing Motion, but there is no reason to believe that the prosecution of the Debtors' Chapter 11 cases got cheaper by 50% over the past few weeks. The fact of the matter is the DIP Facility does not provide sufficient liquidity for the Debtors, so they are forced to move funds from one line item to another in an effort to address the Bank's and other parties' objections.

The Debtors' continue to submit in the DIP Financing Motion that the terms of the DIP Financing are fair, reasonable and appropriate under the circumstances, in a very conclusory fashion. The Bank submits that the terms of the DIP Financing may be fair, reasonable and appropriate for the DIP Lender and the Debtors' professionals, but they are very far from fair, reasonable and appropriate to the $39+ million in secured creditors whose liens are to be primed under the DIP Facility.

If the basic borrowing terms of the DIP Financing are not egregious enough, the DIP Facility continues to be inadequate to meet the Debtors' ongoing obligations, or maintain the Debtors' assets. The Debtors have circulated an updated proposed sixteen-week (the "<u>Budget Period</u>") cash flow budget (the "<u>Budget</u>"), which Budget will be filed with the Court with the Joint Pretrial Stipulation of Facts and Exhibits filed by the parties in connection with the evidentiary hearing scheduled on the DIP Financing Motion. While this updated budget includes funds for the payment of real estate taxes, the Budget is still short of all the funds needed for real estate taxes, utilities and other ongoing basic expenses.

The Budget provides for payment of $286,000 during week 5 of the Budget Period for real estate taxes. The Debtors will owe $379,809.85 in real estate taxes on or before September 15, 2019. Attached hereto as Exhibit A is a summary of the real estate taxes owed, along with

9

copies of the relevant tax bills.  The Bank submits that the Debtors will be approximately $94,000 short in the payment of real estate taxes.

The budget provides $113,610 for equipment and insurance obligations during the Budget Period.  Under the Debtors Motion for Authority to Approve Insurance Premium Financing Agreement (Doc. # 90), the Debtors are required to make monthly payment under that agreement of $17,768.47, or $71,073.88 for the Budget Period.  That will leave the Debtors with $42,536.12, or approximately $10,000 per month, for premiums related to any personal property insurance.[5]  It is unclear if this will be sufficient to pay premiums for any such policy, if the Debtors can even obtain such a policy at this time given the vacant state of the Property and the Debtors financial condition.

As noted above, the Receiver has spent $266,000 in basic property repairs and maintenance over the 11 months since he was appointed, or approximately $24,000 per month.  The Budget has $15,000 allocated for property repairs and maintenance, $30,500 allocated to Mountain operations expense, and $11,488 allocated for golf course maintenance, in each case for the entire Budget Period.  How the Debtors can propose that their maintenance obligations are fifty percent (50%) of the Receiver's actual expense over the past year is unclear and can only reflect the plain fact that the proceeds available to the Debtors under the DIP financing Facility are insufficient to cover their most basic ongoing expenses.  Indeed, each successive budget circulated by the Debtors does not add any additional funds, or eliminate any expenses, but just moves money from one category to another, simply changing the category of expense for which they will have a shortfall.

---

[5] The policy for which the Debtors have sought court approval to finance is a builder's risk policy that does not cover personal property.  The Debtors will need personal property insurance to remain in Chapter 11.

In addition, there are obligations owing to the Cold Brook Fire District No. 1 ("Cold Brook FD1"). Cold Brook FD1 provides water and sewer services to a portion of the Debtors' properties. Cold Brook FD1 charges an annual general fee along with an operations and maintenance fee. HIREHC owed $62,002.82 for operations and maintenance fees and general assessment fees on August 3, 2019. The amount related to the Bank's collateral is $57,334.07, which amount has been paid by the Bank. The Debtors owe an additional $4,668.75 for portions of their property that are not part of the Bank's Collateral, which have not been paid. HIRECH will owe another $23,862.57 on or about November 1, 2019 to Cold Brook FD1 for further operations and maintenance fees, or a total of $85,865.39. The Budget provides $75,000 for the Budget Period for all payments to Cold Brook FD1. As such, absent payment by the Bank of the $57,334.07, the Debtors would not have enough funds in the Budget to pay for water and sewer charges, a very basic expense. Interest accrues on any unpaid charges at a statutory rate of 18% per annum.

