# UNITED STATES BANKRUPTCY COURT
# FOR THE
# DISTRICT OF VERMONT

_____

In re:

HERMITAGE INN REAL ESTATE HOLDING
COMPANY, LLC,

Debtor

Case No. 19-10214

Chapter 11

(Jointly Administered)

_____
_____

In re:

HERMITAGE CLUB, LLC,

Debtor

Case No. 19-10276

Chapter 11

(Jointly Administered)

_____

**OBJECTION TO DEBTORS' MOTION FOR FINAL ORDER AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND GRANTING LIENS AND SUPERPRIORITY CLAIMS TO THE DIP LENDER**

Now comes Barnstormer Summit Lift, LLC ("Barnstormer"), by and through its attorneys, Phillips, Dunn, Shriver & Carroll, P.C., and files this Objection to the Debtors' Motion for Final Order Authorizing the Debtors to Obtain Post-petition Financing and Granting Liens and Superpriority Claims to the DIP Lender ("Debtors' DIP Financing Motion," Doc # 147,) filed in the jointly administered cases of Hermitage Inn Real Estate Holding Company, LLC ("HIREHC") and Hermitage Club, LLC (the "Club") and in support thereof states as follows:

**Preliminary Statement Regarding Prior Objections**.

Barnstormer previously filed an objection (Doc # 122) to Debtors' Second Amended Motion for Interim DIP Financing (Doc # 115). Barnstormer's prior objection included a

1

section detailing why this Court should not give Debtors' DIP Financing Motion deference. For the sake of brevity, Barnstormer incorporates that discussion here by reference, repeating that Debtors are not operating and Debtors' DIP Financing Motion and proposed order do not provide any funds for operation.

### I. Debtors' Do Not Provide Barnstormer With Adequate Protection

Barnstormer's previously filed objection contends that the Debtors do not provide adequate protection to Barnstormer because Debtors present no evidence as to the value of Barnstormer's collateral. Although the most recent motion provides that the Barnstormer Summit Lift is excluded from the proposed priming lien, the Lift is subject to the superpriority administrative claim. Nothing in the Debtors' newly filed DIP Financing Motion addresses those prior concerns, and Barnstormer repeats its prior objections and incorporates them by reference.

In addition, Debtors have provided no evidence that they have obtained insurance on the Barnstormer Summit Lift, and it is impossible to provide Barnstormer with adequate protection if there is no insurance in place.

Finally, the Barnstormer Summit Lift has been mothballed since March, 2018, and only minimal preventative maintenance has been performed. It is uncontested that significant funds will be necessary to make the lift operational again. Debtors' DIP Financing Motion provides no funds for maintenance of the Barnstormer Summit Lift, and regardless of whether a priming lien on the Lift is granted, the fact that the Debtors will continue to defer maintenance and allow the value of the Lift to depreciate fails to provide Barnstormer with adequate protection.

### II. Debtors' Do Not Provide Secured Creditors With Adequate Protection

Barnstormer also repeats its objection that Debtors' have not met their burden of

providing secured creditors with adequate objection.

HIREHC relies solely on an equity cushion" to provide adequate protection.  The Debtors bear the burden of proving adequate protection.  *In re R&H Investment Co., Inc.*, 46 B,R, 114, 116 (Bankr. Ct. 1985) ("When a debtor relies solely on the existence of an equity cushion to provide adequate protection to a secured creditor, the debtor assumes a heavy burden to overcome the creditor's assertion that the secured interest is at risk.").  As this Court has noted, the adequacy of an equity cushion should be evaluated on a case-by-case basis and an element of adequacy of a cushion is the chance that the cushion may rapidly dissipate.  *In re Burlington Tennis Associates,* 34 B.R. 836, 837 (Bankr. Vt. 1983); *In re Johnston,* 38 B.R. 34, 36 (Bankr. Vt. 1983).

