

*JULY 26, 2019*

# *SIXTH REPORT OF RECEIVER ALAN TANTLEFF*

*RE: CERTAIN REAL PROPERTY ASSETS OF*
*HERMITAGE INN REAL ESTATE HOLDING COMPANY, LLC*

EXPERTS WITH **IMPACT**™

## *Table of Contents*

I.      Introduction

II.     Summary of Recent Legal Proceedings

III.    Subject Property Condition Update

IV.     Court-Ordered Responsibilities – FTI Consulting Role

V.      Employment and Payroll Considerations

VI.     Disbursement and Funding Detail

VII.    Appendices

## I.    Introduction

On June 6, 2018 (the "Effective Date"), Judge John R. Treadwell of the Windham Unit of the Vermont Superior Court signed an order (the "Order") appointing me, Alan Tantleff of FTI Consulting, as Receiver for certain properties (collectively, the "Subject Properties") mortgaged to Berkshire Bank (the "Bank") by Hermitage Inn Real Estate Holding Company, LLC (the "Borrower"), its principal (James Barnes) and related entities. The Receiver's primary responsibility is to protect and preserve the Bank's collateral. The following report outlines the actions that I, the Receiver, have taken to preserve and maintain the value of the Subject Properties.

On May 22, 2019 (the "Filing Date"), a creditor group filed for involuntary Chapter 7 bankruptcy in Vermont (the "Chapter 7 Bankruptcy") against Borrower. Immediately following the Chapter 7 Bankruptcy, the Borrowers filed a Chapter 11 bankruptcy in the State of Connecticut.

Prior to the determination of venue in the Bankruptcy, on May 31, 2019 the Bankruptcy Court entered the *Order Granting Emergency Motion Under 11 USC § 303(f) To Keep State Appointed Receiver in Place During the Gap Period to Preserve and Maintain Estate Assets* (the "Bankruptcy Order"). The Bankruptcy Order allowed the receivership to continue until terminated by the Bankruptcy Court.

In the period following the Bankruptcy Order, I have operated in virtually the same manner as discussed in my Previous Reports.  The significant difference is that the Subject Properties under the state receivership order are limited to the real assets of the Borrower mortgaged to Berkshire Bank; the bankruptcy is the entire estate, including other assets not mortgaged to Berkshire Bank, albeit limited.  Immediately after the Bankruptcy Order, I inspected other properties that are owned by affiliates of HIREHC; however, since as of the writing of this report, the Debtors have not filed statements and schedules, I have no information on what properties are owned by the Debtors.  Nonetheless, I inspected the airport, 24 West Main Street and a few other miscellaneous properties.

This is the sixth report that I have prepared for the court during my receivership. My previous reports (the "Previous Reports") were submitted to the court on July 6, 2018, August 6, 2018, November 5, 2018, February 5, 2019, and May 6, 2019.

This report is due August 6, 2019; however, it is being filed early as it may be instructive to the Bankruptcy Court.

II.    **Summary of Recent Legal Proceedings**

**Borrower's Bankruptcy Proceedings**

In the period following my Previous Reports, there have been several significant legal updates and proceedings associated with the Receivership and the Subject Properties as previously discussed.

As stated repeatedly throughout the receivership, I will continue to serve and perform my ordered duties until directed otherwise by the Court.

**Receivership Legal Updates**

A.    **Break-ins at the Horizon Inn**

As discussed in my Previous Reports in April 2019, I was notified by the Director of Mountain Operations that the Horizon Inn had been vandalized and copper piping had been removed from the site. I immediately worked with the Director of Mountain Operations to communicate with the local and state police to investigate the matter. In response to these actions, I have worked with the Borrower's Management Team to establish increased security protocols and procedures at the Subject Properties.

Unfortunately, I was notified on July 16, 2019 of an additional suspected intrusion to the Horizon Inn and additional vandalism, albeit minor damage. Photographs of a suspicious vehicle have been provided to law enforcement.

Local police also investigated a break-in at the Horizon Inn, which turned out to be two trespassers hiking in the woods.  They do not appear to have caused any damage, and police removed them from the premises.

Additional security protocols have been established to prevent further damage.

B.    **Removal of Property from 24 West Main Street**

I was notified on June 24th that agents of Mr. Barnes had removed equipment from 24 West Main Street. This property has been used by HIREHC as a showroom/design center for home sales, namely the "upgrades" such as countertops and appliances.  I was told that on this date, Mr. Bullock was reported at the site with workmen who removed several appliances, including a Sub-Zero refrigerator.  When I inspected the premises earlier that month, I noted that other appliances had been removed.

I inquired of Mr. Barnes if he was responsible for the removal of this personal property and if he could explain the ownership structure of 24 West Main Street.  I received the following email response:

*Alan,*

*The building and its contents have been wholly owned by 24 West Main Street LLC which in turn was wholly owned by LCB Investments LLC. LCB Investments LLC is owned by my children and I am the manager. LCB Investments agreed to transfer ownership of the building and its contents to AS Realty LLC with a deed in lieu in settlement of a loan that was past due. As part of the transaction, AS Realty LLC allowed for LCB to retain or dispose of any of the contents of the building  at will. The business known as Deerfield Valley Design was not owned in any way by HIREHCO. It opened briefly in q1 2017 and then shutdown. Deerfield Valley Design never had a transaction and was never incorporated.   I'm fairly certain there was never a formal   lease or agreement. HIREHCO made some leasehold improvements as did Ritz-Craft Homes who installed their kitchen for marketing display.  HC personnel were allowed to take customers there to see kitchen items and furniture on display as were other builders in town. This practice ended in 2017. Chad was personally authorized by me as manager of LCB Investments LLC  to act as agent and dispose of any*



*contents of this building. I hope this clears up any confusion. Please call or email if you have any further questions.*

*Sincerely,*

*James R. Barnes*

*Manager*

*LCB Investments LLC.*

*CC Doug Skalka*

*Chad Bullock*

    I provided this information and response to counsel for Berkshire Bank, who forwarded it to other constituents.  I have taken no further action.