On October 2, 2019, the Debtors will owe $439,291.92 to Cold Brook FD1 as a special benefit assessment, which amount varies based upon interest rates and payment schedule, and is due bi-annually by HIREHC to Cold Brook FD1 as a result of borrowings from the Vermont Bond Bank that Cold Brook FD1 employed, at the request of the Debtors, to finance and construct infrastructure on the Site. The fees and charges due to Cold Brook FD1 prime other liens on the properties just like unpaid real estate taxes (24 V.S.A. §507-5). There are no funds allocated in the Budget to make this payment.

The Debtors are continuing to ask the Court to approve the DIP Financing Motion, which would prime the Debtors' secured creditors, while the Debtors propose no payment for the most

11

basic expenses directly related to the Debtors' assets, nor payment of other items that will also prime secured creditors. Once again, this is far from fair, reasonable and appropriate.

In addition to the foregoing, the proposed Budget has other failings and raises other questions. The Receiver has incurred an average of $30,500 per month for employee payroll and benefits[6] (See Fifth Report of Receiver Alan Tantleff dated May 6, 2019, and attached as Exhibit 9 to the Rule 9014(e) Notice of Evidentiary Hearing filed by Bank's counsel on May 29, 2019 (Doc # 18). The Receiver has been employing only a portion of the Debtors' payroll – it is unclear how the Debtors' other employee have been or are being paid. The Budget projects over $80,000 per month without explanation as to what employees are included in this list, what those employees will be doing and why the Debtors project incurring such a large increase in payroll over what the Receiver has spent over the past year plus. This increase may be related to the requirement in the DIP Financing Facility that the Debtors hire Jonathan Joslow, or such other professional acceptable to the DIP Lender, to act as the Debtors' Chief Restructuring Officer. Or, payments could be going to the Debtors principal, James Barnes. However, the Debtors provide no explanation for this increase in payroll over what the Receiver has been spending, and creditors should not be required to guess or speculate with regard to the Budget and the proposed use of funds under the DIP Facility.

The Budget also contains four monthly payments to the Bank in the amount of $42,500 per month, presumably as a proposed form of adequate protection. As noted above, interest continues to accrue on the Notes at the rate of $84,396 per month. The Bank submits that such payments do not provide the Bank with adequate protection.

---

[6] Pursuant to an arrangement made between the Debtors and the Receiver, the Receiver is funding the payroll for the employees working for the Receiver directly through the Debtors' payroll service.

One of the benchmarks in the DIP facility is that a meeting of the resort members be held on or before August 7, 2019 with the result being that sixty five percent (65%) of the existing members commence paying one hundred percent (100%) of their monthly dues into an escrow account to be used solely for purposes provided for in a confirmed plan of reorganization (the "<u>Membership Payments</u>") on or before August 19, 2019, however, failure to obtain the Membership Payments shall not be an event of default if the Debtors file a Motion to Sell its Assets Under 11 U.S.C. § 363 on or before August 26, 2019.

It is highly unlikely the Debtors will attain the Membership Payment benchmark, which fact is confirmed by the Ad-Hoc Committee of Members who stated as much in its objection to the First DIP Motion (Doc. # 129). "Without open Facilities, it is inconceivable that members would agree to tender any membership dues to the Debtors, let alone 100% of their dues." The Ad Hoc Committee of Members confirms its position in its most recent Objection to the DIP Financing Motion (Doc. #162) – "it is even less conceivable that by August 19, 2019, the required number of members would tender any membership dues (in escrow or otherwise) to the Debtors."