In order to prove an equity cushion exists, a debtor must show the amount of secured claims against the property and the value of the property.  The Debtors have met neither requirement.  First, the Debtors have failed to provide adequate information on the secured claims against the property.  Debtor's DIP Financing Motion does not list amounts owed to various secured creditors, and does proffer a total amount of secured debts.  It is Debtors' obligation to prove that an equity cushion exists, but Debtors attempt to meet this burden by the summary allegation that the "collateral securing the [secured creditors] was recently appraised by the Debtors at $50 million . . .  significantly greater than the amount owed [secured creditors]."  This bare allegation without supporting documentation or analysis should not be accepted.

Although secured creditors do not bear the burden of establishing the amount of secured claims, Berkshire Bank, in its objection to the Second Amended Motion for DIP Financing, provided credible calculations showing that without including Barnstormer's claim, there are at

3

least $39,297,000 in secured claims against the Debtors' real estate. If this Court were to assume this number as correct, then Debtors would still be required to bear the burden of proving that the value of the Real Estate provides adequate protection to secured creditors.

The Debtors' Initial Appraisal suggested a value of $50,000,000.00. That same appraiser prepared a Revised Appraisal dated July 22, 2019 suggesting values totaling $44,175,000.00. Berkshire Bank's appraisal suggests a value of $23,650,000.00.

Bankruptcy courts are given wide flexibility in determining the appropriate valuation method to be used given the particular facts of the case on hand. *In re SW. Boston Hotel Venture, LLC,* 748 F.3d 393, 406 (1st Cir. 2014). Barnstormer respectfully submits that Berkshire Bank's appraisal reflects more realistic methodology given that the resort has been mothballed and is not operating.

Berkshire Bank's appraisal reflects that the resort has been mothballed by assuming that during the initial years after operations resume there will be some attrition of existing members, new memberships will be sold at a slower initial rate, and there may need to be an initial reduction in both dues and initiation fees to build membership. These assumptions are realistic and appropriate under the circumstances.

On the other hand, the Debtors' Revised Appraisal assumes the highest and best use of the resort is to continue to operate as a members' club but values the resort by using the comparable sales method, comparing only public ski resorts, and then focusing exclusively on only one sale that occurred of an operating (not mothballed) facility.[1] No adjustment is made

---

[1] The Debtors' Initial Appraisal incorporated an income approach for the ski resort, making assumptions that there would be no member attrition, steady membership sales at increasing rates, and dues and initiation fees beginning at the highest historical rate and then increasing. This approach was abandoned in the Revised Appraisal with the explanation that "the Income Approach was not used as a valuation technique as the property is not currently operating and there is [sic] sufficient information to provide a reliable estimate of value via this technique."

4

based on the fact that the resort is mothballed.

The Revised Appraisal also makes no adjustment to sales projections of undeveloped land based on the fact that the resort is closed, assuming a knowledgeable purchaser will agree that sale of 400 housing units (including 118 units in a hotel that has no Act 250 permit) can be completed in four years.

Simply put, Berkshire Bank's appraiser assumes that there will be a ramp up period for the resort after being mothballed, whereas the Debtors' appraiser assumes that as soon as the resort announces it is open, it will be able to demand its highest historic retail rates and will immediately and consistently increase its membership.

Berkshire Bank's appraisal is credible and demonstrates that the value of the secured assets is less than the secured debt.  Accordingly, there is no equity cushion, and there is not sufficient adequate protection for creditors.

**III.    Debtors' 65% Member Benchmark Remains Flawed and Unworkable.**

Debtors' DIP Financing Motion continues the benchmark requirement that a meeting of club members be held (now scheduled for August 7, 2019) "with the result that at least sixty-five percent (65%) of existing members commence paying one hundred percent (100%) of their monthly dues to an escrow account to be used solely for purposes provided in a confirmed plan of reorganization . . . on or before August 19, 2019."

Barnstormer continues to see no value to the estate from placing this "Members' Meeting Benchmark Requirement" as a requirement that will be tested after the proposed DIP Financing has closed and Debtors have incurred $155,000.00 in fees.  The Structuring Fee, Commitment Fee, and Exit Fee alone constitute the equivalent of a prepaid interest rate of 17.65%, and when added to the base rate of 11%, result in a net interest rate of 28.65%.  Those fees and costs

5

could be entirely avoided if the Debtors attempted to meet the Members' Meeting Benchmark Requirement pre-closing.