### III.    Subject Property Condition Update

I have visited the Subject Properties on several occasions in the period following my Previous Reports. While visiting I have met with the Borrower's management team and inspected the Subject Properties. As previously mentioned, I have visited other properties owned by affiliates of the Debtor following the bankruptcy filing.

The following section covers the condition of the Subject Properties at the time of my most recent site visit, as well as key repairs and maintenance.

***Employees:***

Funds provided by Berkshire Bank are used to fund payroll for 5 employees: Director of Mountain Operations, Director of Facilities, Golf Course Superintendent, Lift Mechanic and Golf Course Maintenance.  These employees are still employed by HIREHC, but payroll, and benefits (including health care) are funded by the Bank.

***Economic Condition of the Borrower:***

As discussed in the Previous Reports, the economic situation has reached a stabilized state. The Subject Properties have shown significant improvements after I received funding from the Bank. As detailed later in the report, this funding has allowed for regular maintenance and various repairs which maintain the business viability and collateral value of the Subject Properties.

The prior forecasts provided to the court and Berkshire Bank expire in August.  I will need to create a new budget should the Bankruptcy Court continue with the Receivership.

The Borrower has not paid any of the maintenance or operating expenses during the pendency of the receivership.

***Physical Condition of the Properties:***

Overall, I have been able to preserve the Subject Properties in the "mothballed" state. More specifically:

***Golf Course:***

As discussed in my Previous Reports, the golf course was successfully winterized in November 2018 and the process of de-winterization began in early April 2019. In the weeks following my May 6, 2019 Report, the golf course was successfully de-winterized and regular summertime maintenance and protection commenced.

Based upon my personal inspection of the golf course, and communications with the golf course superintendent and the Borrower's Management Team, the golf course is currently in great condition without any key areas of concern. The golf course's greens, usually the most vulnerable area of the golf course in the winter, survived the winter without any significant damage, and all other areas of the course have remained in good condition.

In summary, the golf course currently is in its best physical shape since my appointment as Receiver on June 6, 2018. Furthermore, expenditures at the golf course in the period of de-winterization and maintenance has trended in accordance with the Updated Budget.

**Ski Lifts:**

We conduct preventative maintenance on the ski lifts and have increased the level of maintenance over the past few months.  We maintain the Barnstormer Lift. None of the Barnstormer creditors have paid for any maintenance; all funds for maintenance and repair come from Berkshire Bank despite the ongoing dispute about whether it is the Bank's collateral.

**Buildings:**

The various buildings are in good shape.  Most of the maintenance budget goes to fund expenses related to the Borrower's biggest building, the ski lodge.  This requires ongoing service of the mechanical equipment, including HVAC.  The remainder of the buildings received minor repairs; most of them have been drained and winterized.  None have experienced any damage, except the Horizon Inn, which sustained some theft and vandalism.

We inspect on a regular basis for mold, leaks, pests, vandalism, fire hazards, and other hazards that can cause property damage.

Protocols have been put in place to store and maintain hazardous chemicals.

**Business Records:**

"Business Records" were not previously included in the Receivership Order. Rather, the Receiver was only allowed to secure and preserve non-electronic records on the Subject Properties (i.e., those which were collateral for Berkshire Bank). Subsequent to the Bankruptcy Order, a number of the business records of HIREHC have been moved from the airport and Brook Bound to the Hermitage Inn and the Clubhouse for safekeeping. "Business Records" includes a variety of items that were stored in multiple boxes, binders, folders and file cabinets. These included:

- Blueprints, plans and specifications

- Employee data

- Membership Lists

- Financial Reports and Tax Returns

- Permits

- Accounts receivable, payables, cancelled checks, bank statements

- Computers and electronic data

Photographs of the "books and records" as they have been stored are included in the Appendix.

**IV.     Court-Ordered Responsibilities – FTI Consulting Role**

*Pay Necessary Bills:*

The Order calls for the Receiver to pay all bills that, if unpaid, could lead to a reduction in the value of the Subject Properties. FTI Consulting has spent many hours coordinating with vendors and HIREHC management to determine necessary expenses to preserve the value of the Bank's collateral in a "mothballed" state. As referenced in the Previous Reports, I established a formal process for the Borrower to request funding for any essential expenses, and during our weekly call the Borrower's submissions are discussed and evaluated.

A discussion of specific expenditures made by the receivership is provided in Section VI of this report.

*Secure the Subject Properties:*

The Order calls for the Receiver to take all reasonably necessary steps with staff sufficient to prevent theft, vandalism, damage by people, pests, or weather to the Subject Properties. As Receiver, I supervise the Borrower's management team's weekly inspection schedule; the staff delivers a formal property inspection report at the beginning of each week, and I hold a 11:30AM call each Monday with the Borrower's management team to review the week's agenda pertaining to the preservation of the Bank's collateral. In the period following the Previous Reports, the Borrower's management team has provided me with each weekly report on a timely basis and consistently ensured that all properties remain secure. I personally inspect the Subject Properties on a regular basis. In response to recent reports of theft and vandalism, additional security procedures and surveillance has been established at the Subject Properties.

*Maintain the Subject Properties and Business Viability:*

The order calls for the Receiver to only provide reasonably necessary maintenance of the Subject Properties, and only to preserve the Bank's collateral in a "mothball" state. The receivership continues to work with the Borrower's Director of Finance to ensure that management receives funding for all expenses that are necessary to maintain the value of the Bank's collateral.