The Debtors failure to meet the Membership Payment benchmark will result in a default under the DIP Financing Facility and a requirement that the Debtors file a Motion to Sell Assets under Section 363 of the Code. However, the Debtors have no funds allocated in the Budget for any sale effort or marketing expenses, which means these cases will likely have to be converted at such time. Further, the Debtors estates will have already paid $435,000 to the DIP Lender for the privilege of staying in Chapter 11 for an additional thirty (30) days. None of this is necessary or appropriate. If a sale process is to occur in these cases, the Bank submits it would be more efficient and less costly to conduct such a sale under the auspices of a Chapter 7 trustee.

58880873 v2

The Court should not approve a DIP Facility that primes all of the Debtors' secured creditors holding liens against the Real Property Collateral, benefits the DIP Lender with an immediate windfall, does not have sufficient liquidity to pay for basic expenses, and will very quickly make these Chapter 11 cases administratively insolvent, while providing no benefit to the Debtors' creditors.

This is the Debtors' management/principal attempting a last ditch effort to hold off the inevitable, and the Court should not allow the Debtors to continue these efforts.

### The Debtors Cannot Provide the Bank and Other Secured Creditors Adequate Protection

Section 364(d) of the Bankruptcy Code provides as follows:

> (d)(1) The court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
>
> (A)  the trustee is unable to obtain such credit otherwise; and
> (B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is to be granted.
>
> (2) In any hearing under this subsection, the Trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. §§ 364(d)(1) and (2).

"The ability to prime an existing lien is extraordinary, and in addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide adequate protection for the interest of the holder of the existing lien or obtain such lien holders consent" (See, Collier on Bankruptcy, 16th Ed., § 364.05, citing *In re Resolution Trust Corp. v. Swedeland Dev. Group, Inc.*, (*In re Swedeland Dev. Group, Inc.*) 16 F. 3d 552, and *In re First South Sav. Ass'n.,* 820 F.2d 700). Adequate protection is not defined in the Bankruptcy Code, but examples of adequate protection are provided in Section 361 of the Bankruptcy Code, which provides that

adequate protection may be provided by cash payments, or granting of replacement liens, to protect the interest holder from a decrease in the value of such entities' interest in such property. 11 U.S.C. §361. The Debtors do not have any unencumbered assets, or any income or cash with which they could provide adequate protection to the Bank or other secured creditors. As such, the Debtors only ability to provide adequate protection to the Bank and other secured creditors is by establishing that the Debtors' assets have a value, and therefore an equity cushion, over and above the amount of secured liens encumbering such assets.

The Bank commissioned Colliers International ("Colliers") to appraise the Bank's Collateral and Colliers has prepared an appraisal report dated July 11, 2019 (the "Bank's Appraisal"). The Bank's Appraisal values the Bank's collateral at $21,310,000. Colliers had prepared a prior appraisal report, dated September of 2018, that ascribed a greater value to the Bank's Collateral. There was a significant reduction in value in the Bank's Appraisal from 2018 to 2019 because of the fact that none of the Debtors' assets are operating or currently in use, and they have not been for almost 15 months. Once again, a fundamental assumption in the Bank's Appraisal in 2018 was that the resort would be open, operating and providing services to its members and receiving membership fees and dues in exchange. The same is true for the inns owned by the Debtors - they have a much greater value when up and operating rather than in a mothballed state. It is not surprising that the inns and ski resort owned by the Debtors will have significantly more value as operating assets rather than mothballed assets. However, the current state of those assets (which has been true now for almost 15 months) is mothballed and idle rather than up and operating.

Based upon the Bank's Appraisal, there is no equity over and above the Bank's secured claim of $22,077,000. In addition to the secured debt owed to the Bank, there are at least

15

$17,230,051.96 in additional secured claims against the Debtors' real property assets. Attached hereto as Exhibit B are two spreadsheets showing the liens recorded with the Town of Wilmington Land Records and the Town of Dover Land Records. These liens (the Bank's secured claim and the other recorded lien claims) total $39,307,052. The Bank submits that there is no equity in the Debtors' assets, and therefore no equity cushion that can provide the Bank and the other secured creditors with adequate protection. Absent providing secured creditors with adequate protection, as is required by the Bankruptcy Code, the DIP Financing Motion cannot be approved.