Barnstormer acknowledges that meeting the Members' Meeting Benchmark Requirement may be problematic as it anticipates soliciting member support for a plan of reorganization without an approved disclosure statement.[2] In fact, the United States Trustee has moved to convert these cases to Chapter 7 proceedings because Debtors have been providing misleading information to creditors and members. However, Debtors have taken no affirmative action to obtain approval from this Court of materials or documents that could be used in connection with soliciting members support in order to meet the Members' Meeting Benchmark Requirement without violating 11 U.S.C. § 1125. Delay in doing so should not be the basis for making that requirement a post-closing condition, especially where the immediate result is both a priming lien and a superpriority administrative claim.

Barnstormer previously objected because failure to meet the Members' Meeting Benchmark Requirement resulted in a default. Although the most recent DIP Financing Motion states that this would no longer be an event of default if Debtors filed a motion to sell their assets by August 26, 2019, there is no guarantee that HIREHC would file such a motion. An event of default will trigger an increase in the interest rate as well as require mandatory prepayment, and prepayment may only be made if the Exit Fee is paid and the DIP Lender "has collected a minimum of twelve (12) months of interest on the Loan." (Doc # 147, Page 48).

Finally, the payment obligation for the Members' Meeting Benchmark Requirement is unclear. The amount of dues to be paid is unclear. Members are supposedly required to

---

[2] Lack of an approved disclosure statement is potentially more troublesome in this context than in a usual Chapter 11 reorganization. Usually solicitation would entail a promise to vote for a plan, the Members' Meeting Benchmark Requirement goes much further and solicits not only support but payment of cash to support a future plan that is not finalized.

6

"commence paying one hundred percent (100%) of their monthly dues," but dues were an annual, not monthly obligation. Is the requirement to pay one-twelfth of the yet unannounced annual payment, and is there a default if some members don't make the second payment and that brings the participating members below 65%? And can these Membership Payments be used for any purpose "provided in a confirmed plan of reorganization," such as payments to pre-petition creditors, or used only for actually re-opening and operating the resort?

These questions are unanswered and cannot be answered appropriately unless sufficient information is provided consistent with the restrictions of § 1125. Accordingly, the Members' Meeting Benchmark Requirement remains flawed and unworkable.

## **CONCLUSION**

For the reason cited above, the Court should deny Debtor's Motion for Final Order Authorizing Post-Petition Financing and Granting Liens and Super-priority Claims to DIP Lender.

Dated at Brattleboro, Vermont this 23rd day of July, 2019.

BARNSTORMER SUMMIT LIFT, LLC

  /s/ David N. Dunn  
David N. Dunn, Esq.  
Phillips, Dunn, Shriver & Carroll, P.C.  
147 Western Ave  
Brattleboro, VT 05301  
(802) 257-7244 x112  
ddunn@pdsclaw.com

**UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**DISTRICT OF VERMONT**

_____

In re:

HERMITAGE INN REAL ESTATE HOLDING
COMPANY, LLC,                                        Case No. 19-10214

                                                     Chapter 11

Debtor

_____


_____

In re:

HERMITAGE CLUB, LLC,                                 Case No. 19-10276

                                                     Chapter 11

Debtor

_____

## CERTIFICATE OF SERVICE

     I hereby certify that, on the 23rd day of July, 2019, a copy of the Objection to the Debtor's Motion for Final Order Authorizing Post-petition Financing and Granting Liens and Super-priority Claims to DIP Lender, was served on all parties of record electronically via the Court's CM/ECF System, and by e-mail or first class mail to all parties identified in Schedule A to the Notice of Debtor's Motion (Doc #149) not represented by counsel on the Court's CM/ECF System.

                                                /s/ David N. Dunn_____
                                                David N. Dunn, Esq.
                                                Phillips, Dunn, Shriver & Carroll, P.C.
                                                147 Western Ave
                                                Brattleboro, VT 05301
                                                (802) 257-7244 x112
                                                ddunn@pdsclaw.com