As discussed in my Previous Reports, throughout the Receivership the Borrower's management team has identified various items in need of repair or replacement. Many of these items were the result of a general lack of preventive or precautionary maintenance by previous management and were significantly damaged in the period between March 2018 and the appointment of the receivership. While the majority of necessary repairs were made in the period prior to my February 5, 2019 report (chiller maintenance, update of the club house fire alarm system, repair of damaged basement heating coils, HVAC repair, grease trap cleaning, and generator maintenance), I continue to be attentive to any major issues arising related to previous faults in maintenance and management. To maintain the business viability and integrity of the Subject Properties, the Receivership has been forced to expend considerable funds in relation to the aforementioned repairs and tasks.

As stated in my Previous Reports, in preparation for winter, I worked with the Borrower's Management Team to determine the role of each Subject Property and its importance to the well-being and business viability of the Hermitage Club. Taking this information into account, I made the decision to winterize (drain and _not_ heat) several of the Subject Properties for the winter season. The Clubhouse, Hermitage Inn, Snow Goose Inn, and Carriage House were determined to be the Subject Properties which I needed to heat through the winter season.

Throughout the winter season, the heating and maintenance of the aforementioned Subject Properties, allowed the Borrower's Management Team to ensure that the business viability of these key assets is protected. In the late spring, the Borrower's Management Team began the process of the de-winterization of the Subject Properties and the commencement of regular spring and summer repairs and maintenance.

In April 2019, Dupuis Lawncare & Plowing, who previously was awarded the plowing contract for the Subject Properties, was awarded the spring and summer landscaping contract for the Subject Properties. To date, Dupuis Lawncare & Plowing has maintained the Subject Properties and worked alongside the Borrower's Management Team to ensure that the business viability is consistently maintained.

***Apply to the Court for Additional Authority:***

The order calls for the receivership to notify the Court if it requires additional authority to secure and maintain the subject properties. At this time, I do not wish to apply for any additional authority.

### V.      Employment and Payroll Considerations

Employees continue to provide services to both the Subject Properties and other real estate assets owned or controlled by entities affiliated with the Borrower, but not mortgaged to the Bank. For example, there are other inns and real property that are not collateral for the Berkshire Bank Loans that are serviced by the HIREHC employees.

Because I have not been given access to the company or the company's accounts, I rely on an arrangement, discussed below, that affords me access to these employees.

***Payroll and Employment:***

As discussed in the Previous Reports, I worked out a "deal" with James Barnes regarding payroll for the remaining four employees. This "deal" was made in a cooperative spirit with the Borrower and was acknowledged in an email on June 20, 2018. This agreement allowed the Receiver to avoid further layoffs; continues to allow the Receiver to avail itself of talented, local employees with significant history and institutional knowledge; permits the Borrower to continue with its restructuring efforts; and reduces the overall costs of the receivership.

In the period following the "deal" with Mr. Barnes, various changes in personnel have taken place. For instance, in September it was brought to my attention that the Interim President of HIREHC was relieved of his duties. In response to these changes, I tasked the Director of Mountain Operations to oversee the remaining staff. To date, the transition has been seamless. Additionally, to transition to the spring season, I have rehired a previously furloughed golf course employee to assist in the de-winterization and maintenance golf-course. The lift-mechanic who was previously retained for the winter season will be retained through the summer and fall to shift focus to general maintenance at the Subject Properties.

On a bi-weekly basis, each party funds its portion of the payroll to a third-party payroll provider. The receivership has met all obligations to date and has ensured that all employee benefit payments have been funded.

I continue to reimburse employees who previous participated in HIREHC's health insurance plan, which was cancelled for non-payment.

I recently was made aware that the workers compensation policy under which the employees were working expired on 7/1/19. The HIREHC Director of Finance has been working to renew the policy and is currently in process of gathering quotes. At this point in time it is unclear whether the updated policy will have a gap period from expiration to renewal.

## VI.    Disbursement and Funding Detail

**Bank Accounts:**

As referenced in the Previous Reports, the judge's Order does not allow the Receiver to seize the bank accounts of the Borrower.  As a result, I established an alternate mechanism to fund protective advances. I have a receivership account established at the Bank (the "Receiver Account") which is funded monthly by the Bank.

**Budget:**

As detailed in the Previous Reports, at the beginning of the Receivership I provided the Bank with a 13-week and 9-month budget estimating the costs of preserving its collateral. It is important to note, that at the time of the budget's creation, there was little clarity into many of the potential repairs and maintenance needed to protect the Subject Properties.

Given the continuation of the Receivership in December 2018 the Bank requested that I prepare a budget extension for the period until August 2019 (the "Updated Budget"). The Updated Budget was prepared in January 2019 and submitted to Berkshire Bank. It is important to note that the Updated Budget does not make any assumptions towards the reopening or operations of the Subject Property. All of the expenses contained in the budget relate to maintaining the Subject Properties in their current "mothballed" state and ensuring their go-forward business viability.

Beginning in February 2019, I have operated under the Updated Budget and corresponding funding schedule from Berkshire for the periods following the expiration of the original budget. As illustrated by the chart provided on Page 10, expenditures have trended well in accordance with the Updated Budget. Prior to the Updated Budget, receivership expenditures frequently exceeded amounts forecasted. As the receivership has progressed, and my understanding of the needs of the Subject Properties has continually grown, the Updated Budget has become an accurate representation of the required funds needed to maintain the Subject Properties business viability in a mothballed state.

**Sources & Uses of Receiver Funds:**

Illustrated in the chart below, to date approximately $1.12M has been funded to the Receiver Account. Approximately $1.03M of these funds have been provided by the Bank in accordance with the process outlined the Previous Reports. The remaining $85K was received as a result of an insurance claim. To date, the receivership has expended approximately $1.02M of the $1.12M, resulting in $0.09M in excess cash.

| Sources & Uses (7/1/18 through 7/24/19) | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Berkshire Bank Funding | $ 1,030,200.00 | Employee Payroll & Benefits | $ 429,650.50 |
| Insurance Claim | 85,047.23 | Property Repairs & Maintenance | 302,859.23 |
| Other Receipts | 165.85 | Professional Fees | 273,276.63 |
| | | Employee Expense Reimbursements | 14,657.43 |
| | | Bank Fees | 1,085.00 |
| **Total Sources** | **$ 1,115,413.08** | **Total Uses** | **$ 1,021,528.79** |
| **Net Increase in Cash** | **$ 93,884.29** | | |

The chart below represents the Receiver's expenses to date in relation to the funding provided by the Bank under the previous and Updated Budget. As illustrated in the chart, in Month 9 through Month 13 the

receiverships expenses have trended in accordance with the Updated Budget and allowed for great financial flexibility.