The Debtors' submit that their assets are worth $44,175,000, based upon an appraisal report prepared for the Debtors by Realty Advisors, and dated July 22, 2019 (the "Debtors' Appraisal"), which is attached to the Joint Stipulation of Facts and Exhibits being filed by the parties in advance of the hearing on the DIP Financing Motion.

The Bank submits that the Debtors' Appraisal is deficient because it places far too great a value on the Debtors assets that are not operating or being used, and makes assumptions that are not true regarding members paying dues or the Debtor having permits in hand that it does not. The Debtor's Appraisal asserts that the development rights at the Property have a value of $10,000,000. The Bank submits that this value is overstated and does not account for the costs, fees and time that it will take to have those development rights come to fruition. Further local and state permitting is required for development at the Site, including, without limitation, compliance with all of the criteria of Act 250. The Debtors' Appraisal states that the Debtors have approval for the development of 411 units, but the Debtors have no such approvals – while the Debtors have a permit in place, the permit is deficient and more permitting will be required for the approval to actually construct the 411 units. Further, the Debtors' Appraisal only

16

allocates $6,136 for fees (including professionals) and permitting expenses for the 400+ units, which is an extremely low amount for what needs to be accomplished.

Significantly, the Debtors' Appraisal seems to be based on the overriding assumption that the Hermitage Club would be open and operated as a private ski resort with 525 members paying increased annual membership fees of $15,000, equating to $7,875,000 in near term potential revenue. The Hermitage Club has not reopened since it was shuttered in March of 2018 and it is still not open, and 525 members did not start paying increased annual membership fees of $15,000. It is unclear when, or if, any members will start paying dues again, but it is clear that this will not be in the near term. As such, the fundamental assumptions on which the Debtor's Appraisal are based are highly questionable, and such values should be reduced based upon the fact that certain fundamental assumptions on which such values are based are no longer true, or have never been true.

## Conclusion

As noted throughout this objection, the Debtors DIP Financing Motion is not viable under any standards and should not be allowed by the Court. As also noted herein, the Bank has incurred additional fees in excess of $200,000 since this case was commenced; in essence, securing and protecting the Debtors' assets. These cases are simply not viable Chapter 11 cases as the Debtors have no cash, income or ability to fund the most basic expenses necessary to remain in Chapter 11. Accordingly, the Bank submits that the Court should deny the DIP Financing Motion on the basis that the DIP Facility does not add any benefit or value to the estate, it contains insufficient liquidity for the Debtors to meet their basic ongoing expenses, and the Debtors cannot provide the Bank or other secured creditors with adequate protection.

58880873 v2

WHEREFORE, Berkshire Bank respectfully requests that the Court (a) deny the DIP Financing Motion, and (b) provide such other relief as is just and reasonable.

Dated at Boston, Massachusetts, this ___ day of July, 2019.

        BERKSHIRE BANK

        By its attorney's

        By: /s/ Elizabeth A. Glynn
        Elizabeth A. Glynn, Esq.
        Ryan, Smith & Carbine, Ltd.
        PO Box 310
        Rutland, Vermont 05702-0310
        (802) 786-1065
        eag@rsclaw.com

        and

        By: /s/ Paul F. O'Donnell, III
        Paul F. O'Donnell, III
        Hinckley, Allen & Snyder LLP
        28 State Street
        Boston, Massachusetts 02109
        (617) 378-4182
        podonnell@hinckleyallen.com

## CERTIFICATE OF SERVICE

      I, Paul F. O'Donnell, III, hereby certify that on this ___ day of July, 2019, I caused to be served a copy of the Objection of Berkshire Bank to Debtors' Motion for Final Order (I) authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (II) Granting Liens and Superpriority Claims to the DIP Lender Pursuant to 11 U.S.C. § 364(c), and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 filed herewith to be served by this Court's CM/ECF System.

                                                            /s/ *Paul F. O'Donnell, III*
                                                            Paul F. O'Donnell, III

58880873 v2