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 13 | Month 14 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 6-Jul-18 | 3-Aug-18 | 7-Sep-18 | 5-Oct-18 | 2-Nov-18 | 7-Dec-18 | 4-Jan-19 | 8-Feb-19 | 8-Mar-19 | 5-Apr-19 | 3-May-19 | 7-Jun-19 | 5-Jul-19 | 24-Jul-19 | |
| Cash Receipts | $ 80,500 | $ 83,400 | $ 75,566 | $ 154,147 | $ 65,500 | $ 53,100 | $ 52,600 | $ 52,600 | $ 88,000 | $ 88,000 | $ 82,000 | $ 90,000 | $ 77,000 | $ 73,000 | $ 1,115,413 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Employee Payroll & Benefits | (23,348) | (25,749) | (33,485) | (26,360) | (27,276) | (46,344) | (31,537) | (34,784) | (30,854) | (26,708) | (29,733) | (47,436) | (29,757) | (16,281) | (429,651) |
| Property Repairs & Maintenance | - | (8,647) | (21,172) | (11,237) | (24,741) | (43,826) | (20,114) | (46,003) | (48,094) | (26,182) | (16,343) | (11,597) | (11,515) | (13,388) | (302,859) |
| Employee Expense Reimbursements | | (1,000) | (166) | (23) | (594) | (200) | (1,066) | (3,858) | (1,968) | (101) | (237) | (2,755) | (2,144) | (547) | (14,657) |
| **Total Operating Disbursements** | (23,348) | (35,396) | (54,823) | (37,621) | (52,611) | (90,370) | (52,716) | (84,645) | (80,916) | (52,991) | (46,313) | (61,789) | (43,415) | (30,216) | (747,167) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Professional Fees | - | (35,099) | (34,974) | (17,225) | (17,792) | - | (35,101) | (24,130) | (17,225) | (17,225) | (28,240) | (20,661) | (18,985) | (6,619) | (273,277) |
| Bank Fees | (90) | (45) | (100) | (100) | (60) | (125) | (70) | (70) | (70) | (100) | (60) | (110) | (70) | (15) | (1,085) |
| **Total Non-Operating Disbursements** | (90) | (35,144) | (35,074) | (17,325) | (17,852) | (125) | (35,171) | (24,200) | (17,295) | (17,325) | (28,300) | (20,771) | (19,055) | (6,634) | (274,362) |
| **Total Cash Disbursements** | (23,438) | (70,539) | (89,897) | (54,946) | (70,463) | (90,495) | (87,888) | (108,845) | (98,211) | (70,316) | (74,613) | (82,560) | (62,470) | (36,850) | (1,021,529) |
| **Net Cash** | $ 57,062 | $ 12,861 | $ (14,331) | $ 99,201 | $ (4,963) | $ (37,395) | $ (35,288) | $ (56,245) | $ (10,211) | $ 17,684 | $ 7,387 | $ 7,440 | $ 14,530 | $ 36,150 | $ 93,884 |

***Berkshire Bank Funded Payments:***

The Bank continues to pay directly for certain utilities and force-placed insurance on the Subject Properties, as it was before the receivership. As a result, the Updated Budget does not include expenses that the Bank continues to pay and are not paid by the Receiver (such as real estate taxes, water, and electric), generally that are senior to the loan.

***The Receiver's Fees:***

This report is due exactly eleven months after the effective date of the receivership and one quarter after the submission of my Fourth Receiver Report. As mentioned in the Previous Reports, I will be paid in arrears, i.e. a bill be prepared after each month. To date, FTI Consulting has been compensated for work performed through June 5, 2019. Copies of the invoices submitted since the Previous Reports are included in the appendix of this Report.

*****

**Respectfully Submitted**

_____

**Alan Tantleff**

**Receiver**

_Dated: July 26, 2019_



**VII.**     **Appendices**

    **a.**     **FTI Consulting Invoices – Submitted May 21, 2019 and June 12, 2019**

**FTI CONSULTING**™

FTI Consulting, Inc.
227 West Monroe Street
Suite 900
Chicago, IL 60606

800.998.1755 telephone
312.759.8119 facsimile

www.fticonsulting.com

May 21, 2019

Elizabeth Glynn, Esq.
Ryan Smith & Carbine, Ltd.
98 Merchants Row
P.O. Box 310
Rutland, VT 05702-0310

Re:  Project Retreat '18
      FTI Job No. 424772.0001
      Invoice # 7512628

Enclosed is our invoice for professional services rendered in connection with the above referenced matter.  This invoice covers professional fees and expenses through May 5, 2019.

Please do not hesitate to call me to discuss this invoice or any other matter.

Sincerely yours,

Alan Tantleff
Senior Managing Director

Enclosures

FTI CONSULTING

*Invoice Remittance*

Elizabeth Glynn, Esq.
Ryan Smith & Carbine, Ltd.
98 Merchants Row
P.O. Box 310
Rutland, VT 05702-0310

May 21, 2019
FTI Invoice No. 7512628
FTI Job No. 424772.0001
Terms: Payment on Presentation
FEDERAL I.D. NO. 52-1261113

Re: Project Retreat '18

Current Invoice Period: Charges Posted through May 5, 2019

| | |
|---|---:|
| Professional Services | $12,587.50 |
| Adjustment to Agreed Fee | $3,662.50 |
| Net Professional Fees | $16,250.00 |
| Expenses | $975.00 |
| Total Amount Due this Period | $17,225.00 |
| **Total Amount Due** | **$17,225.00** |

*Please Remit Payment To: FTI Consulting, Inc.*
*P.O. Box 418178*
*Boston, MA 02241-8178*

*Wire Payment To: Bank of America, NA*
*103 West 33rd Street, New York, NY 10001*
*Account #: 003939577164*
*ABA #: 026009593*

*ACH Payments To: Bank of America, NA*
*1455 Market Street, San Francisco, CA 94109*
*Account #: 003939577164*
*ABA #: 052001633*



*Invoice Summary*

Elizabeth Glynn, Esq.
Ryan Smith & Carbine, Ltd.
98 Merchants Row
P.O. Box 310
Rutland, VT 05702-0310

May 21, 2019
FTI Invoice No.7512628
FTI Job No.  424772.0001
Terms Payment on Presentation
FEDERAL I.D. NO. 52-1261113

Re: Project Retreat '18

Current Invoice Period:  Charges Posted through May 5, 2019

| Name | Title | Rate | Hours | Total |
|------|-------|------|-------|-------|
| Alan Tantleff | Senior Managing Director | $1,050.00 | 5.5 | $5,775.00 |
| Michael Galardi | Senior Consultant | $545.00 | 12.5 | $6,812.50 |
| **Total Hours and Fees** | | | **18.0** | **$12,587.50** |
| | | | | |
| **Less Voluntary Reduction** | | | | **$3,662.50** |
| **Total Net Fees** | | | | **$16,250.00** |
| Administrative Fee (6%) | | | | $975.00 |
| **Total Expenses** | | | | **$975.00** |
| | | | | |
| **Invoice Total for Current Period** | | | | **$17,225.00** |

**FTI CONSULTING**

*Invoice Activity*

## PROFESSIONAL SERVICES

**Alan Tantleff**

| Date | Description | Hours | |
|---|---|---|---|
| 04/08/19 | Deal with theft | 0.50 | |
| 04/11/19 | Payroll, coordinate with J. Barnes on locker, emails from Chad, follow up from meeting | 1.00 | |
| 04/15/19 | Theft, call with A.Sherritt | 0.50 | |
| 04/22/19 | Weekly call, update on issues | 0.75 | |
| 04/24/19 | Call with counsel | 0.50 | |
| 04/29/19 | Weekly call, update on issues | 1.00 | |
| 05/02/19 | Draft quarterly report | 0.25 | |
| 05/03/19 | Quarterly report | 1.00 | |
| | $1,050.00   per hour x total hrs of | 5.50 | $5,775.00 |

**Michael Galardi**

| Date | Description | Hours | |
|---|---|---|---|
| 04/08/19 | Correspond with Property Management re: updates. | 0.50 | |
| 04/09/19 | Correspond with property management re: updates. | 0.50 | |
| 04/10/19 | Correspond with team and paycomm re: payroll. | 1.00 | |
| 04/11/19 | Fund outstanding invoices and update cash disbursement analysis & budget. | 1.00 | |
| 04/11/19 | Fund employee payroll and correspond re: same. | 0.25 | |
| 04/15/19 | Pay invoices and update cash analysis. | 0.25 | |
| 04/15/19 | Correspond with Property Management. | 0.25 | |
| 04/16/19 | Correspond with Berkshire Bank, Dimmick, and Property Management re: invoices. | 0.75 | |
| 04/17/19 | Cash management with Berkshire Bank accounts. | 0.50 | |
| 04/18/19 | Correspond with Property Management. | 0.25 | |
| 04/18/19 | Correspond with Dimmick re: checks. | 0.25 | |
| 04/22/19 | Weekly call with management. | 0.50 | |
| 04/25/19 | Call with Berkshire Counsel. | 0.50 | |
| 04/25/19 | Update cash disbursement and budget analysis. | 0.50 | |
| 04/25/19 | Prepare Fifth Receiver Report. | 0.50 | |
| 04/25/19 | Correspond re: payroll and process. | 0.50 | |
| 04/25/19 | Pay outstanding invoices. | 0.50 | |
| 04/29/19 | Weekly Call with Management. | 0.50 | |
| 04/30/19 | Prepare Receiver Report. | 0.50 | |
| 04/30/19 | Pay invoices and update cash analysis. | 0.50 | |
| 05/01/19 | Prepare Fifth Receiver Report. | 0.25 | |
| 05/01/19 | Pay Invoices / Cash Management. | 0.25 | |
| 05/01/19 | Correspond with Property Management. | 0.25 | |
| 05/03/19 | Prepare Fifth Receiver Report. | 1.75 | |
| | $545.00   per hour x total hrs of | 12.50 | $6,812.50 |

**FTI CONSULTING**

*Invoice Activity*

---

## EXPENSES

Admin

| | | | |
|---|---|---|---|
| 05/05/19 | Administrative Expense | | $975.00 |
| | | Total | $975.00 |

# FTI CONSULTING™

FTI Consulting, Inc.
227 West Monroe Street
Suite 900
Chicago, IL 60606

800.998.1755 telephone
312.759.8119 facsimile

www.fticonsulting.com

June 12, 2019

Elizabeth Glynn, Esq.
Ryan Smith & Carbine, Ltd.
98 Merchants Row
P.O. Box 310
Rutland, VT 05702-0310

Re: <u>Project Retreat '18</u>
     FTI Job No. 424772.0001
     Invoice # 7514732

Enclosed is our invoice for professional services rendered in connection with the above referenced matter.  This invoice covers professional fees and expenses through June 5, 2019.

Please do not hesitate to call me to discuss this invoice or any other matter.

Sincerely yours,

Alan Tantleff
Senior Managing Director

Enclosures

**FTI CONSULTING**

*Invoice Remittance*

Elizabeth Glynn, Esq.
Ryan Smith & Carbine, Ltd.
98 Merchants Row
P.O. Box 310
Rutland, VT 05702-0310

June 12, 2019
FTI Invoice No. 7514732
FTI Job No.  424772.0001
Terms: Payment on Presentation
FEDERAL I.D. NO. 52-1261113

Re: Project Retreat '18

Current Invoice Period:  Charges Posted through June 5, 2019

| | |
|---|---|
| Professional Services.................................................................... | $32,752.50 |
| Adjustment to Agreed Fee............................................................. | ($16,502.50) |
| Net Professional Fees.................................................................. | $16,250.00 |
| Expenses...................................................................................... | $2,735.27 |
| Total Amount Due this Period....................................................... | $18,985.27 |
| **Total Amount Due**.................................................................... | **$18,985.27** |

*Please Remit Payment To: FTI Consulting, Inc.*
            *P.O. Box 418178*
            *Boston, MA 02241-8178*

*Wire Payment To: Bank of America, NA*
*103West 33rd Street, New York, NY 10001*
*Account #: 003939577164*
*ABA #: 026009593*

*ACH Payments To: Bank of America, NA*
*1455 Market Street, San Francisco, CA 94109*
*Account #: 003939577164*
*ABA #: 052001633*

**FTI CONSULTING**

*Invoice Summary*

Elizabeth Glynn, Esq.
Ryan Smith & Carbine, Ltd.
98 Merchants Row
P.O. Box 310
Rutland, VT 05702-0310

June 12, 2019
FTI Invoice No. 7514732
FTI Job No.  424772.0001
Terms Payment on Presentation
FEDERAL I.D. NO. 52-1261113

Re: Project Retreat '18

Current Invoice Period:  Charges Posted through June 5, 2019

| Name | Title | Rate | Hours | Total |
|---|---|---|---|---|
| Alan Tantleff | Senior Managing Director | $1,050.00 | 24.0 | $25,200.00 |
| Michael Galardi | Senior Consultant | $545.00 | 13.5 | $7,357.50 |
| Nicole Loffredo | Intern | $195.00 | 1.0 | $195.00 |
| **Total Hours and Fees** | | | **38.5** | **$32,752.50** |
| | | | | |
| **Adjustment to Agreed Fee** | | | | **($16,502.50)** |
| **Total Net Fees** | | | | **$16,250.00** |
| Administrative Fee (6%) | | | | $975.00 |
| Business Meals | | | | $115.91 |
| Lodging | | | | $563.06 |
| Transportation | | | | $1,081.30 |
| **Total Expenses** | | | | **$2,735.27** |
| | | | | |
| **Invoice Total for Current Period** | | | | **$18,985.27** |



*Invoice Activity*

## PROFESSIONAL SERVICES

### Alan Tantleff

| Date | Description | Hours | |
|---|---|---|---|
| 05/06/19 | Weekly call, update on issues, quarterly report | 1.50 | |
| 05/08/19 | Lawsuit filed, respond | 0.25 | |
| 05/09/19 | Response to press, questions from L. Buccossi, invoices | 0.25 | |
| 05/10/19 | Lawsuit, email on service, response from E. Glynn | 0.75 | |
| 05/14/19 | Invoices, approval of various open items and issues, weekly call, call with counsel | 2.00 | |
| 05/15/19 | Invoices, open items | 0.25 | |
| 05/21/19 | Follow up on tour issues, invoices | 0.75 | |
| 05/23/19 | Chap 7 issues, call with counsel, A. Sherritt | 0.75 | |
| 05/24/19 | Chap 7 issues, coordinate hearing, prep for hearing | 1.25 | |
| 05/28/19 | Prep for hearing | 0.50 | |
| 05/29/19 | Travel to BTV | 6.00 | |
| 05/29/19 | Prep for hearing | 1.50 | |
| 05/30/19 | Hearing | 1.00 | |
| 05/30/19 | Prep for hearing | 1.00 | |
| 05/30/19 | Travel from BTV | 4.00 | |
| 05/31/19 | Follow up questions | 0.50 | |
| 06/04/19 | Misc bk issues | 1.00 | |
| 06/05/19 | Misc bankruptcy issues, review filings, organize agenda, payroll | 0.75 | |
| | $1,050.00   per hour x total hrs of | 24.00 | $25,200.00 |

### Michael Galardi

| Date | Description | Hours | |
|---|---|---|---|
| 05/06/19 | Edit Receiver Report and correspond with Counsel re: same. | 1.00 | |
| 05/06/19 | Update cash disbursement analysis. | 0.25 | |
| 05/06/19 | Weekly call with management. | 0.50 | |
| 05/07/19 | Correspond with Property Management. | 0.50 | |
| 05/08/19 | Review update re: Brook Bound Properties. | 0.25 | |
| 05/08/19 | Process invoices and payroll. | 0.50 | |
| 05/10/19 | Correspond with Property Management re: outstanding payments. | 0.50 | |
| 05/10/19 | Correspond with Property Management re: Fifth Receiver Report. | 0.25 | |
| 05/13/19 | Correspond with Property Management. | 0.50 | |
| 05/14/19 | Correspond with team re: potential site visit. | 0.25 | |
| 05/14/19 | Review updates re: property maintenance and status conference. | 0.50 | |
| 05/14/19 | Participate in call with Vermont Counsel. | 0.50 | |
| 05/15/19 | Correspond re: upcoming site visit. | 0.50 | |
| 05/15/19 | Pay invoices & update cash analysis. | 0.50 | |
| 05/22/19 | Correspond with Property Management. | 0.50 | |
| 05/22/19 | Fund payroll and update cash analysis. | 0.50 | |
| 05/23/19 | Correspond with AT & Counsel & Property Management re: updates. | 1.00 | |
| 05/24/19 | Correspond with management re: invoices and outstanding projects. | 0.75 | |
| 05/24/19 | Correspond with Counsel and review materials re: Ch7 Filing. | 1.00 | |
| 05/25/19 | Review updates and materials re: Ch7 Hearing. | 1.25 | |
| 05/28/19 | Weekly call with Management. | 0.50 | |
| 05/28/19 | Prepare materials for Ch7 Hearing. | 1.00 | |
| 05/28/19 | Update cash and budgeting analysis. | 0.50 | |
| | $545.00   per hour x total hrs of | 13.50 | $7,357.50 |

### Nicole Loffredo

| Date | Description | Hours | |
|---|---|---|---|
| 06/04/19 | Research for expert report. | 1.00 | |
| | $195.00   per hour x total hrs of | 1.00 | $195.00 |

**FTI CONSULTING**

*Invoice Activity*

## EXPENSES

### Admin

| | | |
|---|---|---:|
| 06/05/19 | Administrative Expense | $975.00 |
| | Total | $975.00 |

### Business Meals

| | | |
|---|---|---:|
| 05/29/19 | Meals - Travel Related - Michael Galardi. Coffee and lunch while traveling for Hermitage Ch7 Hearing. | $11.63 |
| 05/29/19 | Meals - Travel Related - Alan Tantleff, Michael Galardi.  Snacks during Hermitage client meeting | $11.39 |
| 05/29/19 | Meals - Travel Related - Alan Tantleff, Michael Galardi.  Dinner during Hermitage meeting | $65.67 |
| 05/30/19 | Hotel - Meals - Travel Related - Alan Tantleff. Food and beverage at hotel during Hermitage client meeting | $23.97 |
| 05/30/19 | Meals - Travel Related - Alan Tantleff. Water during Hermitage client meeting | $3.25 |
| | Total | $115.91 |

### Lodging

| | | |
|---|---|---:|
| 05/29/19 | Lodging - Michael Galardi 05/30/2019 - 05/31/2019.  Hotel in Burlington, VT for Hermitage Hearing | $269.11 |
| 05/30/19 | Lodging - Alan Tantleff 05/29/2019 - 05/30/2019. Hotel during Hermitage meeting | $259.00 |
| 05/30/19 | Lodging - Alan Tantleff 05/29/2019 - 05/30/2019. Sales, occupancy, city, state tax | $29.95 |
| 05/30/19 | Tips - (N-A), Alan Tantleff.  Cash tips to hotel staff during Hermitage meeting | $5.00 |
| | Total | $563.06 |

### Transportation

| | | |
|---|---|---:|
| 05/28/19 | Airfare - Coach/Economy, Michael Galardi, JFK - BTV, 05/30/2019 - 05/31/2019.  Flights to and from Burlington, VT for Hermitage Hearing | $399.44 |
| 05/28/19 | Travel Agent Fees - Michael Galardi. BCD Travel Fee | $12.50 |
| 05/29/19 | Taxi - Michael Galardi, 3 Times Square - JFK. Uber from office to JFK | $100.17 |
| 05/29/19 | Taxi - Michael Galardi, BVT - Burlington VT. Uber from Burlington Airport to Hotel | $12.82 |
| 05/29/19 | Taxi - Alan Tantleff, Pleasantville, NY - Metro North Station.  Taxi from home to train station with luggage for travel to Vermont for Hermitage | $15.00 |
| 05/29/19 | Taxi - Alan Tantleff, Times Square - JFK.  Taxi from office to JFK airport for flight to Vermont for Hermitage meeting | $72.09 |
| 05/29/19 | Airfare - Coach/Economy, Alan Tantleff, JFK - BTV, 05/29/2019 - 05/30/2019. Flight to Vermont for Hermitage meeting. Flight back to NYC after meeting. | $291.24 |
| 05/29/19 | Travel Agent Fees - Alan Tantleff.  BCD fee for flight to Vermont for Hermitage meeting. Flight back to NYC after meeting. | $12.50 |
| 05/29/19 | Taxi - Alan Tantleff, Airport - Hotel. Taxi from airport to hotel during Hermitage meeting | $23.00 |
| 05/30/19 | Taxi - Alan Tantleff, Hermitage - Airport.  Taxi from client meeting to Vermont airport | $18.86 |
| 05/30/19 | Taxi - Alan Tantleff, LGA - Times Square.  Taxi from LGA airport to office after Hermitage client meeting | $63.56 |
| 05/30/19 | Taxi - Michael Galardi, LGA - Home - 389 6th Ave.  Uber home from LGA after Hermitage Travel. | $60.12 |
| | Total | $1,081.30 |



**b.** **Berkshire Bank Statement – June 30, 2019**

# BERKSHIRE BANK

America's Most Exciting Bank
P.O. Box 1308, Pittsfield, MA 01202

**Statement of Account**

**Last statement:  May 31, 2019**
**This statement:  June 30, 2019**
**Total days in statement period: 30**

**Page 1 of 2**

Direct inquiries to:
800-773-5601    OR
BERKSHIREBANK.COM

FTI CONSULTING INC
ALAN TANTLEFF, AS RECEIVER
3 TIME SQ
NEW YORK NY 10036-6564

Berkshire Bank
PO Box 1308
Pittsfield, MA 01202-1308

0

## Summary of Account Balance

| Account | Number | Ending Balance |
|---|---|---|
| Business Checking 500 | | $97,773.17 |

## Business Checking 500

| Date | Description | Additions | Subtractions | Balance |
|---|---|---|---|---|
| 05-31 | Beginning balance | | | $65,364.42 |
| 06-04 | #ACH Debit | | -25.00 | 65,339.42 |
| | BERK CLIENT BILL BEB FEES 190604 | | | |
| 06-04 | #ACH Debit | | -132.68 | 65,206.74 |
| | SUBURBAN HEATING BILL PAYMT 051400503838444 | | | |
| 06-04 | #ACH Debit | | -189.52 | 65,017.22 |
| | SUBURBAN HEATING BILL PAYMT 051400503838448 | | | |
| 06-04 | #ACH Debit | | -323.41 | 64,693.81 |
| | SUBURBAN HEATING BILL PAYMT 051400503838447 | | | |
| 06-04 | #ACH Debit | | -452.62 | 64,241.19 |
| | SUBURBAN HEATING BILL PAYMT 051400503838446 | | | |
| 06-04 | #ACH Debit | | -6,033.17 | 58,208.02 |
| | SUBURBAN HEATING BILL PAYMT 051400503838445 | | | |
| 06-06 | #Wire Transfer-Out | | -14,988.95 | 43,219.07 |
| | OUTGOING WIRE BNF PAYCOM PAYROLLLLC;REF ;WIRE/OUT - 20191570057100 | | | |
| 06-06 | #Direct S/C - Fee | | -15.00 | 43,204.07 |
| | DOMESTIC WIRE OUT | | | |
| 06-11 | Check  140 | | -125.00 | 43,079.07 |
| 06-11 | Check  137 | | -815.00 | 42,264.07 |
| 06-11 | Check  136 | | -1,253.97 | 41,010.10 |
| 06-12 | Check  139 | | -3,551.00 | 37,459.10 |
| 06-13 | #Deposit | 77,000.00 | | 114,459.10 |
| | TLR 104 BR 6120 HERMITAGE | | | |
| 06-19 | Check  141 | | -209.85 | 114,249.25 |
| 06-19 | Check  144 | | -820.00 | 113,429.25 |

## IMPORTANT INFORMATION REGARDING THIS STATEMENT

PLEASE EXAMINE THIS STATEMENT AND ANY ENCLOSURES AT ONCE. This statement will be considered correct unless we are notified otherwise within 30 days from receipt of this statement.

NOTIFICATION OF CONSUMER CREDIT REPORT INACCURACY. The following is the address to which a consumer may write to notify the Bank of a dispute in completeness or accuracy of information reported by the Bank to a consumer credit reporting agency. Please include all details regarding the specific inaccuracy.

Berkshire Bank
Servicing Dept.
PO Box 1308
Pittsfield, MA 01202-1308

## BILLING RIGHTS SUMMARY

WHAT TO DO IF YOU THINK YOU FIND A MISTAKE ON YOUR STATEMENT OR NEED INFORMATION.

If you think there is an error on your statement or if you would like to request information regarding your account, write to us at:

Berkshire Bank
Loan Servicing Department
PO Box 1308
Pittsfield, MA 01202

In your letter, give us the following information:
- Account information: Your name and account number.
- Dollar amount: The dollar amount of the suspected error.
- Description of Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing.

You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

COMPUTATION OF AVERAGE DAILY BALANCE AND INTEREST CHARGE. We figure the interest charge on your account by applying the periodic rate to the "average daily balance" of your account. To get the "average daily balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total number of days in the billing cycle. This gives us the "average daily balance".

## ERROR RESOLUTION NOTICE – CONSUMER ACCOUNTS ONLY

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS. Telephone us toll-free in MA at 1-800-773-5601 or write us at BERKSHIRE BANK ATTN: ELECTRONIC BANKING , P.O. BOX 1308, PITTSFIELD MA 01202-1308, as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you this FIRST statement on which the error or problem appeared.
- Tell us your name and account number (if any).
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

## TO BALANCE YOUR ACCOUNT

| OUTSTANDING DRAFTS | |
|---|---|
| NO. | AMOUNT |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Total Enter in Step 9 | |

1. Deduct from your checkbook balance any service charge or other charge originated by us.

2. If this is an interest bearing account, add interest posted on this statement to your checkbook balance.

3. Place a mark in your checkbook next to each paid check.

4. List in the "outstanding drafts" section at left any drafts issued by you and not yet paid by us.

5. Add to your checkbook Reddi-Cash deposits identified as "LOC LOAN" in the checking account portion of the statement.

6. Enter here the current balance as shown by bank statement.............

7. Enter here all deposits made not shown on bank statement.............

8. Add amount in "step 6" to amount in "step 7" and enter total here.......

9. Enter total amount of outstanding drafts.............................................

10. Subtract amount in "step 9" from amount in "step 8" and enter result (balance in "step 10" should agree with your check book balance).......

Member FDIC

BERKSHIRE BANK

America's Most Exciting Bank®
P.O. Box 1308, Pittsfield, MA 01202

**June 30, 2019  Page 2**
**of 2**
**FTI CONSULTING INC**

| Date | Description | Additions | Subtractions | Balance |
|---|---|---|---|---|
| 06-19 | #Wire Transfer-Out | | -14,843.70 | 98,585.55 |
| | OUTGOING WIRE BNF PAYCOM PAYROLLLLC:REF ;WIRE/OUT | | | |
| | - 20191700112400 | | | |
| 06-19 | #Direct S/C - Fee | | -15.00 | 98,570.55 |
| | DOMESTIC WIRE OUT | | | |
| 06-21 | Check  138 | | -185.34 | 98,385.21 |
| 06-21 | Check  143 | | -302.04 | 98,083.17 |
| 06-21 | Check  142 | | -310.00 | 97,773.17 |
| 06-30 | **Ending totals** | **77,000.00** | **- 44,591.25** | **$97,773.17** |

**CHECKS**

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 136 | 06-11 | 1,253.97 | 141 | 06-19 | 209.85 |
| 137 | 06-11 | 815.00 | 142 | 06-21 | 310.00 |
| 138 | 06-21 | 185.34 | 143 | 06-21 | 302.04 |
| 139 | 06-12 | 3,551.00 | 144 | 06-19 | 820.00 |
| 140 | 06-11 | 125.00 | | | |

**c.    Photographs of Books and Records**











